UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
ex rel. Carlos Urquilla-Diaz, Relator,
Jude Gillespie, Relator,
Ben Wilcox, Relator;



Civil Action No. 8:07cv 669-T23TGW

FILED IN CAMERA AND
UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)

v.

Kaplan University a/k/a
Kaplan College a/k/a/ Iowa
College Acquisition Corporation;
Kaplan Higher Education Corporation,
a division of Kaplan, Inc.,
a wholly owned subsidiary of the
Washington Post Company;

Defendants.
_____/

COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT

Plaintiffs and Relators Jude Gillespie, Carlos Urquilla-Diaz, and Ben Wilcox allege as follows:

### I. Introduction

1. (a) This is an action to recover damages and civil penalties on behalf of the United States of America, arising out of false claims approved and presented by

Defendants to obtain over one-half billion dollars annually from the United States Department of Education pursuant to the Higher Education Act, Title IV ("HEA"), from at least January 1, 1999 continually through the present.

(b) Defendant Kaplan University (hereafter known as Kaplan) is one of the largest recipients of HEA federal student financial aid funds from the United States Department of Education.

(c) In requesting and receiving at least one-half billion dollars annually, Defendants falsely represent every year that they are in compliance with HEA's and all of the Federal regulations that are required for eligibility of the Title IV funds.

(d) Defendants had, and continue to have, actual knowledge that they are not adhering to the HEA regulations that their representations of adherence were and are false, and that they therefore were and are submitting false or fraudulent representations of compliance.

(e) Alternatively, Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims. (f) Relators assert causes of action under the False Claims Act for submission of a knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1) and (2).

## II. Jurisdiction and Venue

2. (a) This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq., and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

    (b) This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the United States of Department of Education pursuant to the Higher Education Act, Title IV.

3. This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

4. (a) 31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any proscribed by section 3729 occurred."

    (b) Venue is proper in the Middle District of Florida because Defendants maintain and operate some of its offices within this District; or conducted business within

the counties comprising this District; and/or

(c) Defendant received financial aid on behalf of students enrolled the Kaplan's facility who resided in counties within this District (Hillsborough, Pinellas, etc.).

### III. Plaintiffs

5. (a) *Qui Tam* Plaintiffs Jude Gillespie (Hereafter "Gillespie") is a citizen of the United States of America and is a resident of Dade County, in the State of Florida.

    (b) Gillespie has worked for defendant Kaplan from August 2004 through April 2005 as a Department Chairman and a Professor of Paralegal Studies at defendant's South Florida campus in Ft. Lauderdale.

    (c) Gillespie brings this action on behalf of the United States of America.

6. (a) *Qui Tam* Plaintiff Carlos Urquilla-Diaz (hereinafter "Diaz") is a citizen of the United States of America and is a resident of Kansas.

    (b) Diaz has worked for defendant Kaplan beginning in April 2005 as a Director of the School within a School Program. He eventually worked as a Professor teaching courses online, and at the offices in Chicago and Ft. Lauderdale.

    (c) Diaz brings this action on behalf of the United States of America.

7. (a) Qui Tam Plaintiff Ben Wilcox (hereinafter "Wilcox") is a citizen of the United States of America, and is a resident of Illinois.

    (b) Wilcox is a former Dean of Kaplan University.

    (c) Wilcox brings this action on behalf of the United States of America

8. (a) As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relators, simultaneously with or prior to the filing of this Complaint, provided to the United States Attorney for the Middle District of Florida and the Department of Justice a statement of all material evidence and information related to this Complaint.

    (b) This disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act (31 U.S.C. §3729(a)(1)).

9. The United States of America is here named a plaintiff because funds of the United States of America ("Federal funds") were and are awarded to defendant Kaplan, pursuant to the HEA, Title IV, as a result of the false claims alleged in

this Complaint.

## IV. Defendants

10. (a) Defendant Kaplan is one of the nation's largest private, for-profit higher education institution providing educational programs for working adult students.

    (b) Kaplan maintains online campuses throughout the country, including its Ft. Lauderdale campus located within the jurisdiction of this Court.

    (c) Kaplan has approximately 79 campuses nationwide and an online program, enrolling approximately 25,000 students.

    (d) Each campus has multiple sites, also known as learning centers.

    (e) The bulk of Kaplan's revenue arises from its online programs,

    (f) Kaplan purchased Quest College in Davenport, Iowa in order to get into the online education business.

    (g) Kaplan is accredited by the Higher Learning Commission and is a member of the North Central Association of Colleges and Schools.

    (h) Through its online program and learning centers, Kaplan offers certificate programs, graduate, and undergraduate degree programs.

11. (a) Relators are unaware of the true names and capacities of the Defendants sued as does 1 through 50.

