**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. CARLOS URQUILLA-DIAZ *et al.*, | |
| Plaintiff, | Case No. 8:07cv669-T23TGW |
| v. | |
| KAPLAN UNIVERSITY *et al.*, | **DISPOSITIVE MOTION** |
| Defendants. | |

**DEFENDANTS KAPLAN UNIVERSITY AND KAPLAN HIGHER**
**EDUCATION CORPORATION'S MOTION TO DISMISS RELATORS' FIRST**
**AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendants Kaplan University ("Kaplan" or "University") and Kaplan Higher Education Corporation (collectively, "Defendants") move to dismiss the First Amended Complaint For Damages And Other Relief Under The False Claims Act ("Complaint" or "AC") filed by Relators Jude Gillespie, Carlos Urquilla-Diaz, and Ben Wilcox (collectively, "Relators") for failure to state a claim upon which relief can be granted, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

**MEMORANDUM OF LAW**

**I.   INTRODUCTION AND SUMMARY OF ARGUMENT**

The False Claims Act ("FCA") was never intended to provide a disgruntled party a vehicle for complaining about any grievance – real or perceived – that he might have against his employer.  Rather, it is a fraud statute, meant to prohibit a recipient of federal funding from knowingly submitting a false or fraudulent claim for payment to the government.

Nevertheless, in this *qui tam* action, Relators attempt to sue Kaplan University under the FCA for a whole variety of purported misconduct, from enrolling "unqualified" students to inflating grades to "illegally" compensating its employees. These alleged grievances are not only inadequately alleged, they have nothing to do with the submission of false claims. Relators' causes of action fail for several reasons.

First, Relators have not adequately alleged that Kaplan engaged in any conduct that is in violation of any statutory or regulatory obligation with which it must comply. Moreover, because Rule 9(b) applies to their claims, Relators must allege such misconduct with particularity. Yet Relators' allegations on this front are vague, conclusory, and insufficient.

Second, Relators' theory of FCA liability fails as matter of law. Styling this as a "false certification" case, Relators contend that Kaplan's purported misconduct is actionable under the FCA because Kaplan "falsely certified" compliance with laws and rules prohibiting the alleged misconduct in Program Participation Agreements ("PPAs") that Kaplan entered into with the U.S. Department of Education ("ED") in order to participate in Title IV, Higher Education Act ("Title IV") programs and in "management assertion letters" that Kaplan submitted to its independent auditors. Relators contend that this rendered "false or fraudulent" all of the Title IV federal student financial aid received by Kaplan's students.

This is not the first time that this theory of liability has been raised in connection with FCA actions brought against educational institutions. In fact, over the last few years, at least six district courts across the country have dismissed FCA claims against schools based on the exact same theory of FCA liability. Three of these cases were affirmed by the Fifth Circuit (one was reversed by the Ninth Circuit). Kaplan urges this Court to follow the well-reasoned

decisions from the Fifth Circuit and the other district courts, and find that Relators' theory fails as a matter of law.  As explained below, the holdings of these courts are consistent with the FCA's purposes and prevent the type of lawsuit we have here, where Relators are attempting to inappropriately convert what is at most a routine regulatory compliance matter into a multi-billion dollar case of fraud under the FCA.

Finally, relator Diaz's "retaliation" claim fails because Diaz has not alleged that he engaged in any "protected conduct" under the FCA that led to his being fired.

## II.  FACTUAL BACKGROUND

### A.  Kaplan University

Kaplan University is an institution of higher learning dedicated to providing undergraduate, graduate, and continuing professional education.  It is accredited by the Higher Learning Commission and is a member of the North Central Association of Colleges and Schools.  AC ¶ 10(g).  Relators allege that Kaplan maintains an online campus, as well as approximately 79 campuses nationwide, enrolling 25,000 students.  *Id.* ¶ 10(c).

### B.  Relators' Allegations

#### 1.  The Alleged Underlying Misconduct

Relators Jude Gillespie and Carlos Urquilla-Diaz worked at Kaplan's Fort Lauderdale location as Department Chairs and Professors of Paralegal Studies for approximately eight months, from August 2004 to April 2005, prior to being fired.  *Id.* ¶¶ 5(b), 6(b).  Since that time, they have filed a series of unsuccessful complaints and lawsuits against Kaplan.[1]

---

[1]   Gillespie, for example, filed an unsuccessful complaint against Kaplan with ED complaining that Kaplan failed to accommodate his Bipolar Disorder, Ex. H at 3; a lawsuit against ED alleging that ED "conspire[d] with [Footnote continued on next page]

Relator Ben Wilcox is a former Dean for Kaplan, although Relators do not allege when or where he worked.  *Id.* ¶ 7(b).  On March 27, 2008, Wilcox was indicted by a federal grand jury in Illinois for committing crimes against the University and its staff.  Ex. N.[2]

Relators' Complaint purports to allege that Kaplan has engaged in various violations of the Higher Education Act ("HEA") and ED requirements.  Among other things, Relators vaguely allege that Kaplan:  enrolled "unqualified" students, AC ¶¶ 17, 41; has not "yet" become "compliant" with a EEOC resolution agreement, *id.* ¶ 18; "pressure[d]" professors to inflate grades and re-enrolled failing students, *id.* ¶ 19; informed students that they could use their remaining Title IV funding "in any way they wished," *id.* ¶ 20; had an inadequate curriculum, *id.* ¶ 21; violated the "90/10 Rule," *id.* ¶ 22; falsified unidentified documents given to accreditors, *id.* ¶ 23; and provided prohibited incentive compensation, *id.* ¶¶ 32(b), 40.  In general, Relators do not identify what requirements this alleged conduct violated, who engaged in it, what it included, where it happened, or when it occurred.

