

**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
61 FORSYTH STREET, SW
SUITE 19T70
ATLANTA, GEORGIA 30303
TELEPHONE: (404) 562-6350

**FAX: (404) 562-6455**
**TDD: (404) 562-6454**

Email: Atlanta_ocr@ed.gov

Mary Ann B. Oakley, Esq.
Holland & Knight LLP
One Atlantic Center, Suite 2000
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309

OCT 27 2005

Dear Ms. Oakley:

Re: Complaint #04-05-2087

The U.S. Department of Education (Department), Office for Civil Rights (OCR), has completed its resolution activities with respect to the complaint filed against Kaplan University (University) in Ft. Lauderdale, Florida on April 14, 2005. Jude Gillespie (complainant) alleged that the University discriminated against him on the basis of disability. Specifically, he alleged that the University:

1. Failed to provide the accommodations he requested when it did not allow him to perform his duties as a virtual employee and work a flexible schedule; by requiring him to attend a one-hour weekly meeting; by requiring him to attend the bi-annual faculty retreat; and by refusing to reassign him from John Berube, Assistant Dean of Paralegal Studies (Berube).

2. The University retaliated against the complainant (a) by not considering him for the position of Assistant Dean of Curriculum for the Criminal Justice School (Criminal Justice); (b) by not considering him for the positions of Assistant Dean of Curriculum and Assistant Dean of Faculty in the School of Paralegal Studies (Paralegal Studies); (c) when his immediate supervisor, Berube, intentionally rigged an academic vote to his detriment; (d) by ordering Randy Shochet and Thomas Tung Nguyen, Academic Department Chairs (DCs) in the School of Paralegal Studies, to discontinue any communication with him and (e) by terminating his employment alleging that he abandoned his job.

Background Information

The University is a subsidiary of Kaplan, Inc., which is a higher education corporation wholly-owned subsidiary of The Washington Post Company. Kaplan Higher Education is a system of more than 65 campus-based schools nationwide and offers an extensive

**EXHIBIT H**

Mary Ann B. Oakley, Esq.
Page 2

selection of online educational programs. Kaplan University is accredited by The Higher Learning Commission of the North Central Association of Colleges and Schools and offers Master's, Bachelor's, and Associate degrees, as well as Certificate programs. The University maintains corporate and academic offices in Fort Lauderdale, Florida; Chicago, Illinois; New York, New York; and Davenport, Iowa. The University is comprised of ten (10) schools, including Paralegal Studies.

During April 2004, the University hired the complainant as a part-time Adjunct Professor in Paralegal Studies. On August 9, 2004, the complainant was promoted to a full-time position as Academic Department Chair in Paralegal Studies. His immediate supervisor was Berube.

## Jurisdiction and Legal Standards

As a recipient of Federal financial assistance from the Department and as a public institution of higher learning, the University is subject to the provisions of Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. Section 794, and its implementing regulation, 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability. Accordingly, OCR has jurisdiction over this complaint.

The Section 504 regulation, 34 C.F.R. Section 104.11(a)(2)(3)(4) and (b)(2) states that no qualified handicapped person shall, on the basis of handicap, be subjected to discrimination in employment under any program or activity that receives assistance under the Education of the Handicapped Act and shall take positive steps to employ and advance in employment qualified handicapped persons, make all employment decisions in a manner which ensures that discrimination on the basis of handicap does not occur, limit, segregate, classify, participate in a contractual or other relationship that has the effect of subjecting applicants or employees in any way that adversely affects their opportunities or status because of handicap in hiring, promotion, demotion transfer, termination, right of return from layoff and rehiring.

The applicable Section 504 regulation, 34 C.F.R. Section 104.12 (a)(b)(2) requires a recipient to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program or activity. Reasonable accommodations may include making facilities used by employees readily accessible to and usable by handicapped persons and job restructuring, part-time, or modified work schedules and other similar actions.

The applicable Section 504 regulation at 34 C.F.R. Section 104.61 incorporates the procedural provisions of the Title VI regulation at 34 C.F.R. Section 100.7(e), which prohibit retaliation against persons who have sought to protect rights secured under Section 504.

Mary Ann B. Oakley, Esq.
Page 3

OCR's investigation of the allegations included a review of records and documentation provided by the University, the complainant, and interviews with the complainant and University personnel.   Additionally, on August 1 through August 3, 2005, OCR conducted an onsite visit to the University.

**Allegation #1**

**With regard to whether the University failed to provide the accommodations requested by the complainant OCR made the following findings of fact:**

**Regarding allowing the complainant to work as a virtual employee and to work a flexible schedule:**

On December 16, 2004, the complainant sent an email to Berube disclosing that in 2000 he had been diagnosed as having "Bipolar I Disorder with rapid cycling and mixed states".  He attached a statement dated December 16, 2004 from his doctor to support his request for accommodations to work full-time with flexible hours and to work from home due to his chronic permanent disability.  Berube forwarded the complainant's request to the University's Human Resources Department (HR), saying that he did not see a problem with the request since the University had already planned to make the DCs' jobs, including the complainant's, virtual positions beginning January 7, 2005. On January 7, 2005, Wilhelmina Campbell (Campbell), Human Resources Manager, wrote the complainant, telling him the University had approved his accommodations request.

**Regarding requiring the complainant to attend a one-hour weekly meeting:**

On January 7, 2005, Berube sent emails to the four DCs in Paralegal Studies, including the complainant, stating that he preferred that the DCs attend the weekly department meeting in person because he believed that such attendance would be beneficial for them. He also said that attendance at the meeting would be voluntary. The email also stated that all DCs (no matter their location) would be required to attend the quarterly meetings in person.

The complainant sent an email to Campbell in HR on January 7, 2005, expressing his displeasure at being required to drive to the University to attend a one-hour meeting each week. Campbell contacted Berube and emailed Lisa Gefen Sicilian (Sicilian), Senior Vice President and Associate General Counsel and Melissa Martin (Martin), Director of Human Resources (HR), asking why one of the DCs could attend the weekly meetings by telephone (one of the DCs lived in Iowa) while the other three DCs who lived in Florida were required to attend the meetings in person. Sicilian granted approval on January 7, 2005, for the complainant and the other local DCs to call in for the weekly meeting because they were virtual employees.

On January 7, 2005, the complainant emailed Campbell, telling her that he did not intend for her to speak to Berube, saying "an employee is always afraid of retaliation from his/her manager when an issue isn't handled as diplomatically as possible." Campbell

Mary Ann B. Oakley, Esq.
Page 4

responded that day, saying that she was trying to help and that "clearly, the only way this matter could have been resolved was by going to John (you or me)." She went on to say that "some information can be kept confidential and some cannot in order to resolve matters."

