CLOSED

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:05-cv-23282-PCH

Gillespie v. U.S. Dept Education, et al
Assigned to: Judge Paul C. Huck
Demand: $0
Cause: 05:0702 Administrative Procedure Act

Date Filed: 12/21/2005
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Jude Gillespie**
*Esquire*

represented by **Thomas Jude Gillespie**
800 W Avenue
Suite 540
Miami Beach, FL 33139
786-348-0023-fax-877
Fax: 827-3093
Email: gillespie.jude@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Department of Education**

**Defendant**

**Secretary of Education of the United States**

*Margaret Spellings, in her official capacity*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/21/2005 | 1 | COMPLAINT for Declaratory and Injunctive Relief filed; FILING FEE $250.00 RECEIPT # 932398 ; Magistrate Judge Andrea M. Simonton (nt, Deputy Clerk) (Entered: 12/22/2005) |
| 12/21/2005 | 2 | SUMMONS(ES) issued for U.S. Dept Education, Secretary Education (nt, Deputy Clerk) (Entered: 12/22/2005) |
| 12/21/2005 | 3 | SUMMONS(ES) issued for U.S. Dept Education, Secretary Education by serving the US Attorney (nt, Deputy Clerk) (Entered: 12/22/2005) |
| 12/21/2005 | 4 | SUMMONS(ES) issued for U.S. Dept Education, Secretary Education by serving the US Attorney General (nt, Deputy Clerk) (Entered: 12/22/2005) |
| 04/11/2006 | 5 | ORDER that on or before 04/15/06, Plaintiff shall file a status report to inform the Court of Plaintiff's attempt to serve Defendants (Signed by Judge Paul C. Huck on 04/11/06) [EOD Date: 4/12/06] (bb, Deputy Clerk) (Entered: 04/12/2006) |

**EXHIBIT I**  )8

| | | |
|---|---|---|
| 04/26/2006 | 6 | AMENDED STATUS REPORT re: service of process by Jude Gillespie (nt, Deputy Clerk) (Entered: 04/26/2006) |
| 04/26/2006 | 6 | NOTICE of Unavailability by Jude Gillespie for dates of: 05/17/06 - 06/01/06 (nt, Deputy Clerk) (Entered: 04/26/2006) |
| 05/16/2006 | 7 | SECOND AMENDED STATUS REPORT by Jude Gillespie (nt, Deputy Clerk) (Entered: 05/16/2006) |
| 05/24/2006 | 8 | ORDER that Plaintiff shall perfect service of process by 06/12/06. ( Signed by Judge Paul C. Huck on 05/24/06) [EOD Date: 5/25/06] (nt, Deputy Clerk) (Entered: 05/25/2006) |
| 06/12/2006 | 9 | SUMMONS(ES) issued for Secretary Education, U.S. Dept Education by serving US Attrorney (ct, Deputy Clerk) (Entered: 06/13/2006) |
| 06/12/2006 | 10 | SUMMONS(ES) issued for Secretary Education (ct, Deputy Clerk) (Entered: 06/13/2006) |
| 06/12/2006 | 11 | SUMMONS(ES) issued for Secretary Education, U.S. Dept Education by serving Attorney General (ct, Deputy Clerk) (Entered: 06/13/2006) |
| 06/16/2006 | 12 | Order of dismissal. Ordered and adjudged that this action is dismissed with out prejudice. All pending motions are denied as moot. The case is closed. ( Signed by Judge Paul C. Huck on 6/16/06) [EOD Date: 6/19/06] (ct, Deputy Clerk) (Entered: 06/19/2006) |
| 06/16/2006 | | CASE CLOSED. Case and Motions no longer referred to Magistrate. (ct, Deputy Clerk) (Entered: 06/19/2006) |
| 06/21/2006 | 14 | MOTION by Jude Gillespie (Attorney ) to vacate [12-1] order (cj, Deputy Clerk) (Entered: 06/26/2006) |
| 06/23/2006 | 13 | MOTION by Jude Gillespie to vacate [12-1] order (kw, Deputy Clerk) (Entered: 06/26/2006) |
| 07/05/2006 | 15 | ORDER denying [13-1] motion to vacate [12-1] order ( Signed by Judge Paul C. Huck on 7/5/06) [EOD Date: 7/6/06] (ct, Deputy Clerk) (Entered: 07/06/2006) |
| 07/05/2006 | 16 | MEMORANDUM by Jude Gillespie in support of [13-1] motion to vacate [12-1] order (cj, Deputy Clerk) (Entered: 07/06/2006) |
| 07/06/2006 | 17 | RESPONSE by Secretary Education, U.S. Dept Education to [13-1] motion to vacate [12-1] order, [14-1] motion to vacate [12-1] order (ct, Deputy Clerk) (Entered: 07/07/2006) |
| 07/07/2006 | 18 | MOTION with memorandum in support by Jude Gillespie (Attorney ) for relief from final order purusuant to Federal Rule of Civil Proceudre 60(B) (Former Deputy Clerk) (Entered: 07/10/2006) |
| 07/07/2006 | 19 | REPLY by Jude Gillespie to response to [14-1] motion to vacate [12-1] order (Former Deputy Clerk) (Entered: 07/10/2006) |
| 07/10/2006 | 20 | ORDER denying [18-1] motion for relief from final order purusuant to Federal Rule of Civil Proceudre 60(B) ( Signed by Judge Paul C. Huck on 7/10/06) [EOD Date: 7/11/06] (ct, Deputy Clerk) (Entered: 07/11/2006) |

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

JUDE GILLESPIE, ESQUIRE, )
           Plaintiff, )
vs. )
     )
UNITED STATES DEPARTMENT )
OF EDUCATION and MARGARET )
SPELLINGS, in her official capacity as )
United States Secretary of Education, )
           Defendant. )
     )
     )
     )
     )
     )
     )
     )
     )
     )
     )
_____)

Civil Action No.

05-23282

CIV - HUCK

MAGISTRATE JUDGE
SIMONTON

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Jude Gillespie, Esquire files this Complaint against Defendants United
States Department of Education (Department) and Margaret Spellings in her official
capacity as United States Secretary of Education, and alleges the following:

### JURISDICTION, VENUE AND PARTIES

1.    This is an action brought under the Administrative Procedures Act, 5
U.S.C. §§ 701 et seq. (APA) that seeks declaratory and injunctive relief to compel the
Department of Education (Department) to comply with Federal law, more specifically
with Sections 504 and 505 of the Rehabilitation Act, as amended, 29 U.S.C. §§794



1

and 794a, as well as the Department's own regulations set forth in Part 105 of Title 34, Code of Federal Regulations.

2.     This is also an action brought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended, and the Privacy Act, 5 U.S.C. § 552a(g), to compel production of records lawfully requested, to ensure the maintenance and protection of the subject records, to provide damages for the violations of the Act and the adverse impacts on the Plaintiff, and to award attorneys' fees and costs of litigation.

3.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331 as this action arises under FOIA and pursuant to 5 U.S.C. §§ 552a(g)(1)(D) and (5) of the Privacy Act. This Court also has jurisdiction over this action pursuant to the Administrative Procedures Act and 28 U.S.C. §§ 2201 and 2202.

4.     Venue is proper in this District pursuant to 5 U.S.C. § 552a(a)(g)(5) and 28 U.S.C. § 1391.

5.     Plaintiff Jude Gillespie, Esquire is a resident of Miami Beach, Florida and is otherwise *sui juris.*

6.     Defendant United States Department of Education is an agency of the United States government according to FOIA and the Privacy Act of 1974, and the Department has possession, custody and/or control over the records Plaintiff seeks.

7.     Defendant Margaret Spelling is the United States Secretary of Education and is sued in her official capacity.

## STATEMENT OF CASE

8.    Plaintiff is a thirty-eight year old attorney who began employment at Kaplan University (Kaplan) as an Associate Professor and Course Developer in April 2004. In August 2004, Plaintiff was promoted to a full-time position as an Academic Department Chair for Kaplan University in the School of Paralegal Studies.

9.    Kaplan Higher Education Corporation, doing business as Kaplan University is a division of Kaplan, Inc., a wholly owned subsidiary of *The Washington Post Company*. In fiscal year 2004, Kaplan Inc. had revenues of $1.135 billion per year. According to *The Washington Posts*' annual report, Kaplan University received $430 million in revenues for the Federal government in the form of student loan funding. *See*, The Washington Post, Annual Report, filed with the SEC, January 2, 2005.

10.    The instant law suit stems from a civil rights complaint that Plaintiff filed against Kaplan University. For purposes of understanding the present action, it will not be for Plaintiff to recount all of the events that took place during the four months between Plaintiff's disclosure of a disability protected by Section 504 and his request for reasonable accommodations to Kaplan University on December 16, 2004 through April 15, 2005, the date when Kaplan University wrongfully terminated his employment. Nevertheless, a very brief recounting of the pivotal events that took place from April 1, 2005 through April 15, 2005 will assist the Court in understanding the present action, and the Department's motive for its continued and willful refusal to comply with Federal law.

11.    Although Kaplan University has unwaveringly purported to have accepted Plaintiff's medical documentation for his disability and also claims to have granted Plaintiff's request for accommodations, the facts prove otherwise. Immediately following Plaintiff's disclosure of his disability, Kaplan's management proceeded to

3

create an increasingly hostile work environment and engaged in irrefutable acts of discrimination. After enduring four (4) months of increasingly hostile events without any intervention by Kaplan management to resolve these issues, Plaintiff had no choice but to file a complaint with the Department's Office of Civil Rights (OCR). The OCR complaint against Kaplan University was filed on April 14, 2005: Not even one day later, Kaplan fired Plaintiff in retaliation. Although Kaplan has claimed that the Plaintiff "abandoned his job," Kaplan's excuse is belied by its own conduct and by the content of a pivotal conversation that took place on April 13, 2005 between Plaintiff and Kaplan University's Provost, David Clinefelter (Clinefelter), which will be discussed later in this Complaint.

