UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY E. MAIN,<br>        Plaintiff,<br><br>    v.<br><br>OAKLAND CITY UNIVERSITY,<br>founded by GENERAL BAPTISTS,<br>INC., d/b/a OAKLAND CITY<br>UNIVERSITY,<br>        Defendant. | )<br>)<br>)<br>)<br>)   3:03-cv-71 RLY-WGH<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ENTRY ON DEFENDANT'S MOTION TO DISMISS**

In April 2003, Plaintiff Jeffrey Main ("Main") filed this case against his former employer, Oakland City University ("OCU"), alleging that OCU has violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. In March 2004, OCU responded to Main's complaint with a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The court heard oral argument on OCU's Motion to Dismiss on January 14, 2005. For the following reasons, OCU's Motion to Dismiss is **granted.**

**I.    Background**

In 1998, Main was hired by OCU as an admissions representative charged with recruiting students for OCU's adult degree programs. (Complaint ¶ 7). He was paid a base salary of $22,000 and additional commissions and bonuses based on his success in

1

**EXHIBIT P**

enrolling students. (Complaint ¶ 8-9). Main was promoted to Director of Admissions in 1999, where he continued to receive commissions and bonuses. Before, during, and after Main's employment with OCU, the university paid other employees commissions and bonuses as well, based on their success in enrolling students. (Complaint ¶ 13).

At some point, Main learned that OCU's practice of paying commissions and bonuses to recruiters was in contradiction to the provisions of the Program Participation Agreements ("PPAs") that OCU had filed with the federal government. (Complaint ¶ 14-15). The PPAs were filed as required by the Higher Education Act ("HEA"), so that OCU could participate in government-sponsored student financial aid programs. (Complaint ¶ 15). Main alleges that OCU's commission and bonus structure violated 20 U.S.C.A. § 1094 of the HEA and 34 C.F.R. § 668.14(b)(22)(I), both of which forbid PPA-bound institutions from granting enrollment-based commissions. (Complaint ¶ 18-19). Main further alleges that OCU was aware that its commission and bonus policy was in contradiction to the provisions of the HEA's institutional eligibility requirements.

Main's complaint against OCU seeks damages and injunctive relief under three sections of the FCA, 31 U.S.C. § 3729, et seq. The FCA allows for a relator, such as Main, to bring a *qui tam* action, meaning that he is suing in the name of the United States government on behalf of both himself and the government. 31 U.S.C. § 3730(a). After a *qui tam* action is filed under the FCA, the United States has the option of either intervening and taking over the case or allowing the relator to continue with the case. In December 2003, the United States gave notice that it declines to intervene in this case.

The United States remains the real party in interest, however, and Main is a partial assignee. *United States ex rel. Zissler v. Regents of University of Minnesota*, 154 F.3d 870, 872 (8th Cir. 1990).

## II.   Motion to Dismiss Standard

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court examines the sufficiency of the complaint, not the merits of the lawsuit. Fed. R. Civ. P. 12(b)(6); *United States v. Clark County, Ind.*, 113 F.Supp.2d 1286, 1290 (S.D. Ind. 2000). The court will dismiss a complaint for failure to state a claim only if it "'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Hamlin v. Vaudenberg*, 95 F.3d 580, 583 (7th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In making its determination, the court accepts the allegations in the complaint as true, and it draws all reasonable inferences in favor of the plaintiff. *Mallett v. Wisconsin Div. of Vocational Rehabilitation*, 130 F.3d 1245, 1248 (7th Cir. 1997); *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996). Additionally, the court will consider facts presented in exhibits attached to the complaint. *See, Zinermon v. Burch*, 494 U.S. 113. In accordance with this standard, the facts outlined above are accepted as Main alleges them.

## III.   Analysis

The essence of Main's allegations is that OCU violated the FCA by knowingly filing false claims that caused the government to pay out HEA Title IV funds, including but not limited to Pell Grants, Perkins Loans, and Federal Work Study Funds.

3

(Complaint ¶ 17). Main brings three claims against OCU, for respective violations of subsections (a)(1), (a)(2), and (a)(3) of the FCA. 31 U.S.C. § 3729. His first claim, based on subsection (a)(1), alleges that OCU knowingly or recklessly presented the government with false claims in the form of PPAs, and that those claims caused payments to be made by the government. (Complaint ¶ 23). Main's second claim, based on subsection (a)(2), alleges that OCU "made, used or caused to be made or used, false records or statements to get false or fraudulent claims approved by the Government." (Complaint ¶ 26). And his third claim, based on subsection (a)(3), alleges that OCU conspired to defraud the government. (Complaint ¶ 29).