    (b) Plaintiffs will amend their complaint when the true names and capacities have been ascertained.

    (c) Each Doe Defendant is responsible in some actionable manner for the events, occurrences, injuries and damages alleged herein.

12. The terms "Defendants" will refer collectively to the aforesaid Defendants acting by and through their managerial employees, and each of them.

13. Managerial employees of the Defendants, in doing the acts and things described in this complaint, were acting within the course and scope of their respective agencies and/or employment with the Defendants, and each of them, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

14. At all relevant times each Defendant was the authorized agent of each other Defendant.

### V. Specific False Claims and Fraudulent Statements
### A. Summary of the Fraudulent Conduct

15. (a) HEA, Title IV, requires all colleges and universities to certify annually that they are in compliance with all Federal regulations, Federal laws, State laws, and that they meet the proper requirements of the accrediting agency in order to receive the Federal financial student loans.

16. (a) The United States Government awards approximately $6 billion a year to help students obtain their educations at colleges and vocational schools.

    (b) The federal funds, however do not go to the students.

    (c) Instead, the educational institution requests the funds of the United States Department of Education or a third party intermediary lender.

    (d) The United States Government or the lender wires the funds directly into the institutions' accounts.

    (e) The institutions then credit their students for tuition.

17. (a) Students are responsible for paying back the United States Government once they graduate or stop attending the university.

    (b) Students disqualified from a university must still repay the federal loans.

    (c) These students, unable to complete their education and obtain a decent paying job to repay their federal loans, are forced into dire financial situations.

    (d) Or, rather than being dropped from Kaplan, Kaplan requires the students to take additional courses, costing them on average $1,000 per course.

    (e) The institutions, meanwhile, retain the fraudulently obtained federal funds.

    (f) To boost its enrollment numbers, Kaplan urges enrollment counselors to enroll students without reviewing their transcripts to determine their academic qualifications to attend the university.

    (g) This process leads to student disqualification from Kaplan (or additional financial costs for the students to take additional classes) and financial disaster for the students forced to repay the federal loans while Kaplan collects the federal

funds for these fraudulently "enrolled" students.

18. (a) One of the requirements that a university must have in place is a program that complies with Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794 (b)(2), and Title I of the Americans with Disabilities Act, 42 U.S.C. Sections 12101-12117.

(b) Kaplan University / Kaplan Higher Education Corporation / Kaplan Inc. / must be compliant under U.S.C. Section 794 (b)(3)(A)(ii), in order for a division to receive Federal financial assistance.

(c) Kaplan and the EEOC entered into a resolution agreement in 2005 or 2006 which Kaplan would become compliant. However, to the best of Gillespie's knowledge Kaplan has failed to become compliant with this provision as of yet.

(d) As a result of Kaplan's failure to meet the compliance requirements, it is not entitled to receive Federal financial assistance.

(e) Any monies received by Kaplan while they are out of compliance would be received under false pretenses.

19. (a) The upper level management of Kaplan's online School of Paralegal Studies put pressure on the professors and the department chairmen to keep the students enrolled, even if work was not turned in, or they had bad grades.

(b) Dean Connie Bosse noted in her email to the department chairmen that given a "C" for no work was not the best idea.

(c) There was emphasis by upper management to give higher, unearned grades in order to keep students enrolled.

(d) Upper management also pressured department chairs not to renew the contract of those professors who did not grade leniently.

(e) Professors were graded on a student survey, which was basically a popularity contest based on the grades the student's received.

(f) Upper management put emphasis on doing whatever was necessary to keep the students enrolled, so the cash flow would continue to come to Kaplan.

(g) Counselors would recruit minority students who were not qualified for college, as they either did not take the SAT exam, or received poor grades on the exam.

(h) A key tactic used by Kaplan was to recruit "at risk students" who would most

likely fail in a traditional classroom, based on Kaplan's research.

(i) Kaplan would attempt to assure students that they would do fine in the online courses, when in fact, Kaplan knew that the students were not prepared to enter that academic program.

(j) When the students failed courses, Kaplan kept re-enrolling the students until the Federal financial aid was cut off. It was only then that Kaplan would dismiss the student.

### Scheme Inducing Students to Misuse Funds

20. (a) Kaplan would pursue "at risk" students and inform them that the US Government would give them loans that would not have to be repaid for some time, and that they could use the funds leftover after tuition was paid in any way they wished.

(b) The fraud is then perpetrated when the student uses some of the loan money to buy a car, and does not even go to class.

(c) Kaplan had an informal referral system due to students telling their friends about how easy it was to get these loans, and then not have to go to class.

(d) Kaplan knew that many of these students would be very unlikely to meet the course requirements and obtain a job in that particular field, yet Kaplan continued to encourage the enrollment and improperly kept its share of the money for huge profits.