### 2.    Relators' Theories of FCA Liability

Relators allege that the "false claims" in this FCA case are the requests for Title IV federal student financial aid made for Kaplan's students.  *Id.* ¶¶ 33-37.[3]  Relators therefore

---

[Footnote continued from previous page]
Kaplan . . . to deny [him] relief," Ex. I ¶ 65; an unsuccessful complaint against Kaplan with the EEOC, Ex. J; and two lawsuits against Kaplan dismissed for failure to prosecute, Ex. K.  Diaz, like Gillespie, filed an unsuccessful complaint against Kaplan with the EEOC, Ex. L, and more recently filed a pending lawsuit against Kaplan where he also names relator Wilcox as a defendant, *id.* Ex M.

[2]    The indictment charges Wilcox with illegally accessing Kaplan's email system and sending false email messages to students and faculty stating, among other things, that students' personal information had been compromised and would be used to open gambling accounts.  Ex. N.  The indictment also charges Wilcox with two counts of transmitting a "communication containing a threat to injure the person of another."  *Id.* at 4, 6.

purport to seek as damages all federal financial aid received by Kaplan's students "from January 1, 1999 continually through the present." *Id.* ¶ 1(b); *see also id.* ¶¶ 44(a), 47(a). Relators allege this amounts to "over one-half billion dollars annually." *Id.* ¶ 1(b).

Relators claim that the Title IV financial aid received by Kaplan's students was rendered "false or fraudulent" by the purported misconduct listed above because such misconduct demonstrates that Kaplan "falsely certified" compliance with the law to the government. *Id.* ¶¶ 24-32; *see also id.* ¶ 1(c). Relators rely upon two such "false certifications." First, they point to PPAs, which all schools are required to sign to become eligible to participate in Title IV programs. *Id.* ¶¶ 25-30. Second, they point to "management assertion letters," which Kaplan provides to its independent auditors to assist them in annual Title IV compliance audits. *Id.* ¶¶ 31-32.

### 3.   Diaz's Retaliation Claim

Diaz also asserts a claim for retaliation. *Id.* ¶¶ 48-51. With respect to this claim, Diaz alleges he was fired after notifying Kaplan of concerns he had with its interactions with its accreditor, "the way [it] recruited students," and "other potential violations," and after he notified Kaplan he was going to inform the "authorities of Kaplan's wrongful deeds." *Id.*

---

[Footnote continued from previous page]

[3]    Relators sue Kaplan under 31 U.S.C. §§ 3729(a)(1) and (a)(2), which prohibit the knowing presentation of a false or fraudulent claim for payment to the government, and the knowing use of a false record or statement to get a false or fraudulent claim paid by the government. AC ¶¶ 42-47.

### C.   Procedural History

Relators filed the instant Complaint on May 17, 2007.  On January 10, 2008, the

United States Government – after investigating Relators' allegations – declined to intervene,

leaving Relators to pursue this matter on their own.

## III.   RELATORS HAVE FAILED TO STATE A CLAIM UNDER THE FCA AND THEIR COMPLAINT MUST BE DISMISSED

Under Rule 12(b)(6), a complaint should be dismissed if the plaintiff has failed to

plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp.*

*v. Twombly*, 127 S. Ct. 1955, 1974 (2007).  This rule should be applied to prevent "a plaintiff

with a largely groundless claim" from being given an undeserved ticket to the discovery

process where he can "take up the time of a number of other people, with the right to do so

representing an *in terrorem* increment of the settlement value."  *Id.* at 1966.

### A.   Relators Cannot Sustain An FCA Case Because They Fail To Allege That Kaplan Engaged In Any Underlying Illegal Conduct

In support of their theory of FCA liability – that Kaplan submitted false claims to the

government because it "falsely certified" compliance with various purported HEA and ED

requirements – Relators advance a smorgasbord of purported "misconduct."  *See* AC ¶¶ 17-

23, 32, 40-41.  Relators, however, have failed to adequately allege that any of the conduct

purportedly engaged in by Kaplan was in violation of any HEA or ED requirement, thereby

dooming their "false certification" claims.  *See, e.g.*, *United States ex rel. Willard v. Humana*

*Health Plan of Texas Inc.*, 336 F.3d 375, 383 (5th Cir. 2003) (false certification claims

dismissed due to failure to adequately allege underlying violation).

Moreover, because the FCA is a fraud statute, Relators must allege these underlying violations with the particularity required by Rule 9(b). *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308-09 (11th Cir. 2002) (Rule 9(b) applies to FCA claims). *See, e.g.*, *United States ex rel. Bott v. Silicon Valley Colleges*, No. 06-15423, 2008 U.S. App. LEXIS 381 (9th Cir. Jan. 4, 2008) (dismissing FCA claims against school for relators' failure to allege underlying illegal conduct with particularity); *United States v. Capital Group Health Servs. of Fla., Inc.,* No. 4:02cv389-RH/WCS, 2005 U.S. Dist. LEXIS 45814, at *12-13 (N.D. Fla. July 7, 2005) (dismissing FCA claims for same reason). For the reasons set forth below, Relators have not, and cannot satisfy Rule 9(b).

### 1. Relators Fail To Identify Statutory or Regulatory Requirements That Were Purportedly Violated

At the very least, Relators must identify the statutes, regulations, or requirements that Kaplan allegedly violated. *United States ex rel. LaCorte v. SmithKline Beacham Clinical Lab., Inc.*, No. 96-1380 C/W 97-942 Section "R," 1999 U.S. Dist. LEXIS 13036, at *30 (E.D. La. Aug. 19, 1999) (dismissing FCA claim because relator "cites no statute or regulation imposing the obligation it asserts defendant has breached"); *see also Barys ex rel. United States v. Vitas Healthcare Corp.*, No. 04-21431-CIV-Jordan/Torres, 2007 U.S. Dist. LEXIS 62293, at *17 (S.D. Fla. June 24, 2007) (dismissing FCA claim because "none of the [alleged] procedures . . . appear contrary to [the] . . . regulations"). But here, in paragraphs 17, 19, 20, and 21 of the Complaint, Relators fail to identify or cite to any legal requirement that the conduct alleged in those paragraphs purportedly violated.