The evidence shows that two of the other DCs thought that they should also be able to attend the weekly meetings remotely and that Berube's January 7, 2005, email was yet another example of his style of micromanaging. One of the DCs told OCR that, except for a couple of occasions, neither he nor any of the other DCs attended the weekly meetings in person. According to that DC, none of them ever suffered repercussions because of their virtual attendance. The DCs, Shochet and Nguyen, said as far as they knew, none of the DCs, including the complainant, ever suffered reprisals because of their virtual attendance.

**Regarding requiring the complainant to attend the Bi-Annual Faculty Retreat (Retreat):**

On or about January 17, 2005, the complainant acquired a copy of the agenda for the University's Retreat that was being held on January 22-25, 2005. It is unclear if Berube sent the agenda to the complainant or if he received it from one of the other DCs. On January 18, 2005, the complainant sent an email to Berube concerning his attendance at the Retreat. The complainant gave Berube an agenda; revised to show the days and times the complainant would be able to attend the Retreat. He stated that he could not attend each Retreat session/event because of the medication regimen, and the consequences thereof, he had to follow because of his disability. The revised agenda reflected that he would attend each of the four days with modified times. The complainant also told Berube that he was concerned that his "part-time" attendance at the retreat would raise questions about why he was not present at all sessions and/or cause other employees to think he was not a dedicated employee. The complainant informed OCR on August 1, 2005 that he never asked anyone at the University to provide hotel accommodations or asked to be excused from attending the Retreat. After attending the Retreat on January 22 and 23, 2005, the complainant decided that he could not attend the Retreat on January 24 and 25 because he was not feeling well. On January 24, 2005, Berube convened a meeting with the Paralegal Studies staff at the Retreat to vote on committee positions (the Assessment Committee and the Curriculum Committee). Berube told OCR that he commented once to those gathered that he was not sure of the complainant's whereabouts. According to the two DCs that OCR interviewed, one of them stated that Berube asked once about the complainant. The other DC recalled Berube asking twice about the complainant's whereabouts. Both DCs stated they felt that Berube was not aware that the complainant was not at the Retreat on that day and that he had expected the complainant to be present. On January 24, 2005, the complainant sent an email to Berube and Martin stating that he was distressed to learn that Berube drew attention to his absence from the Retreat. On January 25, 2005, Berube responded to the complainant, apologizing for not responding to the complainant's earlier emails regarding the Retreat. He told the complainant he did not respond because he had sent the complainant's request to HR asking for guidance concerning how to address any inquiries

Mary Ann B. Oakley, Esq.
Page 5

that might be made from others at the Retreat regarding the complainant's attendance. Berube stated that he had no problem with the complainant's suggested modified plan for attendance at the Retreat. Further, he stated in the email that he was under the impression from his (complainant's) email that he would be at the Retreat at the time the committee voting took place on January 24, 2005, based on the revised agenda submitted by the complainant. He also stated that, as opposed to having someone ask, "hey, where's Jude?" "(because I assumed none of them knew) I simply said I wasn't sure where you were, but that I'd check with you... something to that effect. I certainly didn't want to highlight the fact you weren't there, but you were not there." He stated that he did not act upset or aggravated by the complainant's absence and passed the absence off as an insignificant matter.

During an interview with OCR, the complainant acknowledged that he did provide an agenda to Berube indicating that he would attend the Retreat each of the four days but instead only attended two of the four days because he was not feeling well. He stated that he did not inform Berube or anyone else at Kaplan prior to January 24, 2005, that he had decided he would only attend the Retreat on January 22 and 23, 2005. On August 2, 2005, during an interview with OCR, Martin stated that, because the complainant was approved for accommodations as a virtual employee, had he indicated/requested that he could not attend the Retreat, his request would have been approved. She stated that the complainant never requested to be exempt from attending the Retreat.

**Regarding the University's failure to reassign the complainant to another supervisor:**

On January 27, 2005, the complainant informed Martin that he had concerns about the security of his job and future promotions within the University. He told her that one of his concerns had to do with Berube remaining as his supervisor. On January 28, 2005, he told Martin that he wanted to discuss his concerns of job security and future promotions within the University rather than his past problems with Berube. On February 10, 2005, the complainant contacted Martin regarding the telephone conference he had planned with Connie Bosse, Dean of Undergraduate Studies (Bosse). He asked her what the agenda for the meeting would be so that he would be prepared. She responded that the agenda would be to discuss his issues with Berube and to try to find a solution. She told him it was about his being comfortable in his job and not the accommodations he had requested in December 2004. She told him that since Bosse was Berube's supervisor, her input was needed to resolve the issues. On February 14, 2005, the complainant had a conversation with Bosse. They discussed that he was uncomfortable working for Berube and that he would like to leave Paralegal Studies. He told her that their relationship (his and Berube's) was cordial and that he would never let the students or faculty suffer because of their problems and that he would continue working for Berube for the next six months because the situation was not intolerable.

On April 5, 2005, the complainant sent an email and a draft of a federal complaint to Karen Ross (Ross), Associate General Counsel and Senior VP of Human Relations. In that draft complaint, the complainant states that he told Martin that he "did not wish to

Mary Ann B. Oakley, Esq.
Page 6

report to Defendant Berube". The following day, Ross responded to the complainant's email by asking if he was making the request to be reassigned pursuant to the "ADA/Rehab. Act." The complainant responded by stating that the fact that she was asking that he provide the legal basis for his reassignment request caused him to seriously doubt the University's desire to resolve this controversy without third-party intervention. Ross responded that the University was indeed "quite serious" about achieving an amicable resolution. On April 13, 2005, Ross stated to the complainant that he indicated that he was not interested in any positions in Paralegal Studies and that he wanted no further contact with Berube or Dave Harpool (Harpool), Vice President/Dean Paralegal Studies. On August 17, 2005, during an interview with OCR, Ross stated that although the complainant mentioned the desired reassignment in his email, he never made it clear that he was requesting to be reassigned as an accommodation until April 13, 2005. Additionally, the complainant did not provide any medical documentation to support his request.

**Analysis and Conclusion**

OCR has determined that the complainant made a request for accommodations and that the University's HR department sent an email to the complainant stating that his request for accommodations had been granted. According to several email communications between the complainant and Berube, from December 16, 2004 to December 21, 2005, Berube supported the complainant's request for accommodations and expressed that he saw no problem with approving the complainant's request for accommodations a few weeks earlier than the date his job would become virtual. Therefore, there is insufficient evidence that Berube or any other Kaplan University officials opposed or rejected his request for accommodations to work as a virtual employee and to work a flexible schedule. Thus, OCR has determined that there is insufficient evidence to find that the University violated any of the regulations OCR enforces with respect to this allegation.