12. Before Plaintiff was wrongfully discharged from Kaplan, however, Plaintiff attempted on repeated occasions to resolve his complaints of discrimination amicably and privately with Kaplan management. Plaintiff finally realized, however, that Kaplan had absolutely no intention of resolving his complaints and instead had chosen to create a work environment that was so hostile that Plaintiff would resign voluntarily.

13. Although Plaintiff's suspected that Kaplan had decided to force his resignation, he became fully cognizant that this was Kaplan's intent after he received an email message on April 13 from Karen Ross (Ross), Kaplan Inc.'s Senior Vice-President of Human Resources and Associate General Counsel.

14. Ross's message was a follow-up to an April 1 telephone conversation that the Plaintiff had with Ross about his concerns that Kaplan refused to take any action whatsoever to investigate or to resolve a series of undeniable discriminatory acts by Plaintiff's immediate supervisor and other members of Kaplan management. In fact, even Kaplan University's attorney agreed that Plaintiff's supervisor's conduct was

unacceptable, as she told OCR in a letter in July 12, 2005: "[i]n hindsight, [Plaintiff's supervisor] might not have taken the best course of action . . . ."

15.   During the April 1 conversation, Plaintiff informed Ross that he intended to file a judicial or administrative proceeding to seek appropriate redress. Ross requested that Plaintiff refrain from filing a complaint to provide her with an opportunity to investigate his complaints and to find him another position in one of Kaplan Inc.'s other companies. Plaintiff relied upon Ross's representation, and refrained from filing a complaint against Kaplan as he had intended to do on Monday, April 4, 2005 in order to give Ross the opportunity to resolve Plaintiff's grievances. In addition, Plaintiff emailed a copy of his resume to Ross, as she had requested, to assist her in finding a suitable position. Ross had promised to contact Plaintiff promptly with a resolution to the matter, but Ross repeatedly failed to call when promised.

16.   In the early morning hours of Wednesday, April 13, 2005, Ross finally reported back to Plaintiff regarding his complaints of discrimination. Although Ross had promised to find Plaintiff a different position within Kaplan, Inc. and to investigate his allegations, the letter that Ross sent was anything but that. Instead, Ross had used the intervening two weeks to cause Plaintiff to suffer intense mental stress and anxiety, and to create utter confusion so that Kaplan could then have a pretext to criticize Plaintiff's job performance during this period.

17.   Because her letter is important for understanding the events that have resulted in the instant lawsuit, Plaintiff has reproduced it in its entirety below:

Dear Jude,

As you have advised me and documented in the draft complaint you forwarded to me, you believe that you were discriminated against based on your disability because you did not receive the promotion you sought to the position Assistant Dean of Curriculum for the School of Criminal Justice.  Kaplan has admitted to you that there was an oversight in your not being interviewed.  The oversight was

unintentional and no one involved in the decision knew anything about your disability. Your disability was not a factor in the selection decision and the person selected for the position has a background and experience more consistent with the position than your qualifications. While Ms. Machuca may have told you that you were a qualified candidate, you were not the most qualified.

*I understand you have sent to Andy Rosen a copy of a draft complaint regarding your allegations of discrimination and retaliation.* I have reviewed your complaint and want to make sure you understand Kaplan University's position with respect to your allegations.

Upon notifying Kaplan University of your disability and the reasonable accommodation recommended by your physician, your request to telecommute and work flexible hours was granted. You have never been denied a requested reasonable accommodation you requested. While you have an issue with Mr. Berube's management style, such differences do not constitute discrimination.

Kaplan University appreciates that you notified them of an issue with the Assistant Dean of Curriculum about which they was unaware. Upon verifying the information you provided, KU took definitive action with respect to the Assistant Dean. Contrary to your allegations, there was never any negative action taken toward you.

*You have stated that you are not interested in any positions in the School of Paralegal Studies and you do not want to have any further contact with John Berube or Dave Harpool. Jude, if you are interested in continuing in your position as Academic Department Chair, you must perform the essential functions of your job. Contact with your supervisor and management in the School of Paralegal Studies is an essential function of your job.*

In the course of investigating your allegations, I have learned that since March 25, 2005, you have not posted to the two message boards for Contracts course, and since March 23, 2005, to the message boards for the Law Office Management course. Similarly, you have not responded to all of your students' emails as you are required to do. Additionally, I have learned that since March 25, you have not posted to the message boards regarding your faculty training obligation and *neglected to attend two seminars at which you were assigned to host.*

I have been told there are two seminars scheduled this coming week at which you are assigned to host, including he seminar you are scheduled to host tomorrow, April 13th. *You are expected to fulfill your job responsibilities and host that seminar as well as all other responsibilities of the Academic Department Chair position.*

6

It is critical to our students that all instructors meet job expectations and fulfill the assignments for which they are responsible.  Your failure to perform these job requirements in your current role is unacceptable and cannot continue.

Kaplan University is extremely interested in amicably resolving this matter with you without resort to unnecessary litigation.  However, your email to Andy Rosen appears to be seeking a settlement amount in excess of $100,000.  If that is the case, then our respective assessments of this matter are too far apart to engage in any meaningful discussions.  If not, please email me and I will call you tomorrow to negotiate a fair and reasonable settlement.

Karen Ross
Senior Vice President
Associate General Counsel
Kaplan, Inc.

(Emphasis added).

18.   After Plaintiff reviewed Ross's letter, he realized that she had completely abused the good faith he had demonstrated when he agreed to refrain the filing of his complaint, which he had intended to file on April 4, 2005, so that Kaplan could have one last opportunity to resolve his complaint in an amicable and private manner.

19.   Ross's letter showed that instead of keeping her promise, she had conducted an unscheduled performance review. The letter contained nothing but spurious criticisms of Plaintiff's job performance during the period of March 23, 2005 through April 13, 2005. For example, the letter stated that Plaintiff had failed to conduct two seminars (April 6, 2005) even though Plaintiff had notified his supervisor on April 5 and on April 6 that he had taken those days off as sick days because of the mental and physical stress that Kaplan's actions had caused.

20.   He had also told his supervisor that he had a psychiatrist appointment on April 6 as a result, and he had offered to provide his supervisor with a letter from his psychiatrist. His supervisor acknowledged that he had received Plaintiff's notification of his intent to take a sick day, and stated that it would be unnecessary for Plaintiff to

provide a doctor's letter. Ross's letter, however, accused Plaintiff of having missed two seminars despite Plaintiff's despite the fact that Plaintiff had taken those days as sick days.

21. Ironically, Ross, who is both an attorney and Kaplan Inc.'s Senior Vice-President of Human Relations, and thus should know better, violated the Rehabilitation Act by her own letter, which was supposed to have resolved Plaintiff's complaints of retaliatory behavior.

22. Ross's letter falsely accused Plaintiff of having missed two seminars on April 6. The Rehabilitation Act specifically prohibits discrimination due to sick leave. 34 C.F.R. § 104.11(4)(b)(5). Therefore, her criticisms of Plaintiff's job performance because of sick leave were not only false, they also constitute a separate incident of retaliation that was clearly a sole result of the fact that Plaintiff had told Kaplan of his intent to file suit, an undeniable "protected activity" as defined by 42 U.S.C. § 12203(a).

23. In further demonstration of OCR's gross negligence or deliberate bias, OCR not only failed to identify the legal import of Ross's letter, OCR even accepted the false accusations as true and as providing evidence that Kaplan had a legitimate nondiscriminatory reason to terminate Plaintiff's employment. OCR arrived at this factual conclusion despite having been provided with the letter from Plaintiff's supervisor in which he acknowledged that Plaintiff had taken the day off.

24. Ross's unscheduled performance review was an additional act of retaliation in that Kaplan had placed Plaintiff under greater scrutiny than his colleagues whose performance was not reviewed during the same time period in violation of 42 U.S.C. § 12112.

8

25.   Plaintiff had also just had an annual performance review four (4) months before, in December 2004. In his review his supervisor rated his overall performance a 4 out of a 5. Plaintiff had also been given a 2.5 per cent merit increase in his salary effective and a Three Thousand Dollar ($3,000) bonus in February 2005 because of his 2004 performance. (These decisions had been made before Plaintiff had requested any accommodations, and therefore, do not constitute any evidence of good faith on the part of Kaplan University).

26.   Furthermore, Ross's spurious criticisms of Plaintiff's job performance reflected her failure to perform her job duties adequately since Kaplan, and Ross, had repeatedly promised to contact Plaintiff during the time-period of March 23 through April 13, but consistently failed to follow through on its promises unless Plaintiff threatened to file suit; then she or Kaplan would respond, but only to request once again that Plaintiff delay the filing of his complaint while they accumulated more "evidence" of Plaintiff's alleged failure to perform his duties as Academic Department Chair.

27.   Even if Ross's criticisms were true, however, Ross ended her April 13 letter by giving Plaintiff the option to continue in his role as Academic Department Chair despite his alleged job performance deficiencies. Therefore, Kaplan, through Ross, expressly waived the right to raise any performance deficiencies before April 13 as a justification for its decision to terminate Plaintiff's employment, which would happen just two days later.

28.   More importantly, Ross's letter confirmed that Plaintiff had repeatedly requested to be reassigned from his supervisor due to supervisor's repeated illegal and unethical behavior. Reassignment to a vacant position is one of the specifically identified accommodations that is provided by both the Rehabilitation Act and by the

9

Americans With Disabilities Act. 42 U.S.C. § 42111(9)(B). In *Humphrey v. Memorial Hosp. Assoc.,* the Ninth Circuit Court of Appeals repeated its prior holding that " an employer fails to engage in the interactive process as a matter of law where it rejects the employee's proposed accommodations by letter and offers no practical alternatives." (Emphasis added). 239 F.3d 1128, 1139 (9th Cir. 2001). Therefore, Kaplan University, by Ross as its agent, had violated the Rehabilitation Act as a matter of law as a result of Ross's letter.