OCU's motion to dismiss Main's claims is premised on three arguments. First, OCU argues that this case does not fall within the jurisdiction of the federal courts because Congress has vested the authority to enforce the HEA exclusively with the Secretary of Education ("Secretary"). (Defendant Oakland City University's Motion to Dismiss ¶ 1). Second, OCU argues that even if this court has jurisdiction, Main has not alleged an actionable false claim under the FCA. (*Id.*). Finally, OCU argues that Main's third claim must be dismissed because he does not properly allege the elements of conspiracy. (Defendant Oakland City University's Brief in Support of Defendant's Motion to Dismiss ("OCU Brief") at 20). The court considers OCU's arguments for dismissal in turn.

**A.    Jurisdiction**

According to OCU, this court does not have jurisdiction over the case before it

4

because the HEA has preempted the FCA. Even if the HEA has not preempted the FCA (which would mean that there is federal court jurisdiction over the case), OCU asks the court to defer to the Secretary's enforcement of HEA regulations under the doctrine of primary jurisdiction.

1. **Preemption**

OCU argues that Congress has given the Secretary *exclusive* authority to enforce the HEA requirements and that Main cannot circumvent the HEA's regulatory scheme by invoking the FCA. (OCU Brief at 6-7). According to OCU, if relators such as Main are allowed to go forth with FCA claims "the Secretary's authority will be eviscerated and the underlying purpose of the HEA defeated as complainants forego administrative channels in hopes of reaping a windfall for HEA violations." (*Id.* at 11).

The HEA and the FCA serve different functions. The HEA's overarching purpose is "to assist in making available the benefits of post-secondary education to eligible students." 20 U.S.C. § 1070. The remedies available to the Secretary under the HEA include a variety of enforcement mechanisms, including limitation, suspension, or termination of an institution's participation in HEA programs. 20 U.S.C. § 1094(c)(1)(F). Also, if monetary penalties are assessed against an institution under the HEA, the Secretary has the discretion to alter the amount owed by the institution on the basis of the institution's size or the severity of the violation. 20 U.S.C. § 1094(c)(3)(B)(ii).

In contrast to the HEA, the FCA has the overarching purpose of enhancing "the Government's ability to recover losses sustained as a result of fraud against the

5

Government." S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.A.A.N. 5266, 5266; *see also, United States v. Hess*, 317 U.S. 537, 551 (1943) (defining the FCA's purpose as "to provide for restitution to the government of money taken from it by fraud"). Penalties under the FCA are less discretionary than those under the HEA. Monetary penalties accrue on a per-violation basis, and attorney's fees and costs of litigation are automatically awarded if the relator is successful. 31 U.S.C. § 3729(a). Damages are trebled unless the defendant cooperates with the government's investigation, in which case damages are still doubled. *Id.* The *qui tam* relator in an FCA action is awarded between fifteen and thirty percent of the damages, depending on his or her role in the case, and the remainder goes to the United States. 31 U.S.C. § 3730(d).

OCU does not identify a specific part of the text of the HEA or its legislative history that indicates that Congress intended for the HEA to preempt the FCA. Rather, OCU argues that the HEA implicitly preempts the FCA because the Secretary has the power to enforce the HEA. (OCU Reply Brief at 2). But the court "is not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 265-66 (1992) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). In light of the differing purposes of the HEA and the FCA, and because there is no explicit preemption, the court finds that Congress

6

intended for both statutory schemes to be effective.[1]

### 2. RICO Precedents

As part of its preemption argument, OCU contends that this case is analogous to several cases wherein courts have held that certain HEA violations cannot be the basis for RICO actions. (OCU Brief at 7-8). *See McCulloch v. Educ. Finance Group*, 2001 U.S. Dist. LEXIS 24387 (S.D. Fla. Oct 18, 2001), *aff'd sub nom. McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217 (11th Cir. 2002); *New York Inst. of Dietetics, Inc. v. Great Lakes Higher Educ. Corp.*, 1995 U.S. Dist. LEXIS 13692 (S.D.N.Y. Sept 19, 1995). OCU asks the court to draw a broader principal from the RICO cases: that "a party may not invoke a statutory enforcement mechanism to circumvent the Secretary's exclusive jurisdiction by pleading an HEA violation as a predicate offense under another statute." (Defendant OCU's Response to the United States' Statement of Interest at 12). This court declines to extend the RICO case holdings and instead looks to FCA precedent as guiding.