### Online Diploma Mill

21. (a) Kaplan attempted to make the courses so easy that no one would fail them.

(b) The curriculum did not prepare the student to acquire a job, and failed to prepare them for the job itself.

(C) An employer would find out within just a few days that the so-called diploma and / or degree from Kaplan was provided to the student without requiring the student to demonstrate the proficiency level to obtain the degree.

(d) If a student obtained a degree, when the employer tested a potential employee, the new graduate would not have adequate skills that they should have acquired in obtaining that degree.

(e) As a result, the new graduate would either not obtain the job, or not be able to maintain it.

## Violations of the 90/10 Rule

22. (a) In order for the institution to be eligible to receive Federal financial aid, the institution must comply with the 90/10 Rule.

    (b) To qualify for the Rule, the institution must receive at least 10% of the student's tuition funds in cash, rather than student loans.

    (c) If the institution receives more than 90% of its income from student loans, it is no longer eligible to receive Title IV funds.

    (d) In violation of this Rule, Kaplan pays its employees to become students at Kaplan University to give the appearance that Kaplan is meeting the Rule.

## Falsified Documents for Accreditation

23. (a) Kaplan University officials, with the approval of the upper management, falsified documents which were presented to the HLC for accreditation for certain college degree programs.

    (b) Kaplan knew that without the falsified documents, it would not receive the accreditation it desired.

    (c) After receiving the false accreditation, Kaplan applied for Federal financial aid for its students in those degree programs.

    (d) Kaplan continues to receive the Federal funds under false pretenses.

## Kaplan's False Certifications of Compliance to the Government, Required by Law for Eligibility to Receive the Federal Funds

24. (a) Educational institutions request Title IV funds for eligible students through several programs, including the Federal Pell Grant Program ("Pell"), the Federal Supplemental Educational Opportunity Grant Program ("FSEOG"), the Federal Perkins Loan Program ("Perkins") and the Federal Family Education Loan Program ("FFELP").

25. (a) For an educational institution to be eligible to receive these Title IV grant funds, the federal statutes and regulations require the institution to certify to the United StatesGovernment that the institution will comply with the HEA and DOE requirements through a Program Participation Agreement ("Agreement"). HEA, Sec. 487(a) and (a)(20); 34 C.F.R. Sec. 668.14(a)(1) and (b)(22)). This certification is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

26. (a) An educational institution is ineligible to receive Title IV funds without the Agreement certification of compliance with the HEA and DOE requirements.

    (b) The Agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program.

    (c) The Agreement expressly states, in bold print, highlighted in a box on the first page: The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program.

27. The Agreement's first paragraph furthermore provides that the institution's participation in the Title IV program is "subject to the terms and conditions of this Agreement."

28. (a) One of the "terms and conditions" of the Agreement is the HEA and DOE requirements.

    (b) In the Agreement, the educational institution certifies that "[i]t will not provide . . . any commission, bonus or other incentive payment based directly or I indirectly on success in securing enrollments . . . (Agreement, p. 5, para. 22, quoting directly from the HEA, Sec. 487(a)(2) and the federal regulations, 34 C.F.R. Sec. 668.14(b)(22)).

29. (a) Educational institutions violating the HEA and DOE requirements must return the Title IV funds, along with interest and special costs incurred by the DOE.

30. (a) Kaplan, in requesting and receiving its over one-half billion dollars a year in Title IV funds, every year falsely certifies to the DOE compliance with the HEA and DOE requirements in the Agreement it submits annually to the DOE.

    (b) Kaplan falsely induces the Government to approve and/or pay out the Title IV funds, based on its false promises to comply with the HEA and DOE requirements.

(c) The promises when made are false.

(d) Upon making its promises and certifications, Kaplan knowingly engages in the illegal incentive compensation schemes detailed below.

31. (a) Kaplan every year also falsely asserts compliance with the incentive compensation ban in "management assertion letters" written by Kaplan management for an annual compliance audit.

(b) Kaplan must submit to the United States Government this annual compliance audit performed by an independent certified public accountant.

(c) Participation in the Title IV program is conditioned upon Kaplan submitting these audits certifying compliance with the HEA HEA and DOE requirements.

(d) Kaplan is ineligible to submit any claims for HEA funds unless it submits this annual audit.

32. (a) As a required part of the audit, Kaplan certifies in a management assertion letter that it had "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . for each year at issue."

(b) Kaplan knows this certification is false because Kaplan intentionally violates the incentive compensation ban, by providing trips and club rewards to the highest producing enrollment counselors.

**Kaplan's Claims for the Federal Government**

33. (a) Upon entering the Program Participation Agreement with the United States Secretary of Education, Kaplan is eligible to request the Title IV funds from the United States Secretary of Education (for Pell Grant funds) or from third party lenders (for government-insured loans).