In fact, many of the allegations contained in these paragraphs relate to purely pedagogical matters, such as Kaplan's grading and admissions standards, the quality and

structure of its educational programs, and personnel decisions, including how professors are evaluated.  These are topics that Relators can not – and should not – be able to "regulate" through the FCA, lest established principles of academic freedom be undermined.  *See United States ex rel. Swan v. Covenant Care, Inc.*, 279 F. Supp. 2d 1212, 1222 (E.D. Cal. 2002) (dismissing FCA action because it would supplant regulatory discretion provided to federal agency).[4]

Because Relators have failed to allege any violation of federal law, they can under no circumstances establish that Kaplan submitted a "false or fraudulent" claim with respect to the allegations in paragraphs 17, 19, 20, and 21.

### 2.  Relators Fail To Satisfy Rule 9(b) With Respect To Their Allegations Of Kaplan's Underlying Misconduct

As recognized by this Court, even under Rule 8(a), "[t]he complaint must include 'factual allegations adequate to raise a right to relief above the speculative level.'"  *Bank Hapoalim (Switzerland) Ltd. v. xG Tech., Inc.*, No. 8:07-cv-170-T-23MSS, 2008 WL 126583, at *1 (M.D. Fla. Jan. 10, 2008) (Merryday, J.) (quoting *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1310 (11th Cir. 2007)).  "Stated differently, the factual allegations in a complaint must possess enough heft to set forth a plausible entitlement to relief."  *Id.* (quotations and citations omitted).  Relators' allegations of Kaplan's purported underlying misconduct fail to meet this bedrock standard.

---

[4]    Indeed, the government itself is precluded from regulating many of these topics.  *See* 20 U.S.C. § 1232a ("No provision of any applicable program shall be construed to authorize any department . . . of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution . . ., or over the selection of library resources, [Footnote continued on next page]

To take but one example, in paragraph 18 of the Complaint, Relators appear to allege that Kaplan and the EEOC entered into a resolution agreement "in 2005 or 2006," apparently with respect to the Rehabilitation Act or the ADA, and that "to the best of Gillespie's knowledge, Kaplan has failed to become compliant with this provision as of yet."  AC ¶ 18(c).  That is basically it.  There are no allegations as to what this resolution agreement specifically required, which provisions of it (or of the Rehabilitation Act or the ADA) Kaplan is "yet" to comply with, how Kaplan is not in compliance, or any basis for Gillespie's vague allegations.  These allegations, like the other allegations of Kaplan's purported underlying misconduct, simply do not "raise a right to relief above the speculative level" and should not give Relators an undeserved ticket to the discovery process.

Nor do any of Relators' allegations regarding Kaplan's underlying misconduct even approach the particularity required by Rule 9(b).  As the Eleventh Circuit has recognized, Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior."  *Clausen*, 290 F.3d at 1310 (quotations omitted). Moreover, as the Eleventh Circuit has stated, it is "especially important" that Rule 9(b) be applied with diligence in FCA cases because "of the quasi-criminal nature of FCA violations (i.e., a violator is liable for treble damages)," and to "ensure[] that the relator's strong financial incentive to bring an FCA claim – the possibility of recovering between fifteen and

---

[Footnote continued from previous page]
textbooks, or other printed or published instructional materials by any educational institution . . . ."); *see also id.* § 3403(b) (similar restrictions on ED's authority).

thirty percent of a treble damages award – does not precipitate the filing of frivolous suits." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

One quick read of Relators' Complaint demonstrates that these concerns are in play here. Relators are disgruntled, former employees of Kaplan who, by their own words, are seeking to "destroy" the University.[5] Yet Relators' Complaint is scattershot at best and throws a variety of vague and conclusory accusations against the wall, apparently in the hope that "something sticks." Relators' claims must be dismissed because Relators have not and cannot satisfy Rule 9(b)'s requirement that they plead the "who," "what," "where," "when," and "how" of Kaplan's alleged misconduct. *Corsello v. Lincare Holdings, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). *See also Clausen*, 290 F.3d at 1310 (relator "must plead facts as to time, place, and substance of defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them") (quotations omitted).

"Who": Relators do not plead the names of any people involved in any of the alleged misconduct. Instead, they merely allege, for example, that "Kaplan" urged "enrollment counselors" to engage in conduct and would tell "students" how they could use their financial aid, AC ¶¶ 17(f), 20(a); that "upper level management" at the School of Paralegal Studies pressured "professors," *id.* ¶ 19(a); that "Kaplan" pays "employees" to become students and gave trips to "the highest producing enrollment counselors," *id.* ¶¶ 22(d), 32(b); and that

---

[5]    *See* Motion to Disqualify Relators' Counsel, Ex. C at 3, 11 (Aug. 25, 2006 email from Diaz to Wilcox). As made clear in that motion, Diaz and Wilcox have engaged in various nefarious conduct in an attempt to damage the University. Among other things, Diaz has sued Wilcox in another matter as one of the defendants [Footnote continued on next page]

Kaplan "officials," with the approval of "upper management," falsified documents, *id.* ¶ 23(a). These types of allegations are insufficient. *See, e.g.*, *United States ex rel. Carroll v. JFK Med. Ctr.*, No. 01-8158-CIV-RYSKAMP, 2002 U.S. Dist. LEXIS 28169, at *15 (S.D. Fla. Nov. 18, 2002) ("Regarding corporate defendants the complaint should specify who their representatives were who took part in the alleged unlawful enterprise.") (quotations and citations omitted); *see also id.* at *16 ("broad references to 'nurses,' 'clerk staff personnel,' 'financial personnel,' and 'defendant physicians' are not sufficient[]").[6]

"What": Similarly, Relators do not provide any specifics regarding what any of the purported misconduct consisted of. For instance, although Relators vaguely allege that "Kaplan" told "students" certain things, they never provide any specific statements made by anyone at Kaplan. AC ¶ 20(a). Nor, for example, do they provide any details as to what information was allegedly "falsified" in documents given to accreditors. *Id.* ¶ 23(a). *See Clausen*, 290 F.3d at 1310 (relator must set forth "precisely what statements were made in what documents").