Regarding requiring the complainant to attend a one-hour weekly meeting, although Berube indicated he preferred that the local DCs attend the meeting in person, in that same communication, he also said that attendance was voluntary. Berube's email was directed to all of the local DCs, not just the complainant. Additionally, as soon as the matter was brought to HR's attention, that department informed Berube that he could not require the DCs to attend in person, as all of their positions had become virtual. There is no evidence that the complainant, as a consequence of the January 7, 2005 email, ever physically attended the weekly meetings or that he or any of the other DCs suffered any consequences of their virtual attendance. Thus, OCR has determined that there is insufficient evidence to find that the University has violated a regulation that OCR enforces regarding this allegation.

Regarding requiring the complainant to attend the Retreat, OCR concludes that, although Berube never directed him to attend the Retreat, the complainant sent Berube a revised agenda, indicating the dates and times that he would attend the retreat. Berube told OCR that he did not have a problem with the dates and times the complainant indicated that he would attend the retreat. The revised agenda indicated that the complainant would attend

Mary Ann B. Oakley, Esq.
Page 7

the retreat each of the four days the retreat was held. Based on that agenda, on January 24th, Berube reasonably expected that the complainant would be at the retreat. During an interview with OCR, the complainant stated that he did not make Berube aware that he was not feeling well and would not attend the retreat on January 24 and 25, 2005 as previously planned. There is no indication from Berube or the two DCs interviewed by OCR that Berube drew excessive attention to the complainant's absence from the retreat. However, they did state that Berube did comment once or twice about the complainant's whereabouts. Based on the above, OCR concludes that there is insufficient evidence that the University required the complainant to attend the Retreat.

Additionally, although the evidence shows that the complainant mentioned several times that he wanted to be reassigned to another supervisor because he did not want to report to Berube or Harpool, there is insufficient evidence that he specifically asked to be reassigned as an accommodation until an April 13, 2005 email he sent to Ross. To the contrary, during the February 14, 2005, meeting with Bosse and Martin, the complainant stated that working for Berube was "cordial" and that he would tolerate working for him for at least six months but that he wanted to be reassigned out of Paralegal Studies. Moreover, there is no evidence that the complainant ever supplied any medical documentation to support his request on April 13, 2005 for reassignment as an accommodation. Before acting on a request for accommodations, an institution may require the employee to supply documentation of a diagnosis by a qualified professional that the employee has a mental or physical impairment that supports the need for the suggested accommodation.

**Conclusion**

The evidence is insufficient to show that the University failed to provide the accommodations the complainant requested. Evidence shows that the University approved the complainant's request to perform his duties as a virtual employee, to work a flexible schedule, and allow the complainant and the other local DCs to call in for the weekly meeting. There is insufficient evidence that the complainant was required or was expected to attend the Retreat. There is evidence that the complainant sent a revised agenda to his supervisor (Berube) indicating that he would attend the Retreat for a portion of each of the four days but instead only attended two of the four days without notifying his supervisor of the change. Finally, there is no evidence that the complainant ever supplied any medical documentation to support his request for reassignment as an accommodation or that, prior to April 13, 2005; he requested to be reassigned as an accommodation. Therefore, OCR finds that there is insufficient evidence that the University violated the laws that OCR enforces with regard to allegation number one.

**Allegation #2**

> **With regard to whether the University retaliated against the complainant by: a) not considering him for positions as Assistant Dean of Curriculum for the Criminal Justice School; b) not considering him for the positions of Assistant Dean of Curriculum and Assistant Dean of Faculty in the School of Paralegal**

Mary Ann B. Oakley, Esq.
Page 8

> Studies (Paralegal Studies) c) when his immediate supervisor, Berube, intentionally rigged an academic vote to his detriment; d) by ordering Randy Shochet and Thomas Tung Nguyen, DCs in the School of Paralegal Studies, to discontinue any communication with him; e) in terminating his employment by alleging that he abandoned his job, OCR made the following factual findings:

In order to determine whether retaliation occurred, OCR must examine whether: (1) the individual engaged in a protected activity; (2) the recipient had notice of the individual's protected activity; (3) the recipient took adverse action contemporaneous with or subsequent to the protected activity; and (4) there was a causal connection between the adverse action and the protected activity. If all of these elements establish a prima facie case, OCR next considers whether: 1) the University has identified a legitimate, non-discriminatory reason for taking the adverse action and, if so; 2) whether the reason asserted is a pretext for discrimination.

**Whether the individual engaged in a protected activity and whether the recipient was aware of the protected activity:**

On December 16, 2004, the complainant disclosed to Berube and HR that he was diagnosed in 2000 as being Bipolar. On December 16, 2004, the complainant requested that the University provide accommodations for his disability. On April 5, 2005, the complainant sent a copy of his proposed federal lawsuit filed against the University to Karen Ross. On April 13, 2005, the complainant notified the University of his intent to file a complaint with OCR against the University. On May 11, 2005, OCR notified the recipient (University) that the complainant had filed a complaint against the University alleging that he was discriminated against based on his disability.

OCR has determined that the complainant engaged in protected activity and the recipient was aware of the protected activity.

**Regarding whether the recipient took adverse action against the complainant, OCR made the following factual findings:**

On January 13, 2005, the complainant sent an email to Allen Lowery (Lowery), Associate Dean, Criminal Justice expressing interest in the position of Assistant Dean of Curriculum in the School of Criminal Justice (Justice). On January 13, 2005, Lowery sent an email to the complainant stating that they were recruiting for the position. He stated he would include his Assistant Dean of Faculty, Tricia Hovis (Hovis), so she would have his resume and be aware of his interest. He also mentioned that there was a form that the University requires for a formal application. On the same date, the complainant sent an email to Lowery, with carbon copies to Dee Machuca, Human Resources Recruitment Manager (Machuca) and Hovis stating that he had already completed the necessary internal paperwork to Machuca. However, University personnel stated that the complainant's application for the position was not received until January 21, 2005, after the January 13, 2005 cutoff date. The University informed the

Mary Ann B. Oakley, Esq.
Page 9

complainant that his application "fell through the cracks" and that somehow HR had inadvertently lost his application. As a result, the complainant was not considered as a candidate for the position.

On March 11, 2005, the complainant sent an email to Martin stating that the DCs were informed during their weekly meeting that the Assistant Dean of Faculty and Assistant Dean of Curriculum positions in the School of Paralegal Studies were vacant and that Berube would be hiring for these positions. He stated that he would be interested in applying for these positions and that being selected for one of these positions would resolve his employment dispute with the University. On March 15, 2005, Martin responded, saying she wanted to discuss the internal posting process as it related to his application. On March 23, 2005, the complainant sent an email to Berube, stating that he and the other DCs were surprised when they were informed that the University would be conducting a national search for the Assistant Dean of Faculty and Assistant Dean of Curriculum positions in the School of Paralegal Studies. He also expressed concerns that the positions would not be virtual positions.

On April 4, 2005, the complainant sent an email to Ross which stated that he was certain that the University had no intention of promoting him to either position and that the job descriptions were specifically tailored to exclude all internal applicants because of the requirement that applicants must have a minimum of 1+ years experience in an American Bar Association (ABA) approved program. He stated that no Academic Department Chair had been asked to submit a resume for either position, and no front desk announcement had been published.