29.   In addition, in upholding a jury's finding of discrimination, the Tenth Circuit Court of Appeals held in *Dilley v. SuperValu, Inc.,* an employer failed to fulfill its reasonable accommodation obligation when it did not consider lateral moves to positions that are regarded as equivalent to the employee's current position when such positions are vacant. 296 F.3d 958 (10th. Cir. 2002).

30.   Kaplan University had produced at least ten emails during the month of February 2005 between Plaintiff and its Director of Human Resources, Melissa Martin, that proves that Kaplan University had offered Plaintiff to transfer from his position as Academic Department Chair for the School of Paralegal Studies to the identical position of Academic Department Chair for Criminal Justice in February 2005 that was vacant. The correspondence also proves that Plaintiff had accepted the reassignment in order to avoid further contact with his supervisor, but after Plaintiff had accepted reassignment, Kaplan withdrew that solution.

31.   Thus, Ross's letter and Kaplan's withdraw of its offer to be reassigned constitute violations of the Rehabilitation Acts *as a matter of law*. However, OCR has provided additional evidence its bias by failed to discuss these facts at all in its purported Letter of Resolution, even though the facts were supported by substantial evidence *that Kaplan University had provided them*, and despite the fact that Plaintiff

10

had provided OCR with citations to the above case law before OCR arrived at its "conclusions".

32. In response to her letter, Plaintiff replied that he would file a complaint against Kaplan by 3:30 P.M. that same day. Plaintiff also sent a copy of his letter and complaint to Kaplan's President to provide him with a final opportunity to resolve the dispute without third-party intervention. As a result of Plaintiff's letter to Rosen, Plaintiff received a telephone call from David Clinefelter (Clinefelter), Kaplan University's Provost, and second in command.

33. Clinefelter told Plaintiff that he was asked by Rosen to call to discuss the situation that had developed. During that conversation, Clinefelter let Plaintiff know, in no uncertain terms, that Plaintiff had no future at Kaplan University or Kaplan, Inc., the parent company. Clinefelter then offered three month's salary to induce Plaintiff's resignation. When Plaintiff declined Kaplan's "exit package", Clinefelter increased the offer to six (6) month's salary, which Plaintiff also declined. (Kaplan subsequently raised the exit package offer to 12 months salary, approximately $50,000).

34. As an explanation, Plaintiff told Clinefelter that Plaintiff did not want to be unemployed, but if Clinefelter was telling Plaintiff that he had no future at Kaplan, Inc. and that if Clinefelter was asking for Plaintiff to suggest a settlement offer then would need some time to consider the matter. Accordingly, Clinefelter and Plaintiff agreed to reconvene five days later, on April 18, 2005, at 4:30 P.M. Clinefelter provided Plaintiff with his mobile telephone number and told Plaintiff that he would be in a Board of Director's meeting at that time, but that Plaintiff should nevertheless interrupt the Director's meeting to speak with him about settlement.

35.    Plaintiff and Clinefelter entered into an oral contract that Plaintiff reduced to writing immediately after the telephone conversation that he and Clinefelter had agreed that Clinefelter would find temporary coverage for Plaintiff's duties while Plaintiff prepared a settlement proposal. Clinefelter, also agreed that Kaplan would not use its requirement to find temporary coverage while Plaintiff considered the matter against Plaintiff at a later date.

36.    Plaintiff sent Clinefelter an email that memorialized their oral agreement immediately after the parties spoke. He asked that Clinefelter inform him if Clinefelter disagreed with any term that Plaintiff had set forth in his email message. Clinefelter received the message, as evidenced by a Read Return Receipt, but Clinefelter never objected to the Plaintiff's summary of their agreement.

37.    During this conversation, Plaintiff had told Clinefelter that he was extremely dismayed that the only way an employee could resolve a serious dispute, such as Plaintiff's, with Kaplan was by filing suit or by quitting. Clinefelter had called Plaintiff because Plaintiff had told Rosen and Ross that he intended to file suit that afternoon. Yet, because Kaplan had no legitimate reason to terminate Plaintiff's employment, Kaplan has twisted Plaintiff's statement into a false statement that is completely contradicted by the evidence. the position that Plaintiff told Clinefelter that he had decided to quit working when Clinefelter had only called Plaintiff because *Plaintiff had told Kaplan that he intended to file suit* by 3:30 P.M. that afternoon.

38.    As a result of OCR's investigation, Plaintiff has learned that his coworkers had been instructed by Kaplan management at 9:42 A.M. that same morning to cease all further communication with Plaintiff Kaplan believed that Plaintiff was going to file a law suit and therefore continued contact with Plaintiff would constitute a

12

conflict of interest. Thus, again Kaplan knew that Plaintiff had decided to file suit, and not to "abandon his job."

39. Moreover, Kaplan's instructions to Plaintiff's coworkers to cease communication with Plaintiff because he intended to file a law suit—a protected activity—constitutes an irrefutable violation of the Rehabilitation Act employment, and was in fact, a constructive discharge of Plaintiff's employment even before Plaintiff had spoken with Clinefelter.

40. Kaplan's management obviously recognized that it could not claim that Plaintiff had been lawfully discharged due to performance deficiencies as a result of its express waiver. Therefore, Kaplan decided to proffer job abandonment as the reason that it had terminated Plaintiff's employment. Job abandonment, however, is defined in Kaplan's Field Employee Handbook as an employee who is absent without notice for two or more *consecutive working days*.

41. As mentioned previously, April 13 was a pivotal date in the underlying employment discrimination that has resulted in this instant action. On that same date, Plaintiff had a one and a half hour telephone conference with Kaplan's Provost, David Clinefelter. Obviously, Kaplan cannot claim that Plaintiff was absent on April 13 unless it were also to claim that Clinefelter had the near two hour conversation with himself. Because April 13 fell on Wednesday, however, Kaplan could not have terminated Plaintiff's employment for job abandonment until Monday, April 18, according to Kaplan's own definition of job abandonment. Yet, Kaplan terminated Plaintiff's employment on Friday, April 15, in obvious retaliation for his having filed a complaint with OCR the day before.

42. The unassailable logic of this syllogism proves beyond any doubt that Kaplan's reason proffered reason of job abandonment is a mere pretext, and that

OCR's refusal to acknowledge this conclusion constitutes gross negligence or a deliberate intent to conspire with Kaplan University to deprive Plaintiff of his civil rights, in order to assure the uninterrupted funding of the Distance Learning Demonstration Program.

43.   This lengthy excursion into the history of the underlying employment dispute was unfortunately necessary in order for the Court to understand the events that comprise the present law suit, and so that the Court may appreciate why a memorandum that was written after Clinefelter's conversation with Plaintiff (Clinefelter Memorandum) is crucial evidence in the investigation of Plaintiff's OCR complaint, and why OCR's failure to compel Kaplan to produce the Clinefelter Memorandum constitutes a dereliction of duty and provides irrefutable evidence that OCR's investigation of Plaintiff's complaint was motivated by bias and a conflict of interest.

44.   Plaintiff has learned from some of the documents that Kaplan produced to OCR that after Clinefelter spoke with Plaintiff on April 13 that an email exchange occurred between Clinefelter and Lisa Geffen (Geffen), Kaplan University's Senior Vice President of Human Resources and Associate General Counsel. Kaplan has refused to turn the Clinefelter Memorandum over to OCR and asserts an invalid attorney-client privilege.

45.   The law is clear that the Department is entitled to any and all documents in the possession, custody, and/or control of the recipient of federal assistance, including privileged documents. 34 C.F.R. § 100.6. In addition, Geffen is Kaplan University's Senior Vice-President of Human Resources, and has been a factual witness to the events in this case. There is no indication that the messages that were exchanged between Clinefelter and Geffen were anything but business-related emails that are not

covered by attorney-client privilege. However, even if the memorandum would be protected in civil litigation, Kaplan University may not assert that privilege against OCR, if Kaplan University wishes to continue to receive Federal financial assistance. 34 C.F.R. §100.4.

46.   OCR's web page states that: "The mission of the Office for Civil Rights is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights." (http://www.ed.gov/about/offices/list/ocr/index.html) . Therefore, its responsibility is to insure that recipients of Federal financial assistance do not engage in acts of discrimination by investigations and compliance reviews.

47.   Yet, in completely dereliction of its duty, OCR did not demand that Kaplan turn over the original Clinefelter Memorandum. Instead, OCR, allegedly, permitted Kaplan to submit a summary of the memorandum, justifying its decision as follows:

> Kaplan did assert attorney client privilege regarding a requested document. Such an assertion does not preclude OCR from obtaining the requested information. When a party makes that assertion, OCR will allow that party to submit a summary of the document. After reviewing the summary, OCR will then determine whether the document itself is needed. OCR reviewed the submitted summary and determined it to be sufficient, in lieu of the requested document.

48.   OCR's response begs the question of (1) "How could OCR have determined that a summary of a document is 'sufficient' without having seen the original?" or (2) "Why would OCR need a summary of a memorandum in the first place?" Kaplan's production of a summary of a memorandum would waive any attorney-client privilege once the substance of that communication is revealed to a third-party: the summary of an attorney's advice would waive that privilege. The only possible reason that would explain why OCR did not demand that Kaplan produce the original memorandum was so that OCR could avoid having possession, custody or control of a document that would undeniably establish Kaplan's unlawful conduct,

which would OCR would be required to produce it pursuant to Plaintiff's Privacy Act request.