Several courts have held that FCA actions can be premised on HEA violations. In *Gibson v. Colorado Student Loan Program*, the court allowed the *qui tam* relator to proceed with his FCA claim based on violations of the HEA. 1996 WL 944285 (D. Colo. May 3, 1996); *see also, United States v. St. Augustine College*, 1991 WL 222099 (N.D. Ill. Oct. 21, 1991) (finding defendant liable under the FCA for disbursing Title IV Pell

---

[1] The court notes that many other federal courts have exercised jurisdiction over similar claims. *E.g.*, *Unites States ex rel. Bowman v. Education America, Inc.*, 116 Fed.Appx. 531 (5th Cir. 2004); *United States ex rel. Haskins v. Omega Institute, Inc.*, 11 F.Supp.2d 555 (D.N.J. 1998).

7

Grant money to ineligible students). The *Gibson* court explained that "Plaintiff must do more than point to violations of the HEA. He must show how violations of the HEA are also violations of the FCA or how they caused violations of the FCA." *Id.* at *5. Accordingly, an FCA claim can be premised on an HEA claim.

   3.   **Primary Jurisdiction**

In its final jurisdictional argument, OCU invokes the doctrine of primary jurisdiction and contends that, even if the FCA applies here, the court should stay this case pending referral to the Secretary. (OCU's Reply Brief at 5). The doctrine of primary jurisdiction applies when enforcement of a claim requires the resolution of issues that are within the specialized competence of an administrative body, such as the Secretary in this case. *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991). Application of the doctrine is decided on a case-by-case basis, taking into consideration the purpose behind the statute involved and the relevance of the administrative body's expertise. *Id.* at 131. In this case, the Secretary has expertise in applying the HEA, but the Secretary has no authority to enforce the FCA. As such, the court declines to apply the doctrine of primary jurisdiction to this case.

**B.   Allegation of a False Claim**

In the Seventh Circuit, an actionable false claim under the FCA consists of three elements: "(1) the defendant made a record or statement in order to get the government to pay money; (2) the record or statement was false or fraudulent; and (3) the defendant knew it was false or fraudulent." *United States ex rel. Lamers v. Green Bay*, 168 F.3d

8

1013, 1018 (7th Cir. 1999) (citing 31 U.S.C. § 3729(a)(2)). Main's complaint fails to meet the first of these elements because OCU did not make a claim in order to receive government funds. The PPAs are not claims because they do not directly demand money from the government. Furthermore, while false certifications of compliance can be the basis for FCA liability (that is, they can be considered a "claim"), the PPAs do not qualify as certifications of compliance with the HEA. As such, Main has not alleged an actionable false claim.

1. **Express Demands for Government Funds**

The PPAs at issue here are not demands or claims for government money because funds do not flow to OCU when it signs the PPAs. The PPAs merely establish the institution's eligibility for participation in Title IV programs. (OCU Brief at 13). Funds do not flow to OCU until students apply for and receive financial aid, and then use that aid to pay tuition and fees to the school. (*Id.*). Since there are multiple steps between the submission of the PPAs and OCU's actual receipt of funds, the PPAs cannot be considered a direct claim for government funds.

Main argues that the first *Lamers* element is met in this case (i.e., that there is a claim), and that the *Lamers* opinion itself supports his position. The relator in *Lamers* was the owner of a bus company in the Green Bay area. 168 F.3d at 1014. Mr. Lamers lost his account with the local public school district when the district decided to contract with the city-owned Green Bay Transit ("GBT") to transport students to and from school on public buses. *Id.* Since Green Bay was receiving annual grants from the Federal

9

Transit Administration ("FTA"), it was obligated to run its buses in compliance with certain federal statutes and regulations. *Id.* The GBT buses began transporting students in a pilot program in the spring of 1993. *Id.* at 1015. By September 1995, GBT was operating in full compliance with FTA regulations. *Id.* at 1016. Mr. Lamers brought his FCA action based on the transitional period from 1993 to 1995, when GBT was in violation of FTA requirements because, for example, the published transit system maps did not show the new routes that had been created to accommodate student passengers and "buses sometimes made mid-block stops near schools." *Id.* at 1015.

The *Lamers* court found that Mr. Lamers' "claim [met] the first element because the City's statements in its annual application and letters to the FTA were clearly made in an effort to get the federal government to continue paying the City money." *Id.* at 1018. However, the *Lamers* court ultimately found in favor of the City, because "minor technical violations . . . seem normal for a new bus program," *id.* at 1019, and "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *Id.* at 1020; *see* Defendant OCU's Reply to Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss ("OCU Reply Brief") at 3.