34. (a) For Pell Grant funds, Kaplan submits a request for those funds directly to the Secretary of the United States Department of Education.

(b) The request for funds is not a student application but a request prepared and transmitted by Kaplan to the Secretary of the United States Department of Education, stating the requested amount of funds.

(c) The United States Department of Education transfers the Pell Grant funds electronically directly into a Kaplan account.

(d) Upon receiving the Pell Grant funds, Kaplan credits various Kaplan students

for tuition paid.

(e) A Kaplan student does not request or receive a dime of the Pell Grant funds.

35. (a) Kaplan's claims for the Pell Grant funds are fraudulent.

(b) When Kaplan requests, receives and retains the Pell Grant funds, Kaplan knows it is ineligible for those funds because of its intentional violations of the Higher Education Act HEA and DOE requirements.

(c) Kaplan knows that compliance with the Higher Education Act funding statute incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

36. (a) For government-insured loans, including the FFELP, Kaplan submits the request for those funds directly to a private lender.

(b) The Kaplan request for government-insured loan funds, arranged, managed and prepared by Kaplan, includes a student application that *contains an express certification by Kaplan that the student is an eligible student under the Title IV program.*

(c) The claim for government-insured loans *must* include this Kaplan certification.

(d) Kaplan knows that this claim for funds is false because Kaplan knows its students are *not* eligible under the Title IV program due to Kaplan's violations of the HEA HEA and DOE requirements.

(e) *Only* students at eligible Title IV schools may receive credit for Title IV government-insured loan funds disbursed by private lenders to educational institutions.

(f) Kaplan's fraudulent violations of the HEA and DOE requirements make it an ineligible educational institution to request and disburse Title IV funds, and thus its students are ineligible under the Title IV program.

(g) The lender, typically a bank, transfers the government-insured loan funds directly into a Kaplan account.

(h) Upon receiving the government-insured loan funds, Kaplan credits various Kaplan students for tuition paid.

37. (a) Kaplan's claims for the government-insured loan funds are fraudulent.

(b) When Kaplan requests, receives and retains the government-insured loan

funds, Kaplan knows it is ineligible for those funds because of its intentional violations of the Higher Education Act HEA and DOE requirements.

(c) Kaplan knows that compliance with the Higher Education Act funding statute incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

38. (a) The United States Government pays all interest on the government-insured loans while the students are enrolled in classes and during authorized grace periods.

(b) The loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"), and are subsidized and reinsured by the United States Department of Education.

(c) If a student defaults, the guarantee agency reimburses the lender.

(d) If the guarantee agency cannot collect from the student, the Department of Education reimburses the agency.

39. (a) The United States Department of Education monitors loan defaults of postsecondary schools and calculates a "cohort default rate" every year for Kaplan.

(b) The Department of Education calculates the loss to the United States Government relying upon this rate.

### Enrollment Counselors Are Rewarded with Trips, Gifts and Contest Awards

40. Kaplan rewards the enrollment counselors by providing trips to exotic resorts, free membership in certain clubs, and provides other contest awards.

### Kaplan Pressure to Enroll Students Who Could not Qualify

41. Kaplan pressured its enrollment counselors to recruit students who would not qualify under normal standards.

### First Cause of Action:

### Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.SC. § 3729(a)(1)

42. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through 41 herein.

43. In performing all of the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(3)), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

44. (a) Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1, 1999, through the present.

### Second Cause of Action:
### Knowingly Filing False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(2)

45. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through 44 herein.

46. By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(2)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

47. Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1, 1999, through the present.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00), and not more than Ten Thousand Dollars ($10,000.00), for each violation, plus three times the amount of damages which the United States Government has sustained, pursuant to 31 U.S.C. § 3729(a);

2. Award to Relators, as the *Qui Tam* plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

3. Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

4. Punitive damages on all causes of action, to the extent allowable by law; and

5. Such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to FRCP 38.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to the following with the original to the Clerk of Court this __15__ day of __Aug__, 2007:

Attorney General
U.S. Dept. of Justice
Washington, D.C. 20530

United States Attorney **(BY HAND DELIVERY)**

Middle District of Florida
Attn: Whitney Schmidt
Assistant U.S. Attorney
400 N. Tampa St. Suite 3200
Tampa, FL 33602

_____
J. TROY ANDREWS, ESQ.
Florida Bar # 105635
hangfire@ix.netcom.com
JOHN W. ANDREWS, ESQ.
Florida Bar #178531
jwa@ix.netcom.com
ANDREWS LAW GROUP
3220 Henderson Blvd.
Tampa, Florida 33609
Telephone: (813) 877-1867
Fax: (813) 872-8298
andrewslawgroup@ix.netcom.com
Attorneys for Plaintiffs/Relators