"Where" or "When": Relators also never allege where or when any of the conduct alleged in the Complaint took place. Instead, we are left to guess as to when from "January 1, 1999 to the present," AC ¶ 1(a), and at which one of Kaplan's allegedly more than "79 campuses nationwide," *id.* ¶ 10(c), the conduct alleged in the Complaint occurred. This is

---

[Footnote continued from previous page]
responsible for Kaplan's purported misconduct, even though Wilcox agreed to cooperate with Diaz and the matter overlaps with issues in this case.

[6]  Indeed, the only name mentioned in the Complaint is Dean Bosse, who Relators allege "noted in her email to department chairmen that given [sic] a 'C' for no work was not the best idea."  AC ¶ 19(b).  There are no other details alleged, such as when this occurred or the circumstances giving rise to the email, and – as
[Footnote continued on next page]

insufficient.  *See Corsello*, 428 F.3d at 1013 (allegation that "improper practices took place 'everywhere [defendant] does business throughout the statutory time period'" is insufficient); *Carroll*, 2002 U.S. Dist. LEXIS 28169, at *8 (alleging six-year time span is not sufficient).

<u>"How"</u>:  And finally, Relators do not allege the "how" of any of Kaplan's purported misconduct.  Instead, there is nothing but Relators' often one-sentence, conclusory assertions.  For example, in claiming that Kaplan violated the "90/10 Rule," Relators merely assert that "Kaplan pays its employees to become students . . . to give the appearance that [it] is meeting the Rule."  AC ¶ 22(d).  There are no details alleged, let alone facts as to when or where this happened or who was responsible for this conduct.  Similarly, Relators allege that Kaplan violated the restriction on incentive compensation, 20 U.S.C. § 1094(a)(20), by "providing trips and club rewards to the highest producing enrollment counselors."  AC ¶ 32(b).  But they provide no details, such as whether these items were specifically provided based "on success in securing enrollments" (which is what section 1094(a)(20) covers), how this alleged conduct was carried out, when it occurred, or who was involved.[7]

Thus, Relators clearly have failed to adequately allege an underlying violation of any HEA or ED requirements to which Kaplan supposedly falsely certified compliance.  Consequently, their FCA claims must be dismissed.[8]

---

[Footnote continued from previous page]
mentioned – Relators fail to identify any regulation that Kaplan's purported grading policies violated.  In fact, this allegation does not even satisfy Rule 8, as Relators allege nothing other than that this email was sent.

[7]   Nor do Relators provide any "indicia of reliability" in support of any of their allegations.  *See, e.g.*, *Clausen*, 290 F.3d at 1311 (Rule 9(b) requires "indicia of reliability [to] be given in the complaint").

[8]   Relators' claims suffer from additional pleading defects under both Rules 8(a) and 9(b).  Relators do not, for instance, provide *any* factual allegations in support of their claim that Kaplan "knowingly" submitted false claims, even though this is a critical element.  31 U.S.C. § 3729(a).  Nor do Relators provide, as they must, any [Footnote continued on next page]

**B.   Relators' "False Certification" Theory Fails As A Matter Of Law**

Even if one assumes that Relators have adequately alleged an underlying violation of any HEA or ED requirements – which they clearly have not – Relators' FCA claims still must be dismissed because their theory of "false certification" fails as a matter of law.  The very theory advanced by Relators in this case – that an underlying violation of HEA requirements may provide a basis for an FCA cause of action because of "false certifications" in PPAs and management assertion letters – has already been addressed and rejected by at least six district courts across the country.[9]  Three of the cases emanating from Texas were affirmed by the Fifth Circuit; the one from California was reversed by the Ninth Circuit. *Compare Bowman*, *aff'd*, 2004 U.S. App. LEXIS 24673 (5th Cir. 2004); *Graves*, *aff'd*, 2004 U.S. App. LEXIS 21799 (5th Cir. 2004); *Gay*, *aff'd*, 2004 U.S. App. LEXIS 21489 (5th Cir. 2004), *with United States ex. rel Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir.

---

[Footnote continued from previous page]
particular allegations regarding the "claims" that Kaplan submitted.  Instead, they simply allege in conclusory fashion that some unidentified claims for some unidentified amount were submitted by some unidentified person in the form of student financial aid requests on some unidentified date.  AC ¶¶ 33-39.  This fails to satisfy the Eleventh Circuit's requirements.  *Clausen,* 290 F.3d at 1312-1315; *see also United States ex rel. Nichols v. Omni H.C., Inc.*, No. 4:02-cv-66(HL), 2008 U.S. Dist. LEXIS 25441, at *16-17 (M.D. Ga. Mar. 31, 2008) (relator failed to satisfy "stringent standards for pleading [FCA] causes of action in this Circuit" because he did not identify, among other things, "who" made the claims or "even one . . . [claim] by date or amount").

[9]   Each of these cases dealt with whether a violation of the HEA restriction on incentive compensation could provide the basis for an FCA claim.  *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487 (S.D. Tex. 2003); *United States ex rel. Gay v. Lincoln Tech. Inst.,* No. 3:01-CV-505-K, 2003 U.S. Dist. LEXIS 25968 (N.D. Tex. Sept. 3, 2003); *United States ex rel. Bowman v. Educ. America, Inc.*, No. H-00-3028 (S.D. Tex. Jan. 8, 2004) (order granting mtn. to dismiss, attached as Ex. O).  *See also United States ex rel. Main v. Oakland City Univ.*, No. 3:03-cv-71 RLY-WGH (S.D. Ind. Mar. 15, 2005) (order granting mtn. to dismiss, attached as Ex. P); *United States ex rel. Hendow v. University of Phoenix*, No. CV S-03-457, 2004 U.S. Dist. LEXIS 28990 (E.D. Cal. May 19, 2004).  *Cf. United States ex rel. Payne v. Whitman Educ. Group, Inc.*, No. H-03-3089 (S.D. Tex. June 20, 2005) (order granting joint mtn. to dismiss with leave to reinstate only if Supreme Court vacated denial of certiorari in *Graves*, which it did not, attached as Ex. Q).  *But see United States v. Chapman Univ.*, No. SACV 04-1256 JVS (RCx), 2006 U.S. Dist. LEXIS 53686 (C.D. Cal. May 23, 2006).