With regard to the vote during the Retreat on January 24, 2005, OCR learned that Berube, in fact, conducted a vote for DCs to serve on the Academic and Curriculum committees. Berube stated that he knew the whereabouts of the other chairs but asked others in attendance about the complainant. The complainant was upset that Berube drew attention to his absence. The complainant was nominated to serve on the Curriculum Committee and two of the DCs present at the Retreat voted for him. The complainant felt that he would have received more votes than his opponent had Berube called him because he would have voted for himself. The complainant alleged that Berube intentionally rigged the vote by naming Martin Connor (a DC) as the Curriculum Committee representative when he did not receive a majority of the votes cast. According to the complainant, the Curriculum Committee is more prestigious than the Academic Committee to which Berube later appointed him. Shochet and Nguyen told OCR that they were surprised when Berube announced the vote result because they could not understand how the other DC, Connor, got more votes than the complainant. Berube admitted to OCR that there was a tie vote between the complainant and Connor; but, because a decision had to be made and because he thought the complainant would probably be moving to a position in Criminal Justice, he announced Connor as the winner.

Additionally, on April 13, 2005, Randy Shochet and Thomas Tung Nguyen, DCs in Paralegal Studies, told the complainant that they were directed to stop communications with him.

Mary Ann B. Oakley, Esq.
Page 10

Finally, on April 15, 2005, the University terminated the complainant's employment, alleging that he failed to perform his job since March 24, 2005 and had abandoned his job.

OCR finds that each of the incidents noted above could be construed as adverse actions.

**Regarding whether there was a causal connection between the adverse action and the protected activity, OCR made the following factual findings:**

There was causal connection between the dates the complainant requested accommodations on December 16, 2004 and the following:

- o January 13, 2005, the date that the complainant expressed interest in the Assistant Dean of Curriculum position in Criminal Justice;

- o January 22-24, 2005 and January 24, 2005, the date that the Bi-Annual Retreat was held and the date that Berube conducted a vote for DCs to serve on the Academic and Curriculum committees;

- o March 23, 2005, the date that the complainant expressed interest in the Assistant Dean of Faculty and Assistant Dean of Curriculum positions in Paralegal Studies;

- o April 3, 2005 the date the complainant sent a copy of a proposed federal complaint to Ross;

- o April 13, 2005, the date the DCs told the complainant they were directed to stop communications with him;

- o April 14, 2005, the date the complainant informed the University he had filed a complaint with OCR; and

- o April 15, 2005, the date that the University terminated the complainant's position because it alleged that he failed to perform his job since March 24, 2005 and had abandoned his job.

OCR concludes that the complainant engaged in protected activity and experienced adverse action. OCR has also determined that there was a sufficient connection between the activity and the adverse action to give rise to an inference of retaliation. OCR must consider next whether the University had nonretaliatory reasons for its adverse action. If so, whether the reasons asserted by the University are a pretext for discrimination.

Mary Ann B. Oakley, Esq.
Page 11

**Regarding not considering the complainant for the position as Assistant Dean of Curriculum in the School of Criminal Justice:**

Lowery responded to the complainant's email regarding the position and provided information to the complainant concerning the documentation needed to apply for the position. Berube stated that he received and signed the Internal Posting Application form submitted by the complainant on January 21, 2005. The application deadline for the position was January 13, 2005.

Although the University told the complainant that his application "fell through the cracks", University personnel informed OCR that his application was not submitted before the cutoff date. University personnel told OCR they were mistaken by telling the complainant that his application "fell through the cracks."

Harpool told OCR that Lowery gave him three resumes from persons applying for the position. He said, after reviewing all three, he concluded that only one of the applicants (the eventual hire) was qualified for the position. He said the complainant and the other applicant did not have the requisite experience. Specifically, he told OCR that the complainant did not have a degree involving curriculum or the criminal justice system. Nor, in his opinion, did he or the other applicant have sufficient experience in those areas. The candidate who was selected had that experience. According to Harpool, the complainant's resume reflected that his major experience was in business law. Harpool also told OCR that the complainant did not have 1 year of ABA experience, as required by the position. The selected candidate had the requisite experience. Based on his review of the resumes, he recommended to Lowery that the person who was eventually offered the job be hired. Lowery, the person who made the final decision to hire for the position of Assistant Dean of Curriculum for Criminal Justice informed OCR that, in January 2005, he did not know that the complainant was disabled or that he had engaged in protected activity. Hovis, the person who coordinated interviews, told OCR that, in January 2005, she did not know that the complainant was disabled or that he had engaged in protected activity.

OCR finds that the University has offered a nondiscriminatory reason for the adverse action.

**Conclusion**

Lowery informed the complainant of the requirements for applying for the position. Harpool, Lowery, and Hovis were not aware of the complainant's disability or of his request for accommodations prior to the time the position was filled.

OCR, therefore finds that the University has offered a nondiscriminatory reason for the adverse action, and that there is insufficient evidence to conclude that the reasons provided by the University to justify its actions are a pretext for discrimination.

Mary Ann B. Oakley, Esq.
Page 12

**Regarding not considering the complainant for the positions of Assistant Dean of Curriculum and Assistant Dean of Faculty in Paralegal Studies:**

The University announced the Assistant Dean of Faculty and Assistant Dean of Curriculum positions in Paralegal Studies on The Chronicle of Higher Education's website. Both job announcements required applicants to have a minimum of 1+ years experience in an ABA approved program. The announcement also stated that the jobs would not be virtual positions. According to Harpool, the University was/is seeking ABA accreditation for Paralegal Studies. He told OCR that, because of that effort, the persons filling those positions had to have the 1+ years of ABA program experience.

According to the complainant and other Kaplan personnel interviewed by OCR, none of the then current members of the Paralegal Studies staff had the requisite ABA experience. Although the complainant states that the positions being advertised had previously been virtual, the Paralegal Studies personnel who spoke to OCR, Harpool, Berube, Shochet and Nguyen, all stated that those positions had never been virtual.

**Conclusion**

The requirement for a minimum of 1+ years experience in an ABA approved program for the Assistant Dean of Faculty and Assistant Dean of Curriculum positions in Paralegal Studies impacted all potential applicants, particularly those in Kaplan's Paralegal Studies. There is insufficient evidence that the decision to require ABA experience and the continued requirement that the positions be virtual were made to specifically exclude the complainant. Thus, OCR finds that there is insufficient evidence to conclude that the reasons provided by the University to justify its actions are a pretext for discrimination.