49.   In is indisputable that OCR has abdicated its statutory duty to enforce the nation's civil rights law by failing to obtain the original memorandum—particularly when Kaplan had told OCR that Clinefelter made the ultimate decision to terminate Plaintiff's employment. The Clinefelter Memorandum is obviously crucial evidence to discover the events that took place on April 13. However, a review of the evidence that OCR did provide in response to Plaintiff's Privacy Act request shows that OCR failed to require Kaplan to produce any documents that explained the obvious contradictions in Clinefelter's testimony. If OCR wished to give Clinefelter's oral testimony any credence, without revealing OCR's bias, OCR should have required Clinefelter to answer the following questions:

    a.  Why would Clinefelter have offered six months salary to an employee who claims to have quit working as a "settlement option"?

    b.  Why would Clinefelter have scheduled another meeting with Plaintiff for five days later, on April 18, to continue talking about "settlement options regarding his resignation"?

    c.  Why would Kaplan have stated job abandonment as the reason for Plaintiff's termination if Plaintiff had in fact told Clinefelter that he had resigned?

    d.  Finally, why would Clinefelter have found it necessary to write Plaintiff a letter of termination—just one day after Plaintiff filed his OCR complaint—if Clinefelter truly believed that Plaintiff had told Clinefelter that he had resigned?

50. OCR's failure to ask any of those logical follow-up questions that any first-year law student would have asked proves that OCR never had an intent to "vigorously enforce" any of the laws for which it has been appointed to enforce.

51. OCR accepted all of Clinefelter's unsubstantiated oral testimony without giving any consideration—or discussion—to any of the contemporaneous written documentation or any credence to Plaintiff's testimony without providing any explanation for its decision to discount that substantial evidence. Nor does OCR explain how Clinefelter's testimony could be given credence given the sudden development of his poor memory or the spoliation of evidence that he discussed during his interview to OCR of August 2, 2005. A copy of the summary of the interview that OCR prepared as a result of Clinefelter's interview is attached hereto as Exhibit __ and incorporated by reference.

52. It is clear from this Exhibit that (a) Clinefelter's memory suffered a major lapse during the brief time period of April 15 to August 2 and (b) that OCR conducted a completely inadequate and grossly negligent interview of a key witness. Moreover, OCR, as will be discussed further below, completely failed to comply with the laws that govern its investigation of an employment related discrimination case. Those laws provide that all witnesses' testimony, including Clinefelter's testimony, must be under oath, affidavit, or by declaration. 29 C.F.R. §1614.108. 29 U.S.C. § 794a and 34 C.F.R. part 105.

53. Enron and Arthur Andersen would most certainly have preferred that OCR had investigated their violations of federal law since OCR apparently would have permitted them to submit unconfirmed summaries of their accounting data rather than the raw data. Clearly, OCR's action and explanation are not credible. Therefore, Plaintiff respectfully requests that this Court declare that OCR is in violation of its

statutory duty to conduct a thorough investigation, and to declare that OCR must compel Kaplan University to provide the original Clinefelter Memorandum or commence an administrative proceeding to suspend or terminate Kaplan's federal funding forthwith.

54. In the alternative, Plaintiff would request that this Court declare that Kaplan's failure to produce evidence that it is required by law to produce must lead to an adverse inference, as provided by 29 C.F.R. § 1614.108.

55. Further support for the reason Plaintiff asks this Court to enter such declaratory relief is explained by the following information, which Plaintiff discovered only recently—despite the Department's best efforts to keep this information concealed.

56. Kaplan University is a recipient of Federal financial assistance from the Department, and is one of twenty-four online schools that are current participants in the Department of Education's *Distance Learning Demonstration Program* (Program).

57. The Program was authorized in the 1998 Higher Education Amendments, 20 U.S.C. § 1083, to determine the statutory and regulatory requirements that should be altered to provide greater access to distance education programs.

58. In authorizing the Program, Congress wished to proceed cautiously in amending the statute and required that the Department strictly monitor the participants. *See,* 20 U.S.C. § 1083 (a)(1). Most of the restrictions on the growth of distance education were placed in the Higher Education Amendments in response to perceived abuses of Title IV Student Financial Assistance, particularly abuses relating to program quality. As a result, the legislation establishes that a primary purpose of the program is to test the quality and viability of expanded distance education.

59. The program legislation authorized the Secretary to waive specified statutory and regulatory requirements for up to 15 participants (including Kaplan University), that were selected in the first year of the program, which began on July 1, 1999. Additional participants were selected to join the program in its third year, beginning July 1, 2001 and again in December 1, 2003. Because the Program is up for Congressional review *in just six months*, at the end of June 2006, the Department has an interest in preventing Congress from being informed of its failure to strictly monitor the current participants, let alone additional participants. The Department has also informed Congress that the cost to the taxpayer of this Program's expansion will exceed $600 million over the course of the next ten (10) years.

60. Kaplan has been a participant in the program since 1999, and Plaintiff's OCR complaint could not have come at a worse time for either Kaplan or the Department, for his complaint provides irrefutable evidence that the Department has done anything but strictly monitor the participants as instructed by Congress.

61. Coincidentally, Plaintiff's OCR complaint was filed on April 14, 2005, the very same month that the Department had submitted its "Distance Education Demonstration Program – Third Report" to Congress.

62. In that Report, the Department recommended that Congress enact legislation to expand the program to include additional online schools even though Plaintiff's complaint proves that the Department had not strictly monitored the twenty-four current participants that it was supposed to have been strictly monitoring since 1999. http://www.ed.gov/programs/disted/DEDP-thirdreport.doc.

63. In fact, the only reason that the Department learned that Kaplan had failed to comply with the Section 504 of the Rehabilitation Act was as a direct result of

Plaintiff's OCR complaint, in which Plaintiff told the Department about Kaplan's failure to comply.

64. Because of its self-interest in the continued and expanded funding of the Program, the Department has decided to conspire with Kaplan University to deprive Plaintiff of his federal statutory rights in violation of 42 U.S.C. §§ 1985 and 1986. Plaintiff cannot, therefore, reasonably expect OCR to conduct a disinterested investigation of Plaintiff's employment discrimination case without this Court's monitoring. Accordingly, Plaintiff also respectfully requests that this Court retain jurisdiction to ensure that the Department conducts an investigation of Plaintiff's complaint in accordance with Federal law and that Department takes all necessary steps to ensure that OCR complies with its statutory duties, including the initiation of an administrative proceeding to suspend Kaplan University's funding if Kaplan University continues to refuse to comply with 34 C.F.R. §104.6.

65. When the events discussed below are reviewed with this knowledge in mind, what at first might have been interpreted as gross negligence on the part of the Department can only be interpreted as the Department's intent to conspire with Kaplan University to deny Plaintiff relief, to which he is clearly entitled to remediate Kaplan's violation of his civil rights and its unlawful termination of his employment, so that Kaplan University's illegal conduct would not need to be disclosed when the funding for the Demonstration Program comes up for Congressional review in six months.

***OCR's Admission That Plaintiff's Case Would Be Influenced By Politics***

66.    On August 1, 2005, Plaintiff met with an OCR attorney, Pamela Simmons (Simmons), and an OCR investigator, Connie James (James), in Fort Lauderdale. During the course of this meeting, Simmons & James told Plaintiff that it was quite possible that:

      a.   "Even if OCR determines that Kaplan University violated the Rehabilitation Act, OCR may be unable to provide you with any individual relief."

      b.   "Because Kaplan University is owned by *The Washington Post*, and because Jeb Bush is the governor of Florida, and you know who his brother, your case will likely be affected by considerable political influence."

      c.   "OCR has never ordered a university to reinstate an employee before. The only case that is even remotely similar to your situation involved a school principal who had been unlawfully demoted. Because he was set to retire, OCR settled with the school, allowing the principal to finish the required years to receive his pension at the lower position, but the same salary."

67.    Plaintiff was understandably shocked to hear these comments asserted in such a matter-of-fact fashion from two civil servants. In fact, his shock had led, at first, to disbelief: Plaintiff attempted to disregard these statements as hyperbole. However, when Plaintiff had follow-up telephone conference with Simmons and James on August 11, 2005, Plaintiff realized by the end of the conversation that OCR had already decided—if that is the correct word—in Kaplan's favor since the merits of his complaint were irrelevant given the Department's overriding concern with Congressional approval for its Program.

***Further Evidence of OCR Bias and Prejudgment of Outcome***

68.    Plaintiff's decision that OCR did not intend to investigate his complaint in accordance with applicable Federal resulted after both Simmons and James strongly

"suggested" that Plaintiff elect that the EEOC continue the investigation of Plaintiff's charge since OCR may not find in his ultimate favor. (Plaintiff had filed an EEOC charge in order to preserve his right to bring a Title I ADA action).

69. Simmons and James also stated that John Berube, Plaintiff's former supervisor, had demonstrated no animus towards Plaintiff during his interview with them. The fact that an attorney and investigator would make such an assertion in all seriousness caused Plaintiff to have great concern about OCR's possible incompetence or even worse its outright prejudice.

70. Clearly, no supervisor is going to display any harbored animus—even if it were possible for one to measure animus as one would measure ambient temperature—during an interview when that supervisor clearly feared the loss of his job after he had already been demoted a full-three three (3) levels after Plaintiff's discharge; particularly when Kaplan's attorney was present during the interview and would surely report afterwards to Kaplan management about Berube's behavior during the interview.

71. OCR's bias, however, was to be made even more manifest over the next few days. On August 15, 2005, Plaintiff was hospitalized with kidney stones; an event with which OCR was familiar. On August 17, 2005, Plaintiff's father passed away from terminal lung cancer. Again, OCR knew about both tragic events.[1]

---

[1] In an email message dated, Friday, August 19, 2005 at 1:07 PM, Simmons wrote: "I am saddened to hear of your father's passing . You have my deepest sympathy." Gillespie replied, "Thank you. This has definitely been the worst week of my life with my father's death and my unexpected kidney stones."