Main argues that OCU's statements in the PPAs are analogous to Green Bay's statements to the FTA. The court disagrees. In *Lamers* there was no middleman – no series of steps – between the FTA and Green Bay. In the case at bar, the interim steps of the students applying for, receiving, and conveying the Title IV funds from the government to OCU make it impossible for the PPAs to function as direct claims for

10

government funds.

2. **Implied Certifications of Compliance**

In the absence of an express claim for government funds, the FCA can still be violated by an implied certification of compliance, when the government's payment of funds is conditioned upon the making of such a certification.[2] In the case at bar, however, there is no such certification. The PPAs were signed in order to establish OCU's eligibility to participate in Title IV HEA programs, but, as explained above, the PPAs themselves did not cause the government to pay out HEA funds.

OCU itself concedes that in order for it to receive Title IV funds, it "*must* execute the PPA, which becomes effective once countersigned by the Secretary or a designated Department of Education official." (OCU Brief at 15) (emphasis added). In this way, the filing of the PPA necessarily happens prior in time to the flow of Title IV funds to the

---

[2]An implied certification can, theoretically, be based on either express or implicit requirements found in the underlying statute (here, in the HEA). Since there is neither an express nor an implied certification of compliance in the PPAs, the "express versus implied" issue is not before this court; however, it is worth noting that there are inconsistencies within the circuits regarding exactly when an implied certification of compliance can form the basis for an FCA claim. *See United States ex rel. Graves v. ITT Educational Services, Inc.*, 2004 WL 2376217, *1, n.2 (5th Cir. Oct. 20, 2004) (per curiam) ("[w]hile this Circuit has decided cases dealing with FCA liability based on express certifications of compliance with various statutes and regulations, we have not specifically addressed whether FCA liability can be based on an 'implied certification' theory"); *Mikes v. Straus*, 274 F.3d 687, 700 (2nd Cir. 2001) ("implied false certification is appropriately applied only when the underlying statute *expressly* states the provider must comply in order to be paid") (emphasis original); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 n.8 (4th Cir. 1999) (not ruling on the issue, but noting that the validity of implied certification claims in the Fourth Circuit is "questionable"); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (accepting theory of implied certification, but not finding such a certification based on the facts). The Seventh Circuit has not squarely addressed this issue.

school. But the function of the PPA, as explained on the front page of the PPA itself, is to establish an institution's eligibility to participate in HEA programs, and not to immediately direct money to the institution: "the execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued *participation in* any Title IV, HEA Program." (Defendant's Ex. 1 at 1 (emphasis added)).

In *Graves*, a case very similar to the one at bar, the Fifth Circuit affirmed the District Court's dismissal of the case, finding that "nothing in the PPA required ITT expressly to certify compliance with the provision prohibiting incentive payments." *United States ex rel. Graves v. ITT Educational Services, Inc.*, 284 F.Supp.2d 487, 500 (S.D.Tex. 2003), *aff'd per curiam*, 2004 WL 2376217, *1, n.2 (5th Cir. Oct. 20, 2004). The *Graves* court drew a distinction between a broad, general statement of adherence, such as a PPA, and those particular statements which are necessary prerequisites to receiving payments. *Id.* at 500-01. Ultimately, the *Graves* court held that "[a] general statement of adherence to all regulations or statutes governing participation in a program through which federal funds are received is insufficient as a basis of False Claims Act liability." *Id.* at 501. This court agrees. A PPA does not constitute a certification of compliance.

### C. The Conspiracy Claim

General civil conspiracy standards apply to conspiracy claims brought under the FCA. *U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). Main fails to allege facts that support his third claim, which contends that OCU engaged in a

12

conspiracy. Specifically, Main fails to allege that OCU entered into an agreement with any other party to submit fraudulent PPAs. *See*, *Durcholz*, 189 F.3d at 545-6 (upholding summary judgment when there was inadequate evidence to show a meeting of the conspiratorial minds). Therefore, Main's third count against OCU will be dismissed (and it would have been dismissed even had his other charges survived OCU's Motion to Dismiss).

## IV.  Conclusion

For the foregoing reasons, the court finds that Main has not alleged sufficient facts to support his claims. Therefore, OCU's motion to dismiss is **granted** in its entirety.

**It is so ordered** this 15th day of March 2005.

	RICHARD L. YOUNG, JUDGE
	United States District Court
	Southern District of Indiana

Electronic copies to:

James D. Johnson
RUDOLPH FINE PORTER & JOHNSON
jdj@rfpj.com