2006).[10]  As a result, there is a split of authority between the Fifth Circuit and the Ninth

Circuit over the very theory of liability presented by Relators in this case.

Kaplan urges this Court to follow the decisions of the Fifth Circuit and the other

district courts.  As set forth below, these decisions correctly required that in order to make

out a "false certification" claim, a relator must properly allege both:  (1) the existence of a

certification *and* (2) that the certification was a condition on government payment.  *See*

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir.

2000) ("false certification of compliance . . . cannot serve as the basis for a *qui tam* action . . .

unless payment is conditioned on that certification").  Relators, like those who came before

them, cannot satisfy either element.

### 1.    Relators Cannot Identify Any Actionable "Certifications"

One of the reasons the Fifth Circuit and other district courts reject the "false

certification" theory posed by Relators is that neither the PPA nor the management assertion

---

[10]        The case from Indiana was also reversed by the Seventh Circuit, but on a "fraud in the inducement"
theory not alleged by Relators here.  *See Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005).
Specifically, in that case, the Seventh Circuit found that the relators had adequately alleged that the school had
entered into the PPA without ever intending on complying with the promises it made therein, rendering "false"
the financial aid provided under the PPA.  *Id.* at 917.  Here, putting Relators' conclusory allegations aside,
Relators fail to provide *any* factual allegations – let alone ones with particularity – that support the claim that
Kaplan entered into the PPA with no intention on performing its promises.  Indeed, they do not even allege who
signed the PPA, when it was specifically executed, which provisions of it the school was not intending to
comply with on which signing date, etc.  *See Willard*, 336 F.3d at 385 (affirming dismissal of relator's "fraud in
the inducement" claim on ground that relator did not "assert a single fact to support his allegation that
[defendant] entered into a contract with [the government] with no intent to perform it," did not "allege who was
involved in the negotiations [over the contract], or where or when the negotiations took place," and did not
"allege any facts as to what was said before, during, or after the . . . negotiations to indicate that the contract
was entered with no intent . . . to [perform]") (quotations omitted).  Nor do Relators provide any facts that
support an inference of fraudulent intent at the time of signing the PPA, and their mere allegations of
subsequent noncompliance are insufficient.  *See United States ex rel. Bettis v. Odebrecht Contractors of Cal.,
Inc.*, 393 F.3d 1321, 1329-30 (D.C. Cir. 2005) ("the mere fact that a promise made is subsequently not
performed" does not create inference of intentional fraudulent inducement); *Graves*, 284 F. Supp. 2d at 503-504
(same).  Consequently, neither *Main* nor the "fraud in the inducement" theory is relevant to this motion.

letters actually include a "certification of compliance."  For instance, Judge Rosenthal found, in a thorough and well-reasoned opinion, that "[n]othing in the PPA required [the school] expressly to certify compliance with the provision [allegedly violated]."  *Graves*, 284 F. Supp. 2d at 500.  Similarly, in *Gay*, Judge Kinkeade found:  "[T]he record does not establish that [the school] expressly certified its compliance in the assertion letters."  2003 U.S. Dist. LEXIS 25968, at *11. This is borne out by the facts in the present case.

In the PPA, for instance, the only actual "certifications" are limited to narrow matters, none of which are at issue here. Exs. A-D; s*ee, e.g.*, Ex. A at 2 (requiring school to "certif[y]" it has a drug abuse program); *id.* at 9 (section of PPA entitled "Certifications Required From Institutions").[11]  There is no "certification of compliance with [all] HEA and [ED] requirements," as alleged by Relators.  AC ¶ 26(a).  Rather, the PPA relates to general agreements regarding ***future*** performance.  *See, e.g.*, Ex. A at 3 (providing that "[b]y entering into this [PPA], the Institution agrees that: . . . [i]t ***will*** comply with all statutory provisions of or applicable to Title IV") (emphasis added).

Similarly, with respect to the management assertion letters, an institution does not "certify" to anything to the government.  Rather, these letters are sent by the institution to its auditors. Ex. E.  Furthermore, the attached letters merely state that Kaplan "confirm[s], to the best of [its] knowledge and belief" that it "complied" with certain identified rules.  *Id.* They do not "certify" compliance with anything. *See Gay*, 2003 U.S. Dist. LEXIS 25968, at *11.  For these reasons, district courts across the country have concluded – and this Court

---

[11]     The Court may consider Exhibits A through F, as they are described in the Complaint.  *Bryan v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-81 & n.16 (11th Cir. 1999)

should likewise hold – that the PPAs and assertion letters cannot provide a basis for Relators' "false certification" claims as a matter of law.

The Ninth Circuit, which came to a contrary conclusion, basically found that an actual "certification" is not necessary.  Rather, the court held, "[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake."  *Hendow*, 461 F.3d at 1172.  This view simply ignores the realities of the documents, especially the PPA, which makes a clear distinction between those things to which an institution "certifies" compliance and those to which a school merely promises to perform in the future.  Exs. A-D.  Accordingly, this Court should adopt the views of the Fifth Circuit and the other district courts and find that Relators have not identified an actionable "false certification."[12]

### 2.   The "Certifications" Identified By Relators Are Not Conditions On Government Payment

The second reason why the Fifth Circuit and other district courts reject the theory Relators proffer is that even if the PPAs or assertion letters certify compliance with applicable requirements – which they do not – there is nothing to indicate that government