**Regarding Berube intentionally rigging an academic vote to the complainant's detriment:**

The complainant emailed Berube on January 18, 2005, stating that he would attend portions of the Retreat held on January 22-25, 2005 and expressed concerns about drawing attention to his absence at the Retreat. On January 24, 2005, Berube conducted a vote for department chairs to serve on the Academic and Curriculum committees. Berube needed a quorum in order to properly execute the voting. He stated he knew the whereabouts of the other chairs but was not aware of the whereabouts of the complainant. He also did not know the whereabouts of the then Assistant Dean of Curriculum and asked about her. Berube stated that he felt that calling the complainant during the Retreat would draw attention to the fact that the complainant was not present.

Berube stated that Kaplan management had informed him and the other Deans that although not on the Retreat agenda, decisions had to be made regarding committee assignments as soon as possible. That is why he held the elections during the lunch break on January 24, 2005, at the Retreat.

Mary Ann B. Oakley, Esq.
Page 13

According to Berube, the vote for the Curriculum Committee was tied between the complainant and another DC. Because of his perception that a decision had to be made quickly based on the directive he received earlier that day and because he thought that the complainant would be offered a job in Criminal Justice, he informed OCR that he decided to name Connor to the Curriculum Committee.

On February 1, 2005, Berube sent an email to the complainant apologizing for holding the vote without him and offering to revote the two committee assignments. He stated that he would tell everyone involved that, because of the rushed nature of the Retreat, he was not able to give everyone a chance to participate and did not feel it was fair. The complainant declined the offer by email dated February 2, 2005, saying he was more upset with the process, rather than the result. On February 24, 2005, Berube appointed the complainant to the Assessment Committee, a committee that, according to the complainant, is important, but is not as prestigious as the Curriculum Committee.

**Conclusion**

OCR finds that the University has offered a nondiscriminatory reason for the adverse action. The complainant emailed Berube on January 18, 2005 stating that he would attend portions of the Retreat held on January 22-25, 2005. On January 24, 2005, Berube conducted a vote for department chairs to serve on the Academic and Curriculum committees. The complainant was not present and according to the revised agenda the complainant submitted, he should have been at the Retreat at that time. Berube inquired about the complainant's whereabouts because he expected that the complainant would be at the Retreat. Also, according to Berube, there was an unexpected urgency to vote on the committee assignments, which is why he held the elections during the lunch break on January 24, 2005. Berube contacted the complainant and offered to do a revote for two committee assignments because the complainant and Connie Scuderi, the other person who missed the vote, had raised concerns about the vote. The complainant declined the offer. Berube later appointed the complainant to the Assessment Committee. OCR finds that there is insufficient evidence to conclude that the reasons provided by the University to justify its actions are a pretext to discrimination.

**Regarding ordering Shochet and Nguyen to discontinue communicating with the complainant:**

On April 13, 2005, Berube sent his supervisor, Harpool, an email asking if he had gotten any communication from Ross and Gefen-Silician concerning the complainant's status with the University. He stated that he wanted to know because Shochet and Nguyen told him that the complainant was constantly calling them about his problems. They told him they were aware the complainant was planning on filing a lawsuit against the University and wanted to be able to tell the complainant that the University had instructed them that they could no longer talk to him. On the same date, Harpool informed Shochet and Nguyen by email to avoid the complainant's calls and other contacts.

Mary Ann B. Oakley, Esq.
Page 14

On April 13, 2005, Shochet and Nguyen sent the complainant an email, stating that they were directed to stop communications with the complainant because the University was bracing for his lawsuit and it would be a conflict of interest for them to work for the University and communicate with the complainant during this period. They told him that after his complaints were resolved, they would resume communications with him.

During interviews with OCR, both Shochet and Nguyen confirmed that they were not pressured by the University not to communicate with the complainant. They stated they were uncomfortable with the complainant discussing his problems with them, and because of that discomfort and the time required to communicate with the complainant, they contacted Berube to ask for advice on how to handle the complainant. They stated that in the past the complainant would address issues on behalf of the other DCs, and that generally, they had no problem with him doing so. However, they stated they did not want to get involved in the complainant's lawsuit against the University. They told the complainant to do what he had to do, but that they were content working for the University.

**Conclusion**

OCR finds that the University has offered a nondiscriminatory reason for the adverse action. According to Shochet and Nguyen, they were not pressured by the University to stop communicating with the complainant. They stated they were uncomfortable that the complainant was contacting them to discuss his problems with them. As a result they contacted Berube to ask for advice on how to handle the complainant. They confirmed with OCR that they did not want to get involved in the complainant's lawsuit against the University and that they initiated contact with Berube for advice on how to handle communications with the complainant. It was then that Kaplan officials advised them that they could tell the complainant they were directed to stop communications with the complainant because the University was bracing for his lawsuit and it would be a conflict of interest to work for the University and communicate with the complainant during this period. Thus, OCR finds that there is insufficient evidence to conclude that the reasons provided by the University to justify its actions are a pretext to discrimination.

**Regarding terminating the complainant's employment by alleging that he had abandoned his job:**

In February 2005, Berube sent the complainant a document entitled the Clarification of Expectations, saying, in part, that DCs should be responding to faculty and student emails within 24 hours during the week and within 48 hours on the weekend.

In that document he also told the complainant the following:

a. He has received feedback that the complainant does not respond to all faculty emails. He wants the complainant to copy him as the other chairs do so he can reinforce the complainant's communications with faculty.

Mary Ann B. Oakley, Esq.
Page 15

    b. Some of his faculty told him that the complainant is not sending them assessment results unless they make numerous requests for them. Gisele Franco's self evaluation was sent late. Michael Carr's was not sent at all.

    c. Several of the faculty the complainant supervised (four) failed to meet key standards.

    d. He told the complainant he must make notations in the monitoring report on counseling faculty so they can meet the standards.

    e. He also told him that his teaching measures were below average.

He told the complainant that he needed to improve in the following areas: a) Better response to faculty emails; b) Give faculty advanced warning of classes. He must confirm faculty assignments in advance of the term's start as faculty have complained; c) Send out midterm and final survey results after they have submitted their final grades to the registrar's office. Send the results along with an analysis of what they did well and what they need to improve; d) Send out self-evaluation forms and make sure the forms are completed by faculty; e) Inform faculty of critical deadlines. Those notices must be reinforced a couple of times; f) Send course lead revisions/updates to the assistant dean by the deadlines; g) Improve teaching measures; h) Provide stronger management of course leads.

On March 28, 2005, an instructor in Paralegal Studies, Patrice Paldino, sent Berube an email saying that she had not received any emails from the complainant in a long time. She emailed Berube again on April 4 and April 8, 2005, saying the complainant "has not responded to me at all."

Shochet told OCR that, during late March/early April 2005, the complainant was scheduled to conduct training for instructors at the University. This assignment was routinely rotated between the DCs and it was the complainant's turn to conduct the training. Shochet stated that he received a call from one of the instructors notifying him that she had not received the training and that no one was showing up to teach the seminars. Shochet called the complainant regarding this matter and was told by the complainant that he knew he was missing and that it "was between me and Kaplan." Shochet also stated that the complainant failed to perform required duties such as message board work, sending responses to students, conducting three online seminars and three phone conversations with instructors. Shochet immediately contacted Berube and told him the seminars were not being covered. He stated the DCs took over the classes that were assigned to the complainant on or about April 10-11, 2005. The DCs confirmed this happened but could not give OCR the specific dates.