72. Despite the fact that OCR knew that Plaintiff was supposed to be out-of-town for his father's funeral and knew about the Plaintiff's hospitalization, on the very same day, OCR wrote to Plaintiff to state:

> Mr. Gillespie,
>
> Thank you for the information you sent. We are in the final stages of our investigation of your complaint. As such, please know that if you have any other evidence you want OCR to review, we must receive it by COB Monday, August 22, 2005.
>
> Thank you.
>
> Pamela Simmons

OCR did even allot one full business day for Plaintiff to respond despite the fact that OCR knew of Plaintiff's recent tragedies. Even more egregiously, OCR refused to tell Plaintiff what outstanding issues remained, and therefore, Plaintiff could have no way of knowing what additional evidence OCR could possibly want or need.[2]

73. In addition, there was no deadline pressing that would have required OCR to make such an assertion, although Plaintiff now realizes that this may have been an attempt by OCR to provide the semblance of complying with the United States district court order in *Adams v. Bell,* C.A. No. 3095-70 (D.D.C., filed Dec. 29, 1977). The *Adams* order, according to OCR's website, requires that a complainant be interviewed during the course of an investigation. Further, if OCR anticipates making

---

[2] Email to Simmons August 19, 2005, 4:43 PM, in pertinent part:

> I literally have over 1200 email communications with Kaplan employees. I sincerely doubt that OCR would want me to forward all of those emails. **I had asked that I be given the opportunity to rebut Kaplan's alleged nondiscriminatory defense for my involuntary discharge, but no one has yet told me what Kaplan's defense is exactly.** Was I discharged for job abandonment? If so, on what 2 consecutive days? **Or did Kaplan change its reason for my discharge after-the-fact to some other excuse? If so, what is their new reason for having fired me?**
>
> In other words, I cannot send any further evidence for OCR's review unless I know what it is precisely what it is that I need to rebut.

(Emphasis added).

a finding adverse to the complainant, then OCR must notify the complainant to that effect. In addition, OCR must notify the complainant of the evidence supporting the adverse finding, either by actually showing the evidence to the complainant or by providing a written or oral summary of the evidence. Then, the complainant will be provided an opportunity to respond. *See Adams v. Bell, supra*, para. 10. Plaintiff does not have a copy of the *Adams* order or the consent decree that the Department entered into with the United States district court for the District of Columbia, but the Department's conduct should be compared to the requirements of that district court order in order to determine whether the Department is in contempt.

*See,* http://www.ed.gov/about/offices/list/ocr/docs/edlite-k2exemption.html.

74.    Of course, OCR did not comply with the *Adams* order in its investigation of Plaintiff's complaint against Kaplan University. OCR did not notify him that it had made any adverse finding. Nor did OCR provide him with any of the evidence that allegedly supported its adverse finding. And of course, it never provided Plaintiff with an opportunity to respond to the evidence—except for the message that required him to submit any additional evidence to OCR in one business day during the weekend of his father's funeral.

75.    If OCR had provided Plaintiff with an opportunity to respond to its adverse determinations by providing Plaintiff with a statement of case and a key to the evidence OCR would have discovered that it had committed another error, but perhaps that was its desire all along. The Letter of Resolution states on page 6 that "[R]oss stated that although the complainant mentioned the desired reassignment in his email, he never made it clear that he was requesting to be reassigned [to another supervisor or position] as an accommodation until April 13, 2005. Additionally, the complainant did not provide any medical documentation to support his request."

24

76.   Plaintiff will discuss below how OCR's comment regarding the medical documentation lends additional support to his claim that OCR conspired with Kaplan University; however, the comment regarding Ross's statement about the fact that Plaintiff had not made a request to be reassigned until April 13 comes from the Interview Summary of Ross's testimony that James prepared. In fact, page two of that document states the following:

> Ross said that on 4/5 he asked to be reassigned. On 4/6 she asked him if he was asking for reassignment as an accommodation. He replied saying his complaint shows that he's been requesting reassignment since 1/05. On 4/6 she asks again if the request is related to an accommodation. That day he responds by saying that if she looked at his complaint, her questions would be answered. On 4/13 he writes her and says that he had asked several times to be reassigned as an accommodation. She said he never supplied any medical documentation to support his request. She said she did not directly say yea or nay to his 4/13 accommodation request.

77.   The very paragraph from which James extracted that incorrect information contradicts the LOR. The paragraph shows that Plaintiff had made repeated requests for reassignment before 4/13. If Plaintiff had had the opportunity to review the evidence upon which OCR based its purported Letter of Resolution *before it was finalized*—as the *Adams* order and 34 C.F.R. Part 105 require—OCR would not now find itself in the embarrassing position it has created. A true and correct copy of Ross's Interview Testimony is attached as Exhibit __ and incorporated by reference.

78.   As a result of OCR's behavior and its demonstration of clear bias and its failure to afford even a modicum of procedural due process.

### *Plaintiff Contacted Department of Education's Office of Inspector General*

79.   On August 19, 2005, Plaintiff realized that James and Simmons were not making a prediction when they had told him in Fort Lauderdale on August 2, 2005 that OCR may not be able to provide him with any individual relief: they were, in fact, reporting that OCR had already prejudged how they would resolve Plaintiff's OCR complaint.

80. As a result of these serious irregularities, Plaintiff called the Inspector General's Office for the Department of Education. That Office in turn forwarded his call to Steven Cramolini (Cramolini), Assistant Secretary for Enforcement. Mr. Cramolini spoke with Plaintiff, and subsequently with Mr. George Walker, Atlanta Regional Director for OCR.

81. Plaintiff sent Cramolini an August 22, 2005, email in which Plaintiff described the events that had taken place to date. A true and correct copy of Plaintiff's email is attached hereto and designated Exhibit ___.[i]

82. Cramolini replied to Plaintiff's email on the same date:

Mr. Gillespie,

I was able to get in touch with Gary Walker, the Director of the Atlanta office, and forwarded to him the e-mail that you sent to me. He is looking into it and will get back to you. It may be later in the week, however, before he calls you. I know that you are concerned about having to supply any information to OCR by close of business today. However, OCR will still accept additional relevant information from you after your conversation with Mr. Walker.

Steve Cramolini

83. On August 23, 2005, a day after Plaintiff's correspondence with Cramolini, Simmons wrote to Plaintiff:

From: Simmons, Pamela [mailto:Pamela.Simmons@ed.gov]
Sent: Tuesday, August 23, 2005 10:02 AM
To: Jude Gillespie, JD, MBA
Cc: Shields, Doris; James, Connie
Subject: RE: Additional Evidence

Mr. Gillespie,

I am writing in response to your recent emails and telephone call (to Ms. James) regarding complaint #04-05-2087. If you wish to submit additional information that you believe will rebut Kaplan's assertion that you were not doing your job, you may want to consider providing OCR with a detailed chronology showing your Kaplan activities from March 23, 2005 to April 15, 2005. OCR will review whatever documentation you submit along with the evidence we already have. **Please send this evidence to OCR by COB today, August 23, 2005.**

84.   So, once again, OCR did not even provide Plaintiff with one business day to submit evidence, and it is patently obvious that OCR was doing its best to prevent Plaintiff from establishing Kaplan's liability for his wrongful termination.

85.   In addition, Simmons' email is also the very first time that OCR had presented any evidence Kaplan had changed its untenable position that Plaintiff had abandoned his job to a failure to perform his job duties during the time period of March 23, 2005 to April 15, 2005. Even if Kaplan were permitted to change its pretextual reason for Plaintiff's wrongful discharge to performance deficiencies, regardless of any issues of waiver and collateral estoppel, OCR never requested that Plaintiff supply any evidence to account for his performance *before March 23*.

86.   This inescapable fact simply provides additional evidence of OCR's bias. A review of the October 27, 2005, Letter of Resolution (LOR), in which OCR purports to have resolved Plaintiff's OCR complaint,  OCR discusses alleged performance deficiencies on the part of the Plaintiff that took place *before March 23*, 2005, and for which Plaintiff was never provided an opportunity to respond.

87.   In addition, the LOR also claims that Plaintiff had not submitted medical documentation that was sufficient to support his request for accommodations even though Kaplan University never made either claim. OCR, in effect, has become both Kaplan's advocate and their super personnel department. A true and correct copy of the purported Letter of Resolution and Resolution Agreement are attached hereto and designated Composite Exhibit B.

88.   When Plaintiff received Simmons request for evidence to support the fact that he was doing his job, he realized that OCR or Kaplan had provided a new reason to supports its wrongful termination. However, Kaplan had told the Florida Unemployment Insurance Division that the reason for Plaintiff's involuntary

separation was job abandonment, not malfeasance. In addition, Kaplan's attorney, Mary Ann Oakley, Esquire confirmed, in writing, that it was Kaplan's position that Plaintiff's employment was terminated due to "job abandonment."[3]

89.   In what can only be described as a "Through the Looking Glass" explanation, Simmons replied to Plaintiff's inquiry about Kaplan's new defense, as follows:

Sent: Tuesday, August 23, 2005 3:49 PM
To: Jude Gillespie, JD, MBA
Cc: Shields, Doris; Simmons, Pamela
Subject: RE: Follow-Up

Mr. Gillespie,

I am responding to you from Ms. James' computer as mine is currently inoperative. With regard to a change in terminology regarding the reason for your dismissal, **the words I used – "not doing your job"– in the email today at 10:02am were mine and do not implicitly or explicitly indicate a change in the reasons Kaplan *originally gave* regarding your termination of employment.** Mr. Gillespie, I'm confident you have retained a record of what you have sent OCR. If you believe you have previously supplied OCR with evidence that, in your opinion, accounts for your Kaplan activites between March 23, 2005 and April 15, 2005, you need not submit additional information. If that is not the case, please feel free to submit other information you deem relevant.

(Emphasis added).

90.   Simmons reply is completely nonsensical. It is impossible to maintain that her words "not doing your job" did not indicate a change of reason, either implicitly or explicitly. (Plaintiff would maintain that her words were an explicit admission that

---

[3] From: <maryann.oakley@hklaw.com>
To: <warecornell@hotmail.com>
Sent: Friday, May 06, 2005 8:41 AM
Subject: Re: Jude Gillespie Unemployment

We state that the reason is job abandonment but will neither appeal nor oppose his efforts.