---

[12]    Nor can Relators rely – as they attempt to do – on the certifications made on student loan applications submitted to third party lenders that the student is "eligible."  AC ¶ 36.  Apparently, Relators claim this is false because only students who attend an "eligible institution" may receive loans and Kaplan is "ineligible" because of its violations.  *Id.*  This argument fails because a certification that a ***student*** is eligible is not a certification that the ***school*** is in compliance with HEA or ED requirements.  34 C.F.R. § 682.603(a) ("school shall certify that the information . . . ***about the borrower*** . . . is complete"); Ex. F (example:  "I hereby certify that the borrower . . . is accepted for enrollment . . . [and] that the student is an eligible borrower.").  Moreover, there is no dispute that Kaplan at all times has been operating under a valid PPA, making it an "eligible" institution.  Consequently, Relators cannot use this assertion as a basis for their "false certification" claims.  Similarly, Relators' allegation that the HEA itself requires schools to "certify annually that they are in compliance" with all laws lacks support.  AC ¶ 15(a).  Relators do not cite to one statute or regulation in support of this claim, and it cannot provide a basis for their causes of action.

payment is conditioned on those certifications.  *See, e.g.*, *Gay*, 2003 U.S. Dist. LEXIS 25968, at *11 ("Relators present nothing establishing that [the school] made a false certification of compliance . . . as a condition of payment."); *see also Graves*, 284 F. Supp. 2d at 500-02.

This requirement – that the certification be a condition to government payment – is widely recognized.  *Siewick*, 214 F.3d at 1376 ("[T]he rule, adopted by all courts of appeals to have addressed the matter, [is] that a false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA unless payment is conditioned on that certification."); *accord United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 793 (4th Cir. 1999).

Moreover, strictly imposing this requirement is fundamentally important.  Without it, there would be nothing requiring a relator to show a nexus between the alleged violation of an underlying statute or regulation (compliance with which is "falsely certified") and the government's ultimate decision to pay.  In other words, the requirement of a certification as a condition of government payment is the only thing preventing the FCA from becoming that which it is not – a broad, sweeping statute imposing treble damages and forfeitures for any violation of any statute or regulation, regardless of how important or removed from the government's payment decision.  *Cf. Clausen*, 290 F.3d at 1311 ("The [FCA] does not create liability merely for a . . . disregard of Government regulations or improper internal policies unless, as a result of such acts, the [defendant] knowingly asks the Government to pay amounts it does not owe."); *accord Corsello*, 428 F.3d at 1012.

In the prior education cases raising (and rejecting) the "false certification" theory, the courts analyzed the statutes and documents at issue, and found that any purported certification of compliance made in the PPAs or assertion letters were, at most, simply conditions on a school's participation in Title IV programs. *See Graves*, 284 F. Supp. 2d at 501-02; *Gay*, 2003 U.S. Dist. LEXIS 25968, at *11. That is, they were things the school had to say or do to participate in Title IV programs. They were not conditions on the government's decision to pay Title IV funding under those programs. *See, e.g.*, *Graves*, 284 F. Supp. 2d at 501-02 ("[T]he regulation that Relators allege was violated is a condition of eligibility to participate in the [Title IV] program, not an express condition of payment of specific claims or retention of payments."); *see also Bowman*, 2004 U.S. App. LEXIS 24573, at *1-2 (affirming district court decision on these grounds).

This distinction, between conditions on participation in a government program and conditions on government payment, has long been recognized. In fact, the Second, Fourth, and Fifth Circuits have all held that the two are not the same, and that a false certification cause of action only exists for the latter. *Mikes*, 274 F.3d at 700 (finding that conditions on eligibility to participate in Medicare were not also conditions of government payment under Medicare, and stating that false certification theory applies only when "underlying statute or regulation upon which the plaintiff relies ***expressly*** states the provider must comply ***in order to be paid***") (second emphasis added); *Harrison*, 176 F.3d at 786 n.8, 793 (finding that provision requiring government contractor to certify absence of conflicts as part of government contract did not provide basis for FCA action based upon subsequent violation because it was merely a threshold requirement for demonstrating contracting eligibility and

was not "in any way related to, let alone [a] prerequisite[] for, receiving continued funding"); *Willard*, 336 F.3d at 382 (rejecting FCA claim because government could respond to violation by suspending future enrollment or payments or imposing monetary penalties, "rather than withhold[ing] payment for those already enrolled"; thus, compliance affected only future eligibility and was not condition of payment). *Cf. United States ex rel. Coppock v. Northrop Grumman Corp.*, 2002 U.S. Dist. Lexis 14510, at *43 (N.D. Tex. Aug. 1, 2002) ("thousands of laws and regulations may govern participation in a Government program without being material to the issue of whether payment is due").[13]

Here, as in the prior cases, Relators allege – at most – a violation of laws upon which Title IV program participation, not payment under Title IV, is conditioned. First, Relators cite to no statute or regulation providing that compliance with any of the HEA or ED requirements that Relators claim Kaplan violated – whatever they are – was a prerequisite to government payment, rather than simply a condition on Title IV eligibility. *See United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (relator failed to allege that purported violation "rises to the level of affecting the government's decision to pay" because he did not cite any "applicable statute or regulation"). Indeed, Relators readily admit that the PPA only provides that it is a "'prerequisite to the Institution's initial or continued *participation* in any Title IV, HEA Program.'" AC ¶ 26(c)

---

[13]    The Eleventh Circuit also appeared to recognize this distinction in *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005). There, the court analyzed whether a defendant's violation of a Medicare program requirement (i.e., compliance with the Anti-Kickback Act) could provide a basis for an FCA claim *only after first* noting that it was undisputed that compliance with that Act was also "a *condition of payment*" and that violation would automatically "disqualif[y] [a party] from receiving *payment* [under the] program." *Id.* at 1259 (emphasis added).