During an interview with OCR in August 2005, Nguyen provided an explanation of a chart previously submitted by the University. He stated that the chart tracks how instructors performed their duties from February 28 through April 4, 2005. According to Nguyen, the chart shows that the complainant missed many of his job responsibilities

Mary Ann B. Oakley, Esq.
Page 16

particularly from Lesson 3 to Lesson 5. He stated Berube asked him to take over the complainant's classes after Lesson 5.

On April 6, 2005, Berube emailed the complainant regarding certain of his responsibilities. He told the complainant that he had missed two practice seminars and that as a consequence the complainant needed to add a few seminars to host. Berube also told the complainant that documents needed to be sent to the faculty prior to the next term.   Berube further told the complainant that he needed to (a) schedule the new instructor phone call, (b) make sure the faculty received and reviewed the syllabus, (c) supply the faculty with general classroom information by April 14, 2005, and (d) make sure the faculty does outreach to missing students. In reply, on April 6, 2005, the complainant stated that "John: I have received your email, but I am unable to respond until I receive a response from Kaplan, Inc." regarding his discrimination/retaliation allegations. According to Berube, the complainant did not perform the assigned tasks.

On April 8, 2005, Rebecca Seidner, Academic Advisor, sent an email to Miya Burt-Steward (Burt-Steward), Manager, Academic Operations, saying that she received a call from a student who said that the complainant had not been present in the Law Office Management class since reading week (March 28 – April 4, 2005). Further, she stated that students had not received any feedback, had not had any of the promised modifications to the weekly lessons, and that the class had to contact Student Services to find a replacement for their weekly seminar. The complainant told the class his father had just become ill without warning. He told them that he had not checked any I-mails (University's version of email) since April 4, 2005.  Burt-Steward sent the email to Berube who forwarded it to Harpool and Monica Rego (Rego), Vice President, Human Resources, saying that the complainant was not involved with his classes and that he had to get the classes under control. He told them that the complainant had not posted to the training message board since March 25, 2005, had missed all scheduled seminars, and that he (Berube) would contact faculty members to make sure they had received their training materials.  Berube also told them he was not sure that the complainant had scheduled new instructor phone conferences for the next week and that he was concerned about the start of the term.  On April 8, 2005, the complainant responded to an email from Berube, which, in part, inquired about the complainant's health.  The complainant responded by saying "No, I am not feeling better yet because no resolution has been reached regarding any of the problems that have been percolating since December 2004. Therefore, if you have any questions, please direct them to Karen Ross..."

On April 13, 2005, Dr. David L. Clinefelter (Clinefelter), Provost and Vice President for Academic Affairs, contacted the complainant by telephone at the request of Dr. Arnold Rosen (Rosen), President of Kaplan University, to address his concerns.   The complainant had previously sent Rosen an email regarding his discrimination/retaliation allegations against Kaplan. Clinefelter told OCR that, during the conversation, the complainant informed him that he had not been showing up for work for over a week because he needed to get the University's attention concerning the problems he had been experiencing. He told Clinefelter he felt he had a choice to either quit working or sue the

Mary Ann B. Oakley, Esq.
Page 17

University, so he chose to quit working.    The complainant denies making those statements.

According to the complainant, although the complainant offered to cover a scheduled seminar the evening of April 13, Clinefelter told him he would take care of it. Clinefelter, however, denies making that statement and says that he specifically told the complainant he had to fulfill his work obligations.    Clinefelter immediately contacted Berube and Harpool, the complainant's supervisors, to confirm whether it was true that the complainant had not been performing his job responsibilities.    Clinefelter contacted HR for guidance on how to address this problem and told the complainant that he would continue talking with him on April 18, 2005 regarding settlement options regarding his resignation. On April 13, 2005, the complainant sent Clinefelter an email confirming the settlement conversation on April 18th and that he would refrain from taking any judicial or administrative action until they had their discussion.    Clinefelter sent an email to the complainant on April 14, 2005, stating that he looked forward to resolving his dispute but that he expected him to fulfill his job responsibilities.

In an interview with OCR on August 17, 2005, Ross said that the complainant told her on April 1, 2005, that he had stopped working in order to get Kaplan's attention. On April 1, 2005, Ross and the complainant spoke about his allegations and the fact that he no longer wanted to work with Berube and Harpool.    Ross told the complainant that she would attempt to find him another position in the Kaplan system if he would send her his resume.    When she got the resume, she forwarded it to Jim Whelan, Kaplan's corporate recruiter.    Whelan later told Ross that nothing was available.

On April 13, 2005, Ross contacted the complainant regarding the concerns he raised with Rosen. She told the complainant that it was an oversight that he was not interviewed for the DC positions in the Criminal Justice Department but that no one in that department knew about his disability. She explained that the person selected for the position in Criminal Justice had more experience. She told him that his December 4, 2004, request for accommodations was granted and that his disputes with Berube's management style did not amount to discrimination. She informed the complainant that he was expected to fulfill his job responsibilities as a DC and that his failure to perform these job requirements was unacceptable and could not continue.    Ross warned him that if he was interested in continuing in his position as a DC, he must perform the essential functions of his job and that contact with his supervisor and management in Paralegal Studies was an essential function of his job.

On April 15, 2005, Clinefelter sent a letter to the complainant notifying him that his employment was terminated because he failed to perform his job since March 24, 2005 and had abandoned his job. He told OCR that, after he got reports from Harpool, Berube and Ross, he was convinced the complainant had not been working and thought he had sufficient grounds to terminate him.

Mary Ann B. Oakley, Esq.
Page 18

## Conclusion

The evidence shows that Berube directed two other DCs to take over some of the complainant's job responsibilities because students and faculty had reported that he was not participating in classes and seminars. On April 6, 2005, Berube told the complainant he was not fulfilling certain of his duties. The complainant told Berube he could not respond until Kaplan had responded to his allegations and Berube reported to OCR that the complainant did not perform the duties as directed in the April 6 email. Though there is a dispute between the complainant, Clinefelter, and Ross about his informing them that he had quit working in order to get Kaplan's attention, there is evidence that the complainant told both of them he had quit working. Both Ross and Clinefelter investigated and according to both of them, it was clear that the complainant had failed to perform many of his duties.

Based on the above, OCR finds that the University has identified a legitimate, non-discriminatory reason for terminating the complainant's employment with the University. Because of that finding OCR must further determine if the reason provided is pretextual.

According to the University's Field Employee Handbook, effective February 1, 2003, item #6 entitled, <u>Your Responsibility</u>, tardiness or absence, including absence of two (2) consecutive working days without notification to the Company or satisfactory reason for failure to notify. The policy states that failure to comply can result in disciplinary action up to and including termination.