Mary Ann B. Oakley

Kaplan had changed its reason). In addition, if Kaplan still maintained that job abandonment was the reason for Plaintiff's termination then what would be the purpose for Simmons' request? In addition, how would Plaintiff know if he had met his burden of production based upon his opinion, and with less than one business day to prepare? And after OCR knew that the week Plaintiff had just left the hospital and was grieving for the loss of his father, who had just passed away days before. OCR's conduct in this regard not only demonstrated bias, it was in fact reprehensible and inexcusable.

91.    In a complete about face, however, on September 1, 2005, Doris Shields wrote to Plaintiff, stating: "Kaplan also has not provided OCR with any information that changes its position that you were terminated due to job abandonment." However, when one reviews the purported LOR, one sees that Shields' statement was an intentional falsehood and again provides evidence that OCR had absolutely no intent to fulfill its statutory duty to conduct a thorough investigation of Kaplan University according to the Rehabilitation Act. The Department also unequivocally demonstrated its complete disregard of Congress's instructions about the strict monitoring of participants in the Distance Learning Demonstration Program. But, Plaintiff has not even fully described the egregiousness of OCR's behavior: there is far more to come.

### *OCR Refused to Comply with Department of Labor Regulations*

92.    On August 31, 2005, Plaintiff wrote to Shields, and requested that OCR contact the EEOC in order to coordinate Plaintiff's dual-filed complaint, in accordance with 29 C.F.R. 1640.8. In complete defiance of the Department of Labor's regulations, which Congress has stated should govern employment related investigations, on September 1, 2005, Shields replied to Plaintiff's request as follows:

**September 1, 2005 Doris Shields to Jude Gillespie**

Mr. Gillespie,
The CRIM provision you cite is applicable at the outset of an investigation when a complainant in a Section 504 case chooses whether to have OCR or EEOC initially investigate allegations. As OCR is in the final stages of its complaint resolution process, OCR is not required to nor will we contact EEOC regarding deferral. As we stated previously, if EEOC wishes to contact OCR, we will be happy to provide requested information. What information you choose to give EEOC regarding your OCR complaint is up to you.
Doris Shields
Team Leader

93.    OCR failed to contact the EEOC as it was required to do according to 29 C.F.R. § 1640.8. Its reliance on its own Case Resolution and Investigation Manual as a means to avoid this obligation is entirely misplaced, and in contravention of federal law. However, further evidence of foul play in OCR's investigation of Plaintiff's complaint is evidenced by Shields comment that "OCR is in the final stages of its complaint resolution process," yet OCR did not complete its investigation until October 27, 2005, almost a full two-months later. In addition, OCR repeatedly told Plaintiff that OCR had reached no preliminary conclusions whether Kaplan University had discharged his employment in retaliation, or not.

94.    Clearly, OCR could not have been in the final stages of its resolution process without reaching this threshold question. Accordingly, Shields statement on September 1 was either a deliberate misrepresentation <u>or</u> subsequent events interrupted OCR's investigation: Plaintiff believes that the latter explanation is more convincing based upon the evidence.

95.    As a result of Cramolini's instruction, on August 24, 2005, Plaintiff spoke with George Walker, OCR-Atlanta's Regional Director regarding the shocking comments that James and Simmons made to Plaintiff during their August 2 meeting in Fort Lauderdale and about the irregularities that had taken place thereafter.

96.     Walker began the conversation by immediately dismissing Plaintiff's concerns out of hand based upon Walker's own personal relationships with Simmons & James. Because of these improprieties and allegations of bias, however, OCR should have transferred the OCR complaint to another OCR office for processing, but as will discussed shortly, that transfer would not have changed the outcome of Plaintiff's complaint because the Department had already decided to let Kaplan "off the hook" in order to protect the Distance Learning Demonstration Program.

97.     In order to obtain information about his complaint that OCR had refused to supply, and in order to investigate the comments that Simmons and James had made during the August 2 meeting in Fort Lauderdale, Plaintiff filed a Freedom of Information Act and Privacy Act request by letter dated September 7, 2005. Plaintiff directed his request to the Department's Freedom of Information Act Office, Teresa-Maria Cueva (Cueva).  Plaintiff's letter requested the following items:

  a.  Any and all documents referring, relating and/or regarding "Thomas" Jude Gillespie, SSN 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.

  b.  Any and all documents referring, relating and/or regarding OCR Complaint Number 04-05-2087, Jude Gillespie = Complainant, Kaplan University = Recipient.

  c.  Any and all documents referring, relating and/or regarding to any complaints filed with the Department of Education Office of Civil Rights against: Kaplan University, Kaplan College, Kaplan Higher Education Corporation or Concord Law School.

  d.  Any and all documents referring, relating and/or regarding any employment discrimination case or wrongful discharge case dispute

filed with the Atlanta OCR in which the recipient refused to comply with a violation letter of finding (LOF).

e. Any and all documents referring, relating and/or regarding any complaint filed with the Atlanta OCR that proceeded to enforcement and in which the recipient's funding was suspended and/or terminated.

f. Any and all documents referring, relating and/or regarding any employment discrimination case or wrongful discharge case filed with OCR in which the recipient was ordered to reinstate the complainant to his/her former position in order to become compliant.

g. Any and all documents referring, relating and/or regarding any employment discrimination case or wrongful discharge case filed with OCR in which the recipient was required to pay monetary damages in order to become compliant.

98. By letter dated September 12, 2005, Cueva acknowledge that the Department received his request on September 8, 2005.[1] Plaintiff's request was assigned FOIA Request No. 05-00054-F-PA.

99. On September 14, 2005, Plaintiff received a letter from Doris Shields (Shields), OCR-Atlanta Team Leader. Shields had requested the Plaintiff to narrow his FOIA requests. Plaintiff did agree to narrow certain items, but did not agree to others since he believed that OCR's request that he narrow the scope of his request

---

[1] A scrivener's error in Cueva's letter erroneously acknowledges having received Plaintiff's request on August 8, 2005.

32

was to prevent Plaintiff from obtaining further proof that OCR had decided to abdicate its statutory duty to enforce Federal civil rights law.

100. According to Department regulations, OCR had ten working days from the date of receipt of Plaintiff's request (September 12, 2005) to determine whether it would release or withhold the agency records responsive to Plaintiff's FOIA and Privacy Act requests. Therefore, the Department had until **September 26, 2005**, to make that decision. 34 C.F.R. § 5.51(d).

101. To date, OCR has failed to comply with this regulation. In fact, as will be seen, OCR even committed intentional falsehoods in order to prevent Plaintiff from obtaining the records to which he was (and is) lawfully entitled. The reason OCR did not want Plaintiff to have access to the underlying evidence is understandable after reading this Complaint.

102. On October 13, 2005, Plaintiff received an email from Shields that provides irrefutable evidence that Plaintiff's OCR complaint was being influenced by political influences, as Simmons and James had stated on August 2. Shields' message states that Plaintiff's OCR complaint had drawn the attention of "higher-ups", who clearly were interested in the effect an adverse decision by OCR would have on the Demonstration Program. Shields email stated, in pertinent part:

> Mr. Gillespie,
>
> This correspondence is in response to your emails of October 4, 2005 and October 12, 2005.  Although OCR has been working diligently and in good faith to complete the complaint resolution process regarding complaint number 04-05-2087, we concluded last evening that we will be unable to complete the process as we hoped.  There are at least two reasons for this unfortunate delay: 1) the facts involved in your complaint are voluminous and have required much study and review; 2) *because the complaint has been brought to the attention of persons who normally are not involved in this phase of the process. As a consequence, the number and intensity of the layers of review have been increased*.
>
> (Emphasis added).

103. Shields' failure to explain why Plaintiff's complaint would have drawn the attention of "persons who normally are not involved" is most telling. In addition, Shields replied to Plaintiff's inquiry about the status of his FOIA request that had been due as of September 26, 2005. Shields responded:

> With respect to your FOIA request, please know that we have begun to try to identify and collect the data you requested. However, because of the extent of the documentation you requested, particularly numbers 6 and 7, we have to coordinate with OCR offices throughout the country to identify and locate the information you seek. After the relevant data is identified, it will have to be located from the various offices ( file rooms, archives), then sent to Atlanta for final processing. We will supply you with the requested documentation as soon as we can,

As of September 26, Plaintiff had still not received any of the agency records that he had requested in his September 7 FOIA request.

### OCR Fails to Comply With Federal Law and the Department's Own Regulations

104. The purported LOR makes what can only be interpreted as deliberate—or grossly negligent—errors in both legal and factual analysis. Plaintiff will file a separate action against Kaplan University for violation of his civil rights, but because Plaintiff requests this Court to declare the purported Letter of Resolution agreement void as an unlawful agency action, Plaintiff will provide three (3) brief examples to substantiate his claim.

105. First Example: The LOR (p. 3) states that Plaintiff submitted "a statement dated December 16, 2004 from his doctor to support his request for accommodations to work full-time with flexible hours and to work from home due to his chronic permanent disability," and that "[o]n January 7, 2005, Wilhelmina Campbell (Campbell), Human Resources Manager, wrote the complainant, telling him the University had approved his accommodations request."

106. Just four pages later, however, the LOR states (p. 7):

Moreover, there is *no evidence* that the complainant *ever supplied* any medical documentation to support his request on April 13, 2005 for reassignment as an accommodation. Before acting on a request for accommodation, an institution may require the employee to supply documentation of a diagnosis by a qualified professional that the employee has a mental or physical impairment that supports the need for the suggested accommodation.

107. Clearly, the LOR is facially inconsistent. Even more telling of OCR's bias in favor of Kaplan University, however, OCR attempts to raise an issue with regard to the sufficiency of the medical documentation that Plaintiff submitted to substantiate his requests for accommodation that *Kaplan University never raised*. This is an issue that was wholly created by OCR, and provides irrefutable evidence of bias.