(quoting PPA) (emphasis added).  *See* 34 C.F.R. § 668.14(a)(1).  Similarly, Relators allege

that Kaplan must submit management assertion letters and subsequent compliance audits

merely as a "condition" on "*[p]articipation* in the Title IV program."  AC ¶ 31(c) (emphasis

added).[14]

 Second, nothing in the PPA or assertion letters distinguishes any of the requirements

that Kaplan is accused of violating from any other requirement with which a school must

agree to comply to become eligible to participate in Title IV programs.  Exs. A-D.  In fact,

the PPA, for example, actually treats these requirements with less seriousness than various

other statutes to which a school must actually "certify" present compliance.  *Id.*  Similarly,

Relators proffer nothing to indicate that a school's alleged violation of any of the HEA or ED

requirements automatically causes the school to forfeit Title IV funding or results in the

automatic termination of a school's eligibility, as occurs upon the happening of other events.

*See* 34 C.F.R. § 600.40.[15]

 In fact, the evidence demonstrates the opposite.  For instance, with respect to the

allegation that Kaplan violated the incentive compensation provision, a policy memorandum

from the ED Deputy Secretary states that although a violation of this provision may

---

[14] The assertion letters also only discuss a school's compliance with respect to a ***prior*** period under review, and they are issued long after financial aid from that period has been distributed, further undermining any claim that their purported "certifications" are a ***prerequisite to payment***.  *Graves*, 284 F. Supp. 2d at 501-02.

[15] Instead, there is a whole array of lesser, alternative administrative remedies available to ED.  20 U.S.C. § 1094(c)(1)(F)-(G); 34 C.F.R. Part 668, Subparts G.  This, in itself, demonstrates that compliance with these requirements is not a condition of payment.  *See Swan*, 279 F. Supp. 2d at 1222 (compliance with Medicare statutory requirement is not condition of payment because denial of payment is one of several remedies available and "not an automatic penalty").  *See also Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1046 (N.D. Ill. 1998) (fact that contract provided remedy for regulatory violation that did not involve repayment contradicted attempt to show compliance was prerequisite to government payment).

"commonly" result in a fine, it does ***not*** result in monetary loss to the government and "does ***not*** render a recruited student ineligible to receive student aid funds for attendance at the institution on whose behalf the recruiting is conducted." Ex. G. In other words, the government will continue to pay out Title IV program funds (or at least not request the return of them) if a school is found to be in violation; thus, compliance clearly is ***not*** a "condition on" the government's decision to pay.

Again, the Ninth Circuit's came to a different, unpersuasive result. Specifically, the Ninth Circuit found that, in contrast to all of the authority cited above, a relator could assert an FCA claim based upon a violation of a condition on participation in a government program, as opposed to a condition on government payment, because – the court held – there is no functional distinction between the two. *See Hendow*, 461 F.3d at 1176. Consequently, the court essentially found that any alleged violation of any requirement set forth in or incorporated into the PPA could provide the basis for a false certification claim.

The Ninth Circuit's decision is an unjustified and dangerous expansion of the law. In this very context, for instance, schools must execute a standard-form PPA in which they agree to comply with hundreds, if not thousands of statutory and regulatory requirements as a condition of participating in Title IV programs. Exs. A-D. Among other things, schools agree to comply with the Age Discrimination Act, "all" Title IV statutes and regulations, and all requirements established pursuant to the HEA by the Secretary, State authorizing bodies, and nationally accrediting agencies. *See, e.g.*, Ex. A at 2-3, 6.

If the reasoning of the Ninth Circuit prevails, and the distinction between conditions on participation in government programs and conditions on payment is ignored, all of the

myriad conditions on participation applicable to schools like Kaplan would be actionable under the FCA.  Thus, for example, the Court would be faced with many more cases like this, where relators attempt to sue Kaplan for "billions" in "fraud" damages based upon – among other things – an alleged violation of the ADA or Rehabilitation Act, with which a school agrees to comply in the PPA.  Under the Ninth Circuit's reasoning, schools could also be sued for "fraud" under the FCA for violating the Civil Rights Act, failing to maintain athletic reports required by Title IV, failing to meet state or accreditor requirements, and virtually anything.  Schools in violation of any of these conditions on participation – each with their own enforcement mechanisms – would face potentially billions of dollars in exposure and, at the least, be subject to massive discovery and its associated costs and attendant pressure to settle.  This cannot be – or at least should not be – the proper result.[16]

In other words, the Ninth Circuit's decision turns the "condition on payment" requirement into a nullity.  It also transforms the FCA into what it is not – a means for relators to turn allegations of routine regulatory noncompliance into federal cases of fraud. *See Mikes*, 274 F.3d at 699 ("the [FCA] was not designed for use as a blunt instrument to enforce compliance with all . . . regulations – but rather only those regulations that are a precondition to payment – and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach").  *See also United States ex*

---

[16]    Moreover, this result is not as far-fetched as it might appear.  In *United States v. Chapman Univ.*, for instance, a court in the Central District of California applied the reasoning adopted by the Ninth Circuit to find that a violation of requirements imposed by a ***regional accreditor*** relating to "***minimum clock-hour requirements***" could provide a basis for an FCA action, because of an institution's agreements in the PPAs. 2006 U.S. Dist. LEXIS 53686, at *17-20.  This case proceeded to summary judgment, only to be dismissed after Chapman was forced to incur significant costs in defending against the relators' suit.

*rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations").

For these reasons, the Court should adopt the position of the Fifth Circuit and all of the other district courts, and hold that Relators' theory of FCA liability fails as a matter of law.

### C.   Diaz's Retaliation Claim Fails Because He Merely Reported Unspecified Violations And Not False Claims To The Government

Finally, Diaz's retaliation claim must also be dismissed, because Diaz – who currently has another case pending against Kaplan based on similar issues – fails to allege that he engaged in "protected conduct" under § 3730(h).  *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999) (plaintiff must show "that she engaged in protected conduct and that the defendant retaliated against her because of that protected conduct").  "Protected conduct" is "conduct from which a factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud."  *Id.* at 1314; *see also Childree v. UAP/GA Chem, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) (FCA action must be "distinct possibility" when employee acts).  Under this standard, courts ask whether the employee "communicated to the employer that she believed that the employer had engaged in illegal or fraudulent conduct ***involving submission of claims for payment to the government***."  *Mann*, 49 F. Supp. 2d at 1314 (emphasis added).