On August 23, 2005, OCR requested that the complainant provide a chronology of his actions from March 23 through April 15, 2005. On August 27, 2005, the complainant responded that because he was a flextime employee, an hour-by-hour chronology is not applicable and that he sent and reviewed over 600 emails during this timeframe. He also stated that March 28 through April 3, 2005 was "Reading Week" and that faculty and DCs were not expected to send I-mails (University version of emails) on the Kaplan system or post to the message board; therefore, the majority of his communications were emails through the Internet. He provided a list of emails he sent and/or received from April 1 through April 15, 2005. The complainant did not provide the contents of any of those emails listed. According to the complainant, because of limited storage space on the Kaplan system, he setup a program on walla.com to store his incoming email messages to an external web mail account (judegillespie@walla.com) for permanent offline storage. The complainant stated that the University failed to disclose to OCR that he and the other DCs used two electronic message accounts (I-mail and Kaplan.edu) to perform their duties. The complainant stated that it would be "an extremely laborious exercise" to provide a copy of each walla.com message.

On August 23, 2005, OCR contacted the University for clarification on the DC's use of the walla.com account. A copy of the documentation received from the complainant was also submitted to the University.

Mary Ann B. Oakley, Esq.
Page 19

On September 12, 2005, the University responded that it does not use walla.com and no one really knows what it is. Berube stated that he does not recall the complainant ever using the walla.com account. He stated that their instructors are told that the only way they are to communicate with students is through the University's internal email system.

Also, according to Shochet and Connor, faculty is required to respond to emails from students during reading week. Shochet's reading week coincided with the complainant's. The evidence shows that Shochet sent emails to students on March 28 through March 31, 2005 and on April 3, 2005. The evidence also shows that, although students sent emails to the complainant during reading week, he did not respond. University personnel stated that the complainant was not authorized to use walla.com to perform his job responsibilities.

The University stated that, after March 25, 2005, there were six emails from the complainant not relating in any way to his work; an e-mail and the duplicate of it saying that he would take a sick day on April 5; a threatening e-mail he wrote to Andy Rosen complaining about his complaints (which had nothing to do with his work); and communications with or about Karen Ross, again not related to his work. According to the University, there is not one email related to his work after April 4, 2005 meaning that he did not work on April 5 and 6 (sick days) through April 13 or any day thereafter. He also missed the seminars he had scheduled on April 6th and 12th. The University informed OCR that constitutes eight consecutive days of job abandonment, even though he had time to write to Andy Rosen and Karen Ross to complain. He not only abandoned his job during a critical period when he was supposed to be training new teachers, but at least five people (Clinefelter, Ross, Berube, Nguyen, and Shochet) said he did not perform certain of his duties. Colleagues, Shochet and Nguyen, had to fill in for him; Berube had to teach the April 6 seminar when no one showed up. According to the complainant and Berube, the complainant asked for and received permission from Berube to take sick leave on the 6th. Berube states that the complainant did not tell him he had a seminar that night. The complainant states that Berube should have known he had a seminar and would need a substitute for the session. Although the complainant did ask for sick days on April 5 and 6, 2005, and did not work on those days, he did not complete the requisite documentation (Paid Time Off) for them to be considered authorized absences.

On April 15, 2005, the recipient terminated the complainant's employment, citing the following reasons: The complainant did not attend seminars he was scheduled to teach, did not respond to student and faculty email inquiries, and did not provide students with feedback on assignments. The terminating notice also states "it is clear that you have abandoned your job." Kaplan's Field Handbook, at Section IV (6)(8) states that an employee may be terminated because of tardiness or absence, including absence of two (2) consecutive working days without notification to the Company or satisfactory reason for failure to notify…"

The evidence shows that the complainant communicated with his supervisor, Berube, at least through April 6, 2005 regarding his duties and what Berube expected of him. There

Mary Ann B. Oakley, Esq.
Page 20

is further evidence that the complainant communicated by email to other Kaplan employees regarding Kaplan business. For example, there were emails regarding the grades to be submitted by a faculty member dated March 24 and March 27, 2005, scheduling for upcoming terms to faculty March 31, 2005, and the complainant's notification to Berube on April 4 and April 6, 2005, that he would be taking a sick days. Additionally, the complainant has produced a list of emails dated April 1, 2005 to April 15, 2005, that, according to the complainant, show he was communicating with Kaplan during the time in which the recipient alleged he abandoned his job. Kaplan said they knew he had a personal email address but did not know about the storage facility at walla.com, a private online storage facility. However, neither the complainant nor the recipient has produced the contents of those emails. The complainant said it would be too cumbersome for him to produce them. Kaplan says it has no access to the complainant's emails on walla.com.

Kaplan provided OCR with documentation showing that between April 2003 and September 2005, Kaplan dismissed thirty-five employees (including the complainant) for job abandonment.

**Conclusion**

In making a determination as to whether the University's reasons for terminating the complainant were a pretext for discrimination, OCR finds that the evidence shows that thirty-four other Kaplan employees were terminated for job abandonment between 2003 and 2005. None of those former employees had engaged in a protected activity. The evidence also shows that the complainant had been cited for performance problems in his December 2004 evaluation and in a February 2005 document from Berube. The evidence also shows that because the complainant did not perform many of his major responsibilities, his colleagues had to fill in for him. For example, the complainant did not perform duties that Berube pointed out in an April 6, 2005 email. Because the complainant was not covering his instructor seminars, two of his colleagues took over those classes. One of his colleagues, Nguyen, stated that the complainant missed his job responsibilities in one of his classes, particularly from Lesson 3 to Lesson 5. In April 2005, Berube asked Nguyen to take over that class.

OCR did not find any evidence that the complainant performed his duties on April 7 and 8, 2005. Although the complainant was communicating with Ross and other Kaplan employees about his allegations of discrimination and retaliation, there is no evidence that he performed any of the essential functions of his job on those dates.

Although the complainant has given OCR a list of purported emails, which he said he sent and/or received from April 1 to April 15, 2005, OCR does not have any evidence that the list is truly a list of emails related to work activities for Kaplan or anything else. We have no evidence of the content of the emails or to whom or from whom the emails were sent. Additionally, the University has stated that it does not have access to walla.com, could not have monitored walla.com and that personal email addresses are not to be used to communicate with students or to post messages, both essential requirements

Mary Ann B. Oakley, Esq.
Page 21

of the complainant's job. OCR asked the complainant for copies of the content of the walla.com emails, but he stated that it would be too cumbersome to retrieve them and that we should get them from the University.

Based on the foregoing, OCR finds that there is insufficient evidence that the reasons for the adverse action (termination) were pretextual or that the University took adverse actions for retaliatory reasons.