108. Second Example: The LOR states (p. 17):

"The University stated that, after March 25, 2005, there were six emails from the complainant not relating in any way to his work [including] a *threatening* email he wrote to Andy Rosen complaining about his complaints [sic] *(which had nothing to do with his work)*." (Emphasis added.)

109. Far from being threatening, however, the email to Mr. Rosen was *written as a courtesy* to provide the President of the University with an opportunity to take action to resolve Plaintiff's grievances before the Plaintiff had no other choice but to file an administrative or judicial proceeding. What is more important, however, is the fact that Plaintiff's email to the President about his grievances clearly constituted "protected activity" as defined by 42 U.S.C. § 12203(b), yet OCR accepts Kaplan's characterization of that activity as "threatening," without realizing that Kaplan's statement, on its face, provides further evidence that Kaplan had retaliated against the Plaintiff.

110. Third Example: The LOR (p. 17) states:

*On April 13, 2005*, Ross (Kaplan's Associate General Counsel and Senior Vice President of Human Resources) contacted the complainant regarding the concerns he raised with Rosen. . . [Ross] informed the complainant that he was expected to fulfill his job responsibilities as a [Department Chair] . . .

and warned him that *if he was interested in continuing in his position* as a [Department Chair], he must perform the essential functions of his job. . . .

(Emphasis added).

111. By offering Plaintiff the choice of "continuing in his position," Ross's statement proves that Kaplan excused any alleged job performance deficiency that would have taken place before April 13. The LOR continues:

> On April 13, 2005, On April 13, 2005, Dr. David L. Clinefelter, Provost and Vice President for Academic Affairs, contacted the complainant by telephone at the request of [Mr. Andrew] Rosen (Rosen), President of Kaplan University, to address [Plaintiff's concerns].

112. During that conversation, Clinefelter offered Plaintiff six (6) months salary in order to induce Plaintiff's resignation.[4]

113. The LOR, on page 17, states—wrongly—that, "[complainant] chose to quit working." The LOR utterly fails to explain, however, why Clinefelter would have offered Plaintiff six months salary to induce his resignation if the Plaintiff had in fact told Clinefelter that he had chosen to quit working on his own: That is the definition of resignation, not abandonment. Further on, in the same paragraph, OCR states that "Clinefelter contacted HR for guidance on how to address this problem and told the complainant that he would continue talking with [Plaintiff] on April 18, 2005 *regarding settlement options regarding his resignation*." (Emphasis added).

114. OCR's statement defies commonsense. If Plaintiff had told Clinefelter during this conversation that Plaintiff had quit working then: (1) Why would Clinefelter offer six months salary as a "settlement option"? (2) Why would Clinefelter schedule another meeting with Plaintiff five days later, on April 18, to

---

[4] Clinefelter told OCR that he only offered three (3) months salary, but a letter from Karen Ross states that Clinefelter "increased the cushion to six months."

continue talking about "settlement options regarding his resignation"? (3) Why would Kaplan state *job abandonment* as a reason for Plaintiff's termination if Plaintiff had in fact told Clinefelter that he had resigned? (4) Finally, why would Clinefelter have found it necessary to write Plaintiff a letter of termination—just one day after Plaintiff filed his OCR complaint—if Clinefelter truly believed that Plaintiff had told Clinefelter that he had resigned?

115. During the April 13 conversation with Clinefelter, Plaintiff and Clinefelter entered into an oral contract which Plaintiff memorialized in writing immediately after their conversation ended. Plaintiff forwarded an email in which Plaintiff set forth the parties' agreement that Clinefelter would fine temporary backup coverage for Plaintiff until the parties reconvened on April 18 to discuss further "settlement options regarding Plaintiff's resignation." Clinefelter received Plaintiff's message, as evidenced by a Read Return Receipt, but Clinefelter did not respond or object to Plaintiff's transcription.

116. In addition, the Letter of Resolution is internally inconsistent, and it is replete with misstatements of both fact and law. Its completely inaccurate legal analysis and failure to consider all of the substantial evidence that was provided to the Department should be an embarrassment for the Department, and I am sure that it is; however, the Department is more concerned in assuring the success and continued funding of the Distance Education Demonstration Program.

117. Although there is no question that OCR conducted its investigation in a biased manner, the Letter of Resolution must be annulled as an unlawful agency action because Letter of Resolution (LOR) undeniably states that the Department investigated Kaplan University under the wrong statute and under the wrong regulation—regulations with which the Department should be intimately familiar.

118. The LOR states that Kaplan University is subject to Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. Section 794, and its implementing regulation, 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability. These statements are true; however, because Plaintiff's OCR complaint alleged employment discrimination, Kaplan is also subject to 29 U.S.C. § 794a, which mandates that the procedures set forth in Section 505 of the Rehabilitation Act must be utilized when OCR processes an employment discrimination complaint against a recipient of Federal financial assistance.

119.  Congress amended the Rehabilitation Act in order to overturn the effects of *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In order to make it clear that Congress intended a broad reading of "program or activity" when interpreting Section 504, and other civil rights acts,  Congress passed the Civil Rights Restoration Act of 1987, which is codified in 20 U.S.C.A. § 1687, 42 U.S.C.A. § 2000d—4a, 42 U.S.C.A. § 6107(4) and 29 U.S.C.A. § 794(b). This Act added a section (d) to the Rehabilitation Act § 504 to define the phrase "program or activity" in each statute to make it clear that discrimination is prohibited throughout entire agencies or institutions if any part of an agency or institution receives federal financial assistance.

120. With respect to educational institutions, the Civil Rights Restoration Act provides that where federal aid is extended anywhere within a college, university or public system of education, the entire university or system is covered under the applicable federal statute. 29 U.S.C.A. § 794(b)(2). The Department cannot legitimately dispute that Kaplan University, as an educational institution, is included in the definition of "program or activity" that Congress broadened in order to overturn

38

the *Grove City College* holding. *See, Radcliff v. Landau*, 883 F.2d 1481 (9th Cir. 1989).

121. As a result, Kaplan University is subject to Section 505 in cases of employment discrimination. That Section provides:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

122. The Department of Education's implementing regulation for Section 505 is 34 C.F.R. Part <u>105</u>. It is irrefutable that the Department wholly-failed to comply with the Rehabilitation Act, as amended, and wholly-failed to comply with its own implementing regulation, including 34 C.F.R. 105.20, which provides that:

> No qualified individual with handicaps shall, on the basis of handicap, be subjected to discrimination in employment under any program or activity conducted by the Department. As provided in §105.41(b), the definitions, requirements, and procedures of section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791), as established by the Equal Employment Opportunity Commission in 29 CFR part 1613[5], shall apply to employment in federally conducted programs or activities.

123. Some of the significant requirements that are imposed by Section 1614.108 are as follows:

Section 1614.108, Investigation of Complaints

.   .   .   .

(c) The procedures in paragraphs (c) (1) through (3) of this section apply to the investigation of complaints:

(1) The complainant, the agency, and any employee of a Federal agency shall produce such documentary and testimonial evidence as the investigator deems necessary.

---

[5] Section 1613 of Title 29 was renumbered 29 C.F.R. part 1614 in 1992.

(2) Investigators are authorized to administer oaths. *Statements of witnesses shall be made under oath or affirmation or, alternatively, by written statement under penalty of perjury.*

(3) When the complainant, or the agency against which a complaint is filed, or its employees fail without good cause shown to respond fully and in timely fashion to requests for documents, records, comparative data, statistics, affidavits, or the attendance of witness(es), the investigator may note in the investigative record that the decisionmaker should, or the Commission on appeal may, in appropriate circumstances:

    (i)    Draw an adverse inference that the requested information, or the testimony of the requested witness, would have reflected unfavorably on the party refusing to provide the requested information;

    (ii)    *Consider the matters to which the requested information or testimony pertains to be established in favor of the opposing party;*

    (iii)    Exclude other evidence offered by the party failing to produce the requested information or witness;

    (iv)    Issue a decision fully or partially in favor of the opposing party; or

    (v)    Take such other actions as it deems appropriate.

    . . . .

(e) The agency shall complete its investigation within 180 days of the date of filing of an individual complaint or within the time period contained in an order from the Office of Federal Operations on an appeal from a dismissal pursuant to §1614.107 . . .

(f) Within 180 days from the filing of the complaint . . . *the agency shall provide the complainant with a copy of the investigative file,* and shall notify the complainant that, within 30 days of receipt of the investigative file, *the complainant has the right to request a hearing and decision from an administrative judge* or may request an immediate final decision pursuant to §1614.110 from the agency with which the complaint was filed.

(g) Where the complainant has received the notice required in paragraph (f) of this section *or at any time after 180 days have elapsed from the filing of the complaint, the complainant may request a hearing by submitting a written request* for a hearing

directly to the EEOC office indicated in the agency's acknowledgment letter. . . *Within 15 days of receipt of the request for a hearing, the agency shall provide a copy of the complaint file to EEOC and, if not previously provided, to the complainant.*

124. None of the requirements just discussed are provided to a complainant in a non-employment related Section 504 complaint; however, OCR failed, either intentionally or by gross negligence, to conduct its investigation of Plaintiff's OCR complaint in accordance with the above-referenced provisions.

125. On December 13, 2005, Plaintiff informed OCR of its failure to comply with 34 C.F.R. part 105, and requested that OCR respond immediately. Unsurprisingly, OCR has refused to admit its grave error. On December 16, 2005, Plaintiff sent OCR a formal request for hearing pursuant to 29 C.F.R. 1614.108(g) and also demanded a copy of the investigative file within 15 days (December 31, 2005). Plaintiff also asked that OCR voluntarily annul the October 27, 2005 Letter of Resolution and the Resolution Agreement in that both documents were prepared without due regard to the requirements of 34 C.F.R. Part 105, and that Plaintiff's complaint could not be resolved until an administrative law judge has rendered a decision in accordance with 29 C.F.R.108(g).