Nothing in the Complaint suggests that Diaz put Kaplan on notice that he believed Kaplan had submitted false claims for payment to the government.  Rather, Relators allege that Diaz reported only such things as that Kaplan was "not being truthful with HLC

regarding meeting the HLC requirements." AC ¶ 48(b).  But Relators provide no basis to support the conclusion that Diaz's reports of untruthful statements made to the HLC (a private accreditator) or anything else Diaz alleges could have put Kaplan on notice that Diaz was considering reporting Kaplan for "illegal or fraudulent conduct involving submission of claims for payment to the government." *Mann*, 49 F. Supp. 2d at 1314.  Because Kaplan was never put on notice that Diaz intended to take action against it under the FCA, it cannot have acted with retaliatory intent necessary to state a claim. *Mack v. Augusta-Richmond County*, 365 F. Supp. 2d 1362, 1378 n.19 (S.D. Ga. 2005) ("[A] defendant cannot retaliate . . . against a plaintiff because of his whistle-blowing activities if [it] is unaware of such activity").

Relators also fail to allege that Diaz reported that Kaplan made any false statement to obtain payment from the government.  A plaintiff cannot establish protected conduct where "there was no possibility that [he] could have filed a viable FCA action" based on the information he reported, such as where the alleged false statement was not a claim for payment. *Dookeran v. Mercy Hosp.*, 281 F.3d 105, 108 (3d Cir. 2002).  In *Dookeran*, for example, the court held that the plaintiff failed to establish protected conduct under § 3730(h) where he alleged that he refused to sign an application that "was not a request or demand for federal funds." *Id.* at 109.  The court reasoned that the application "was simply the first step in a process that ultimately might have led . . . to the authorization of the payment of federal funds to [the employer]." *Id.*  "Even if the application had been accepted," the court stated, "no money, either federal or private, would have been paid to [the hospital;] . . . [c]learly, the application was not a 'request or demand . . . for money or property' as is required to be a 'claim' under the FCA." *Id.*  Because there was no possibility that the plaintiff could state a

viable FCA action, the court held, his activity was not protected.  *Id.*  Like the application in

*Dookeran*, Kaplan's purported violations are not alleged to have caused any "money, either

federal or private, [to be] paid."  *Id.*  Diaz cannot state a viable FCA claim based on Kaplan's

alleged violation of rules that did not involve claims for payment.[17]

## IV.   CONCLUSION

For the reasons stated above, and for any additional reasons that may arise at a

hearing on this Motion, Defendants respectfully request that the Court dismiss the Complaint.

DATED:  May 1, 2008.                        Respectfully submitted,

                                            By: /s/  Susan N. Eisenberg

Timothy J. Hatch                            Susan N. Eisenberg
CA Bar No. 165369; *Pro Hac Vice* M.D. Fla.   FL Bar No. 600393
THatch@gibsondunn.com                       Susan.eisenberg@akerman.com
Nicola Hanna
CA Bar No. 130694; *Pro Hac Vice* M.D. Fla.
NHanna@gibsondunn.com

**GIBSON, DUNN & CRUTCHER LLP**             **AKERMAN SENTERFITT**
333 South Grand Avenue                      One S.E. 3rd Avenue, 28th Floor
Los Angeles, California 90071               Miami, FL  33131-1714
Phone:  (213) 229-7000                      Phone:  (305) 374-5600
Fax:  (213) 229-7520                        Fax:  (305) 374-5095

*Co-Counsel for Defendants*                 *Co-Counsel for Defendants*

---

[17]     Additionally, Diaz's retaliation claim violates the rule that protected conduct must include "more than [an] employer's noncompliance with federal or state regulations."  *United States ex rel. Vargas v. Lackmann Food Service, Inc.*, 510 F. Supp. 2d 957, 966 (M.D. Fla. 2007) (quotations and citations omitted).  *See also Mack*, 365 F. Supp. 2d at 1379.  In *Mack v. Augusta-Richmond County*, for instance, the court rejected an employee's § 3730(h) claim because the employee "was simply trying to ensure compliance with the HUD regulations[,]" and there was no indication "that an FCA action was a 'distinct possibility.'"  148 Fed. Appx. 894, 897 (11th Cir. Sept. 19, 2005).  *See also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996). Likewise, here, Diaz merely alleges that he reported that his employer was failing to comply with applicable rules and regulations, not that he reported fraud or threatened to report his employer for FCA violations.  AC ¶ 48(a)-(e).  These allegations, like those in *Mack*, lack the necessary nexus to the FCA.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 1st day of May, 2008, I electronically filed the foregoing, as well as the accompanying exhibits, with the Clerk of the Court via CM/ECF which will send notification of such filing to all parties registered with CM/ECF, including the following:

| | |
|---|---|
| J. Troy Andrews, Esq. | Susan N. Eisenberg, Esq. |
| hangfire@ix.netcom.com | susan.eisenberg@akerman.com |
| John W. Andrews, Esq. | **AKERMAN SENTERFITT** |
| jwa@ix.netcom.com | One S.E. 3rd Avenue, 25th Floor |
| **ANDREWS LAW GROUP** | Miami, FL  33131-1714 |
| 3220 Henderson Blvd. | Telephone:   (305) 374-5600 |
| Tampa, Florida  33609 | Facsimile:    (305) 374-5095 |
| Tel. (813) 877-1867 | |
| Fax (813) 872-9298 | |
| | |
| *Attorneys for Relators* | *Attorneys for Defendants* |

I further certify that I mailed the foregoing document, as well as the accompanying exhibits, and the notice of electronic filing by first-class mail to the following non-CM/ECF participant on May 1, 2008.

Robert E. O'Neill, Esq.
United States Attorney
Charles T. Harden III, Esq.
Assistant United States Attorney
Middle District of Florida
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Phone: (813) 274-6000
Fax : (813) 274-6358

By: /s/  Susan N. Eisenberg_____
           Susan N. Eisenberg, Esq.