**Kaplan's Policies and Procedures**

Section 504 and its implementing regulation at 34 C.F.R. 104.7(b) provides that a recipient that employs 15 or more persons shall adopt grievance procedures that incorporate appropriate due process standards that provide for the prompt and equitable resolution of complaints alleging any actions prohibited under Section 504. 34 C.F.R. 104.8 imposes an obligation on recipients to notify employees of the recipient's obligations under Section 504.

The University utilizes several manuals in its operations. Among them are:

- Kaplan Higher Education Corporation (KHEC) Employee Handbook, Revised July 2003:

This document states that Kaplan "prohibits discrimination based on race...disability... and other protected classes as provided by applicable Federal and State law. Company policy includes compliance with the Americans with Disabilities Act." The document also contains a non-harassment policy, prohibiting harassment based on disability, among other protected status. One of the policy's purposes is to "encourage anyone who feels they have been subjected to harassment to report such conduct to the Company, which will investigate and respond to any report." Harassment is defined as "verbal or physical conduct that denigrates or shows hostility or aversion towards an individual because of his or her... disability, or that of persons with whom the individual associates." The handbook details a policy for reporting and investigating harassment. The policy lists several persons to whom a complaint may be made. The complaint does not have to be in writing. It also provides a number for the Ethics Hotline. The policy also states that while complaints should be reported promptly, there is no time limitation. The policy states the Company will not retaliate against a person making a complaint. It also provides that all allegations will be investigated thoroughly and will subject a person who violates the policy to appropriate disciplinary action. It does not provide a timeframe for completion of an investigation nor does it provide that its findings will be communicated in writing or that a complainant has the right to appeal any decision made.

- Kaplan Field Employee Handbook, Effective February 1, 2003;

Mary Ann B. Oakley, Esq.
Page 22

The discrimination and harassment policies in this document closely mirror the provisions in the KHEC handbook. However, employees who wish to complain are directed to contact persons different from those named in KHEC. This policy states that complaints will be promptly investigated. Like KHEC, it states that persons who violate the policy will be appropriately disciplined. It does not provide a timeframe for completing its investigation, provide an opportunity for appeal or state that a complainant will be notified of the result of its investigation.

- Kaplan University Faculty Handbook, Undated

The document cites, by reference, the non-harassment policy and complaint procedures found in the KHEC handbook. It also cites the ADA and Section 504. The document contains no other references to a discrimination/harassment policy or complaint procedure.

- None of the Kaplan documents that OCR reviewed contains a policy or procedure detailing Kaplan's policy regarding proving accommodations to disabled staff or how a disabled person is to seek accommodations.

As a result of reviewing the University's policies and procedures, OCR has made the following findings:

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.
- The non-harassment policy only addresses the types of harassment to which an employee might be subjected. As all discrimination does not necessarily rise to the level of harassment, the University needs to provide policies and procedures that address discrimination separately from harassment.
- The discrimination/harassment complaint procedure should be amended to provide the detailed process in which employees might seek informal and formal resolutions to their concerns.
- The University should designate consistently to whom informal and/or informal complaints may be addressed.
- The University's policies and procedures should be amended so as to provide a definite detailed manner and period of time in which prompt investigations are to be completed (30-60 days).
- The complaint procedures should be amended to require the University to notify complainants in writing of the results of investigations
- The University's policies and procedures should provide where a complainant and/or one who has been accused may appeal the investigation's findings.

In order to resolve these concerns, the University agreed to amend its accommodations and grievance policies in accordance with the attached Resolution Agreement (Exhibit A) and will provide OCR with copies of items 1 –7 by April 15, 2006. Additionally, by May 30, 2006, the University will provide evidence to OCR that copies of items 1 –7 were published as agreed upon.

Mary Ann B. Oakley, Esq.
Page 23

The complainant has alleged that because Kaplan's grievance policies were not in compliance with the regulations that OCR enforces, his allegations of discrimination and retaliation against Kaplan University were not properly handled and that mishandling led to his termination.   OCR has found insufficient evidence that the University discriminated or retaliated against the complainant prior to his termination.  Additionally, OCR finds that, although the policies are not in compliance with the regulations OCR enforces, the complainant was able to voice his grievances and to have them heard by every person at Kaplan he contacted.  Further, the evidence shows that the complainant was terminated because, at least, in part, there is evidence that he told Kaplan officials (Berube, Clinefelter, Ross) that he quit working to get their attention and that Kaplan should consider his correspondence with Kaplan management regarding his allegations as work.

This concludes OCR's investigation of this complaint.  This letter is not intended, nor should it be construed, to cover any other issues regarding the University's compliance with Section 504 that may exist and are not discussed herein.

In accordance with agency procedures, we must remind the recipient that intimidation or retaliation against Complainants by recipients of Federal financial assistance is prohibited.  No recipient shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the laws OCR enforces, or because one has made a complaint, or participated in any manner in an investigation in connection with a complaint.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records, upon request.  If we receive such a request, we will seek to protect, to the extent possible, any unwarranted invasion of privacy.

I want to express my appreciation for the courtesy and cooperation that you and your staff extended to the staff of OCR.  If you have any questions regarding this letter, please contact Ms. Connie James Investigator, at (404) 562-6389.

Sincerely,

Doris N. Shields
Team Leader

Enclosure

**RESOLUTION AGREEMENT**
**KAPLAN UNIVERSITY REGARDING**
**COMPLAINT #04-05-2087**

In order to resolve outstanding issues related to Complaint #04-05-2087, Kaplan University (the University), without admitting any violations or non-compliance, and the Department of Education, Office of Civil Rights (OCR), agree to the following actions, consistent with Section 504 of the Rehabilitation Act of 1973:

1. The University will publish its procedures regarding complaints related to disability matters, which will detail how a disabled employee (mental, physical or other) can request disability related accommodations.

2. As all discrimination does not necessarily rise to the level of harassment, the University will publish its policies and procedures that broadly address disability discrimination as well as harassment.

3. The disability discrimination complaint procedure will be amended to provide the detailed process by which employees may seek resolutions to their concerns regarding alleged disability discrimination.

4. The University will designate a person/position(s) to whom informal and/or informal complaints regarding disability issues may be addressed. A position, address and telephone number will be provided for each person/position so designated.

5. The University's disability complaint procedures will be amended so as to provide a specific period of time in which prompt investigations are to be completed (30-60 days).

6. The University's disability complaint procedures will be amended to require the University to notify complainants in writing of the results of its investigations.

7. The University's procedures will be amended to provide appeal procedures for those who do not agree with the above findings.

In order for OCR to monitor implementation of these assurances, the University agrees to provide the following monitoring report(s):

By April 15, 2006, the University will:
- Provide OCR with copies of items 1-7.

Kaplan University
Resolution Agreement
Page 2


By May 30, 2006, the University will:
- Publish copies of items 1-7.


For Kaplan University                    Date 10/12/05


Gary S. Walker                           Date 10/27/05