126. Plaintiff asked that an attorney for OCR respond by the close of business on December 16, 2005, and also stated that if OCR failed to respond to Plaintiff's request, he would be forced to draw the inference that OCR will not acknowledge its error and that OCR contumaciously refuses to comply with Federal law voluntarily.

127. Although Plaintiff received notification that several OCR attorneys had read his correspondence, no one from OCR contacted Plaintiff. It is for this reason, among others, that Plaintiff is now required to seek injunctive and declaratory relief from this Court.

128. In addition, the Department has learned from Plaintiff's OCR complaint against Kaplan University that Kaplan University is not in compliance with Section 504, and thus Kaplan University has not been entitled to receive Federal financial assistance all of these years, from 1999 to 2005. The funds that Kaplan University has been receiving are enormous, and in fiscal year 2004 alone, Kaplan University received $430 million dollars from the Department of Education.

129. According to 29 U.S.C. 794(b)(3)(ii), however, Kaplan Higher Education Corporation (KHEC) is also required to comply with federal civil rights law, not just Kaplan University, which is a subsidiary of Kaplan Higher Education.

130. OCR's failure to recognize KHEC's obligation is inexcusable given the fact that Kaplan University is receiving nearly half a billion dollars a year in Federal funding, and given the fact that Kaplan University would not be entitled to receive Federal funding at all, if it were not for the Distance Learning Demonstration Program that Congress authorized the Department to conduct. However, when Congress amended the Higher Education Act to allow the Department to issue waivers to institutions, such as Kaplan University, Congress specifically required the Department to "strictly monitor" those institutions. Undeniably, the Department has failed to comply with Congress's mandate.

131. Likewise, Kaplan University's and Kaplan Higher Education Corporation's failure to comply with Section 504 and Kaplan University's refusal to produce the Clinefelter memorandum, in violation of 34 C.F.R. 100.6, provide ample reason to support Plaintiff's request that the Court enjoin Kaplan University from further participation in the Distance Learning Demonstration Program until Kaplan complies with all requirements of Federal law. To permit Kaplan University to continue in the

Demonstration Program under these circumstances would be to disregard Congress's clear intent when it amended the Higher Education Act.

132. In addition, a recipient of Federal financial assistance is also required to conduct a self-evaluation and to maintain those results for three (3) years. 34 C.F.R. 104.6(c). On information and belief, neither Kaplan University nor KHEC have complied with this federal regulation, and this provides yet another reason that this Court should declare that Kaplan University is ineligible to continue in the Demonstration Program.

133. Continue with FOIA violations, and legal inadequacy of Cueva's recent correspondence.

<div align="center">

**COUNT ONE**
**PRIVACY ACT VIOLATION**
**REFUSAL OF ACCESS TO RECORDS THAT NAME PLAINTIFF**

</div>

134. The Plaintiff incorporates the paragraphs 1 through 133 herein by reference.

135. If the Department intended to claim an exemption prevent the release of any documents on the basis A timely response providing access to the records requested should have been provided on or before September 27, 2005.

136. The Agency <u>cannot</u> rely upon a FOIA exemption alone to deny Plaintiff access to any of his records under the Privacy Act. <u>See</u> 5 U.S.C. § 552a(t)(1); <u>see also</u> <u>Martin v. Office of Special Counsel</u>, 819 F.2d 1181, 1184 (D.C. Cir. 1987) ("If a FOIA exemption covers the documents, but a Privacy Act exemption does not, the documents <u>must be released</u> under the Privacy Act.") (emphasis added); <u>Viotti v.</u> <u>United States Air Force</u>, 902 F. Supp. 1331, 1336-37 (D. Colo. 1995) ("If the records are accessible under the Privacy Act, the exemptions from disclosure in the FOIA are

<div align="center">43</div>

inapplicable."), aff'd, 153 F.3d 730 (10th Cir. 1998) (unpublished table decision); Savada v. DOD, 755 F. Supp. 6, 9 (D.D.C. 1991) (citing Martin for the proposition that "[i]f an individual is entitled to a document under FOIA and the Privacy Act, to withhold this document an agency must prove that the document is exempt from release under both statutes"); cf. Stone v. Def. Investigative Serv., 816 F. Supp. 782, 788 (D.D.C. 1993) ("[T]he Court must determine separately [from the FOIA] whether plaintiff is entitled to any of the withheld information under the Privacy Act."); Rojem v. United States Dep't of Justice, 775 F. Supp. 6, 13 (D.D.C. 1991) ("[T]here are instances in which the FOIA denies access and the Privacy Act compels release."), appeal dismissed for failure to timely file, No. 92-5088 (D.C. Cir. Nov. 4, 1992); Ray v. United States Dep't of Justice, 558 F. Supp. 226, 228 (D.D.C. 1982) (requester is entitled, under subsection (c)(3), to receive the addresses of private persons who requested information about him, as "defendant is unable to cite a specific [Privacy Act] exemption that justifies non-disclosure of this information"), aff'd, 720 F.2d 216 (D.C. Cir. 1983) (unpublished table decision).

137. Defendant's willful refusal to timely provide the records requested violates the Privacy Act. See, e.g., 5 U.S.C. § 552a(d).

138. Defendant's willful refusal to timely provide the records requested prohibited unlawfully the Plaintiff from seeking corrections to any information that may be contained in the documents he requested. The Defendant's refusal to allow review and correction of records (if necessary) is likewise a violation of the Privacy Act. See, e.g., 5 U.S.C. § 552a(d).

## COUNT TWO
## PRIVACY ACT VIOLATION
### REFUSAL OF ACCESS TO RECORDS THAT NAME PLAINTIFF

139. The Plaintiff incorporates paragraphs 1 through 138 herein by reference.

140. Defendant has failed to establish and maintain physical safeguards to ensure the security and confidentiality of records in its possession in violation of the Privacy Act and the Defendant's regulations. See, *e.g.*, 5 U.S.C. § 552a(e)(9) and (10); 34 C.F.R. part 5b.

## COUNT THREE
## FOIA VIOLATION

141. The Plaintiff incorporates the prior paragraphs 1 through 140 herein by reference.

142. The materials at issue in this action are agency records of the Department within the meaning of 5 U.S.C. § 552. The Plaintiff has requested release of these records under FOIA, the agency has denied release.

143. The circumstances surrounding the Department's failure to release these records raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding of the records within the meaning of 5 U.S.C. § 552(a)(4)(F).

## COUNT FOUR
## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

144. Plaintiff incorporates paragraphs 1 through 143 herein by reference.

145. The Department's refusal to comply with 34 C.F.R. part 105 has injured the Plaintiff by preventing him from the substantive and procedural due process that section affords, and by preventing Plaintiff from obtaining access to information to which he has a statutory right, and its ongoing application will continue to injure him in the future by impeding or denying access to additional information that he has requested or will request under FOIA.

146. The Department's refusal to comply with 29 U.S.C. §§ 794 and 794a is contrary to the express command of Congress when it enacted the Civil Rights Act and thus constitutes agency action that is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority and limitations, and short of statutory right within the meaning of the APA (5 U.S.C. § 706(2)(A)&(C)).

147. Plaintiff has a right to judicial review of, and declaratory and injunctive relief against, such action under 5 U.S.C. §§ 702, 704, and 706, and 28 U.S.C. § 2201.

### RELIEF REQUESTED

WHEREFORE, Plaintiff prays for the following relief:

(1)     A declaratory judgment that the Department's withholding of the records at issue is unlawful and that the circumstances surrounding its failure to release the records raise questions whether the particular agency personnel responsible acted arbitrarily or capriciously with respect to the withholding of the records within the meaning of 5 U.S.C. § 552(a)(4)(F);

(2)     An injunction requiring the Department to make the requested records available to the Plaintiff forthwith;

(3)     A declaratory judgment that the Department has failed to comply with the requirements of 34 C.F.R. part 105 and 29 U.S.C. §§ 794 and 794a, and as a result that the Department must (i) void the October 27, 2005 Letter of Resolution and Resolution Agreement, (ii) follow the requirements of 34 C.F.R. part 105, and refer Plaintiff's OCR complaint to an administrative law judge in accordance with 29 C.F.R. § 1614.108(g), and (iii) provide Plaintiff with a full and complete copy of OCR's investigative file by December 31, 2005;

(4)     A declaratory judgment that neither Kaplan University nor Kaplan Higher Education Corporation is in compliance with Section 504 of the Rehabilitation

Act and that Kaplan University has unlawfully refused to disclose the Clinefelter memorandum, and until such time that Kaplan University and Kaplan Higher Education Corporation fully comply with Federal law and provide Plaintiff with a copy of the Clinefelter memorandum that Kaplan University is declared ineligible to continue its participation in the Distance Learning Demonstration Program;

      (5)      An award of costs and reasonable attorney fees as authorized by FOIA, 5 U.S.C.§ 552(a)(4)(E) and/or the Equal Access to Justice Act, 28 U.S.C. § 2412;

      (6)      Declare that the Defendant has violated the Privacy Act by withholding the requested records;

      (7)      Order the Defendant to immediately make the requested records available to the Plaintiff;

      (8)      Alternatively, declare that the Defendant has violated the Privacy Act by failing to safeguard records pertaining to the Plaintiff;

      (9)      Award the Plaintiff damages for all lost income, benefits, and/or other adverse impacts;

      (10)      Award Plaintiff all costs and attorneys' fees pursuant to 5 U.S.C. § 552a(g)(2);

      (11)      Refer this case to the Office of Special Counsel for investigation into the Departments' willful noncompliance with the Privacy Act.

      (12)      Grant such order and further relief as the Court may deem just and proper.

Filed December 21, 2005

Respectfully submitted,

JUDE GILLESPIE, ESQUIRE
FLORIDA BAR NUMBER 949401

800 West Avenue
Suite 540
Miami Beach, Florida 33139

Tel: 786.399.6522
Fax: 877.827.3093
Email: jude.miami@gmail.com