UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-20756-CIV-SEITZ/SIMONTON

UNITED STATES OF AMERICA,
*ex rel.* JUDE GILLESPIE,

        Plaintiff,

v.

KAPLAN UNIVERSITY, *et al.*,

        Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MOTION AND DENYING RELATOR'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants Kaplan, Inc., Kaplan University, and Kaplan Higher Education's Motion for Summary Judgment [DE-363] and Relator Jude Gillespie's Motion for Partial Summary Judgment [DE-365]. This *qui tam* action alleges that Defendants violated the federal False Claims Act by falsely certifing that they were in compliance with the Rehabilitation Act in order to be eligible to receive federal student aid funds. Defendants (jointly referred to herein as "Kaplan") move for summary judgment arguing that Relator cannot establish three of the four elements of a claim under the False Claims Act. Relator (Gillespie) moves for partial summary judgment finding that Kaplan was in violation of Section 504 of the Rehabilitation Act and its implementing regulations. Because Gillespie cannot establish all of the elements of his claim, Kaplan's motion is granted and Gillespie's motion is denied as moot.

## I. Undisputed Material Facts

*The Program Participation Agreements*

Defendants Kaplan University (KU) and Kaplan Higher Education Corp. (KHEC) are accredited by the Higher Learning Commission and are recipients of federal student financial aid funds from the U.S. Department of Education (DOE), pursuant to Title IV of the Higher Education Act (HEA). KU operates numerous online educational enterprises throughout the United States. KU is a wholly owned subsidiary of KHEC. KHEC is a division of Defendant Kaplan, Inc. (Kaplan, Inc.). In order to obtain federal student financial aid through Title IV of the HEA, an educational institution must certify to the United States government (Government) that it will comply with statutory and regulatory prerequisites established by the HEA and the DOE. Certification is done through the execution of a Program Participation Agreement (PPA).

In May 2004, KU, then called Kaplan College, entered into a PPA with the DOE. (DE-367-39.) Gary Kerber, as President and CEO of KHEC, signed the May 2004 PPA on behalf of Kaplan College. (*Id.*) KU entered into another PPA with the DOE in November 2007.[1] (DE-367-40.) Jeffrey Conlon, as President, executed the November 2007 PPA on behalf of KU. (*Id.*) Both the 2004 and 2007 PPAs contained language that stated that KU agreed to comply with Section 504 of the Rehabilitation Act of 1973 and the implementing regulations, 34 C.F.R. Part 104. (DE-367-39 at 2; DE-367-40 at 2.)

---

[1] By prior order, the Court held that Gillespie's claim only covers up until OCR found Defendants in compliance with the Rehabilitation Act. *See* DE-262 at 14. Thus, once OCR issued its finding that KU had fulfilled its obligations under the Resolution Agreement, the time frame for Gillespie's claims end. Consequently, anything that occurred after May 24, 2007 is irrelevant to the claims currently before the Court.

*Gillespie's OCR Complaint and the Investigation*

Relator Jude Gillespie was employed by KU from April 2004 until April 15, 2005. On April 14, 2005, Gillespie filed a complaint with the DOE's Office of Civil Rights (OCR) alleging that KU engaged in discrimination and retaliation on the basis of Gillespie's disability and that Kaplan did not have an "institutional grievance process as required by 34 CFR 104.7." (DE-367-35.)

On June 16, 2005, OCR sent KU a letter notifying it of Gillespie's complaint and requesting that KU supply OCR with certain documents as part of its investigation of the complaint. (DE-367-9.) On July 12, 2005, via letter, KU responded to the request for documents and to specific questions from OCR. (DE-367-10.) On September 26, 2005, OCR sent KU a memorandum outlining its concerns regarding KU's policies and procedures. (DE-367-11.) The memo set out seven specific findings:

- The University does not have a published procedure detailing how a disabled employee can request accommodations based on his/her disability.
- The non-harassment policy only addresses the types of harassment to which an employee might be subjected. As all discrimination does not necessarily rise to the level of harassment, the University needs to provide policies and procedures that address discrimination separately from harassment.
- The discrimination/harassment complaint procedure should be amended to provide the detailed process by which employees could seek informal and formal resolutions to their concerns.
- The University should designate consistently to whom informal and formal complaints may be addressed.
- The University's policies and procedures should be amended so as to provide a definitive detailed manner and period of time in which prompt investigations are to be completed (30-90 days).
- The complaint procedures should be amended to require the University to notify complainants in writing of the results of investigations.
- The University's policies and procedures should provide where a complainant and/or one who has been accused may appeal the investigation's findings.

3

(DE-367-11.) On September 28, 2005, KU responded that it would implement new policies and procedures that would address OCR's concerns and asked for forms that OCR believed would be appropriate. (DE-367-12.) OCR responded on September 30, 2005, stating that it could not find any OCR approved policies and further stated that it had found some policies on the internet. (DE-367-13.) On October 27, 2005, OCR sent a letter to KU formally setting out its findings and conclusions regarding Gillespie's OCR complaint. (DE-367-16.) While OCR found that Gillespie had not been discriminated or retaliated against, it raised the seven issues with KU's policies and procedures that had been raised in the September 26, 2005 memorandum. (*Id.*).

On October 12, 2005, KU signed a Resolution Agreement with OCR. (DE-367-16.) KU did not admit to any violations or non-compliance in the Resolution Agreement. (DE-367-16 at 25.) Over the next few months OCR and KU continued to communicate as KU worked towards compliance with the terms of the Resolution Agreement. (DE-367-17 through DE-367-27.) On May 24, 2007, OCR sent KU a letter stating that KU had fulfilled its obligations under the Resolution Agreement and that, as a result, no further monitoring by OCR was necessary. (DE-367-28.) At no time did OCR revoke KU's eligibility to receive Title IV funds.

*Kaplan's Compliance With the Rehabilitation Act*

Defendants and Gillespie have filed the depositions, or portions of depositions, of numerous Defendants' employees involved in the execution of the PPAs and/or involved in ensuring Kaplan's compliance with the Rehabilitation Act. The depositions include: Gary Kerber, President and CEO of KHEC; Karen Ross, Vice President of Human Resources and Associate General Counsel of Kaplan, Inc., who later became Senior Vice President of Human Resources and Associate General Counsel; Elaine Neely, Senior Vice President of Regulatory

4

Affairs from 2005 until 2011; Deana Echols, who began working for KHEC in the mid-nineties and worked her way up to the position of Institutional Eligibility Manager by 1999 and then became Director of Institutional Eligibility in 2003 or 2004; Lisa Gefen Sicilian, former Senior Vice President of Human Resources and Legal for KU and current Chief Administrative Officer (at the time of her December 12, 2012 deposition); and Steve Lovig, the former Human Resources Manager for KHEC. As set out below, these employees were tasked with ensuring that Kaplan was in compliance with the Rehabilitation Act and other requirements of the PPAs.

According to Gary Kerber, who executed the 2004 PPA, people with expertise in the areas covered by the PPA would review the PPA for accuracy before it came to Kerber for his signature. (Kerber Dep.[2] 11:1-10.) While Kerber did not independently review the PPA before signing it, he made sure that he hired people with expertise in the various areas and expected them to properly review things before they ended up on his desk. (*Id.* at 12:3-13:1; 54:7-19.) Kerber knew that Kaplan was required to comply with Section 504 of the Rehabilitation Act and stated that Kaplan was "very on board with meeting those requirements." (*Id.* at 50:3-25.) Kerber also knew that compliance with the requirements in the PPAs was a continuing obligation and that failure to comply could result in the loss of federal funding. (*Id.* at 51:1-22.)

In 2002, Kaplan, Inc. hired Karen Ross as Vice President of Human Resources and Associate General Counsel. In 2004, Ross was promoted to Senior Vice President of Human Resources and Associate General Counsel. While Ross was not responsible for ensuring that Kaplan legally qualified to participate in federal student aid programs, she knows that someone

---

[2]Kerber Dep. refers to the deposition of Gary Kerber filed at DE-376-14.

in the general counsel's office was. (Ross Dep.[3] 65:11-24.) Ross's responsibilities at Kaplan included ensuring that Kaplan's policies complied with the Rehabilitation Act. (*Id.* at 67:9-19.) As a result, when Ross started at Kaplan, she reviewed and revised handbooks and provided nondiscrimination training. (*Id.* at 67:20-68:12.) The training she provided included written materials and powerpoint presentations. (*Id.* at 68:13-69:20.) Additional training included computer-based interactive programs that provided nondiscrimination training for all employees, annual meetings for human resource directors, and an annual managers meeting. (*Id.* at 197:3-23.)

After her initial review of Kaplan's existing handbook, Ross revised it using nondiscrimination language that had been approved by the EEOC. (*Id.* at 77:25-78:10.) The EEOC had approved the language when Ross used it for a prior employer. (*Id.* at 120:16-121:6.) The revised handbook covered nondiscrimination on the basis of disability and included grievance and complaint procedures. (*Id.* at 79:9-80:5.) Ross believes that she developed a legally compliant handbook that was sent to the various Kaplan entities who were instructed to use Ross' handbook as a template. (*Id.* at 75:21-76:11.) Ross believes that the policies she drafted complied with all legal requirements that Kaplan had. (*Id.* at 118:12-14.) Ross testified that it was her habit to submit such revisions to her supervisor before disseminating them company-wide. (*Id.* at 122:24-123:22.) No one ever told Ross that her policies might not comport with federal law. (*Id.* at 125:17-126:2.)

Ross stayed up to date on employment law issues by reading the Rehabilitation Act, reading cases interpreting the Rehabilitation Act, reading the daily labor report, and attending

---

[3] Ross Dep. refers to the deposition of Karen Ross filed at DE-376-11.

6

employment law CLEs. (*Id.* at 136:7-137:10.) She believes that she and Kaplan did everything in good faith to try to be compliant with all laws, including the Rehabilitation Act. (*Id.* at 194:25-195:5.)

Elaine Neely, Senior Vice President of Regulatory Affairs from 2005 until 2011, was involved in ensuring compliance with federal regulations, rules, and laws that dealt with students, not employees. (Neely Dep.[4] 148:13-23.) Neely was in charge of filling out and submitting the application for obtaining a PPA. (*Id.* at 42:13-43:5; 46:12-14.) When the DOE issued a new PPA, Neely would review it. (*Id.* at 48:2-4.) She reviewed the 2004 PPA for Kaplan College. (*Id.* at 72:17-20.) While she did not read every single word because it was a template, she reviewed the PPA for conditions or unusual things. (*Id.* at 72:21-73:17.) Neely skimmed the general terms and conditions section because the general terms and conditions were the same in all PPAs. (*Id.* at 76:19-7710.) The DOE issues two types of PPAs, a full PPA and a Provisional Participation Agreement. (Echols Dep.[5] 101:5-21.) All full PPAs are standard with the same language. (*Id.*)

Neely knew that the PPA required Kaplan College to comply with the Rehabilitation Act and knew that Kaplan had policies and procedures in place to ensure compliance with the Rehabilitation Act. (Neely Dep. at 88:11-16.) Neely saw the training materials prior to forwarding the PPA to Kerber for his signature. (*Id.* at 90:1-7.) She testified that outside counsel reviewed the training materials to ensure that they were accurate and appropriate. (*Id.* at 90:8-13.) She also worked with outside counsel to prepare training materials covering the

---

[4]Neely Dep. refers to the deposition of Elaine Neely filed at DE-376-22.

[5]Echols Dep. refers to the deposition of Deana Echols filed at DE-376-23.

Rehabilitation Act. (*Id.* at 102:1-103:7.) The training materials conveyed that a violation of Section 504 of the Rehabilitation Act was a serious matter. (*Id.* at 115:19-116:16.) However, she was unaware of any training or materials in connection with Section 504 that existed prior to her time with Kaplan, and was also unaware of any employee requests for accommodations. (*Id.* at 91:15-92:18.)

Deana Echols, Institutional Eligibility Manager and then Director of Institutional Eligibility, would receive the new PPAs and send them on to Kerber for signature. (Echols Dep. at 27:20-28:9; 99:14-100:8.) Echols was aware of the General Terms and Conditions in the PPA that required compliance with the Rehabilitation Act. (*Id.* at 102:10-13.) Echols did not personally ensure that Kaplan was in compliance with the Rehabilitation Act because she was aware that Kaplan had policies, procedures, and guidelines developed by its various departments to ensure compliance with the various federal regulations. (*Id.* at 105:19-106:17.) Echols had no reason to believe that Kaplan was not in compliance with the Rehabilitation Act because Kaplan had established policies and procedures that it followed. (*Id.* at 120:4-18.)

Employee issues with the Rehabilitation Act fell under the purview of Human Resources, not compliance, eligibility or regulatory. (Echols Dep. at 72:19-22.) Lisa Gefen Sicilian, former Senior Vice President of Human Resources and Legal for KU and current Chief Administrative Officer, testified that prior to Gillespie filing his complaint with OCR, no other complaints had been filed regarding discrimination or not being accommodated and none have been filed since. (Sicilian Dep.[6] 48:1-7; 48:11-15.) Throughout OCR's investigation, Kaplan maintained that it was in compliance with the Rehabilitation Act. (*Id.* at 91:19-21.) According to Sicilian, during

---

[6]Sicilian Dep. refers to the deposition of Lisa Gefen Sicilian filed at DE-367-52.

the investigation, OCR told Kaplan's outside counsel that Kaplan was not in violation of the law, despite the OCR findings. (*Id.* at 97:9-16.)

Steve Lovig, the former Human Resources Manager for KHEC, testified that during his time with KHEC[7] he never had any reason to believe that Kaplan was not in compliance with the Rehabilitation Act. (Lovig Dep.[8] at 107:9-19.) In fact, Lovig believed that Kaplan was in compliance based on the training and information provided to employees. (*Id.*)

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

---

[7] Because only a portion of Lovig's deposition has been filed in the record, it is not clear when exactly Lovig worked for KHEC.

[8] Lovig Dep. refers to the deposition of Steve Lovig filed at DE-367-57.)

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Discussion

This Court has previously held that there are four elements to a false certification claim: (1) the submission of a false claim; (2) scienter; (3) the false statement must be material to the government's decision to pay out moneys to the claimant; and (4) an actual claim or call on the government fisc. *See* DE-19 in Case No. 09-md-02057 (citing *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1171-73 (9th Cir. 2006)). Kaplan moves for summary judgment because Gillepsie cannot establish three of these four elements. Specifically, Kaplan alleges that Gillespie cannot establish that: (1) Kaplan actually violated the Rehabilitation Act and, thus, made a false statement; (2) Kaplan acted with the requisite scienter; and (3) any false statement was material to the Government's decision to release Title IV funds to Kaplan students. Based on the record evidence, Gillespie cannot establish that Kaplan acted with scienter. Therefore, he cannot establish a necessary element of his false certification claim.[9]

The False Claims Act does not require proof of specific intent to defraud; instead, it

---

[9] Because Gillespie cannot establish scienter, the Court need not address whether the other elements of a false certification claim have been met or whether Gillespie is entitled to partial summary judgment as to whether Kaplan was in violation of the Rehabilitation Act.

10

defines the terms "knowing" and "knowingly" to mean that a person:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

31 U.S.C. § 3729(b) (2008).[10] Plaintiff argues that Kaplan acted with deliberate ignorance or in reckless disregard of the truth. Kaplan asserts that there is no evidence that it acted such and that the evidence indicates that it attempted to comply, and did in fact comply, with Section 504 of the Rehabilitation Act.

The "knowing" element of the False Claims Act was not meant to punish honest mistakes or incorrect claims submitted through mere negligence; it was meant to reach the situation where an individual has "buried his head in the sand" and failed to make basic inquiries which would alert him that false claims are being submitted. *U.S. v. Kaman Precision Products, Inc.*, 2011 WL 3841569 (M.D. Fla. Aug. 20, 2011) (discussing legislative history). Other courts have described reckless disregard as "an extreme version of ordinary negligence." *U.S. v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997). Thus, while a defendant need not have an actual intent to defraud, he must have acted with more than mere negligence in submitting the claim.

Here, Gillespie has not shown that Kaplan knowingly did not comply with Section 504 of the Rehabilitation Act. While Kerber has admitted that he did not personally ensure compliance prior to executing the May 2004 PPA, he testified that he knew Kaplan had to comply and relied on the expertise of others to ensure that Kaplan was in compliance with the Rehabilitation Act.

---

[10]The False Claims Act was amended in 2009. While the definition of "knowing" did not change the numbering of the section changed slightly. It is now 32 U.S.C. § 3729(b)(1).

11

According to the testimony in the record, those others included outside counsel and inside counsel. Associate General Counsel Ross' job responsibilities specifically included ensuring compliance with the Rehabilitation Act. To that end, she rewrote Kaplan's policies and procedures soon after starting at Kaplan and provided nondiscrimination training to employees. Ross modeled the new policies and procedures on language that had previously been approved by the EEOC. Ross also testified that she made a point of staying on top of developments in the labor and employment law fields. Kaplan also relied on outside counsel. Neely testified that she worked with outside counsel to develop training materials that covered the Rehabilitation Act and that outside counsel reviewed Kaplan's policies and procedures.

Furthermore, there is no evidence of record to indicate that Kaplan knew or should have known that it was not in compliance with the Rehabilitation Act. Prior to Gillespie's OCR complaint, Kaplan had never had a complaint about its Rehabilitation Act policies. Kaplan had policies and procedures in place to ensure compliance and there is no evidence that those policies and procedures were not followed. Even when OCR made its findings, Kaplan's counsel was told by OCR that Kaplan was in compliance with the Rehabilitation Act. Thus, the evidence does not show that Kaplan "buried its head in the sand" or failed to make basic inquiries to ensure compliance.

The cases Gillespie cited do not support the conclusion that Kaplan acted with deliberate ignorance or reckless disregard. In *U.S. v. Krizek*, the defendants had submitted Medicare and Medicaid claims that had been completed with little or no factual basis, no effort had been made to determine how much time the doctor had spent with a patient, and the doctor had completely failed to review the bills submitted on his behalf. 111 F.3d at 942. Similarly, in *U.S. v. Stevens*,

605 F. Supp. 2d 863, 869 (W.D. Ky. 2008), the doctor who submitted the Medicare and Medicaid claims took no steps to ensure that the billings were correct and turned over the billing to a person with no prior experience. Unlike in *Krizek* and *Stevens*, where the defendants had no system to ensure correct billings were submitted, Kaplan had employees, including attorneys, who were tasked with ensuring compliance with the Rehabilitation Act and who, together with outside counsel, developed policies, procedures, and training to ensure compliance. Gillespie has not come forward with any record evidence indicating that Kaplan's employees lacked the skills and experience to do their jobs. Nor has he come forward with record evidence showing that the employees did not do their jobs. Thus, Gillespie has not shown the existence of a general issue of material fact.

*U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998), also does not support a finding that Kaplan acted with deliberate ignorance or reckless disregard. In *Compton*, the defendant did not comply with a testing requirement in its contract with the Government. While the defendant argued that it did not believe that it had to test the goods, it had drafted the contract language requiring the testing, its president testified that he knew of the testing requirement, and, yet, no testing was done. *Id.* at 304. The Sixth Circuit found that this was sufficient to find scienter. Here, however, Kaplan was aware of the PPA's requirement that it comply with the Rehabilitation Act and, as set out above, undertook to comply with it. Thus, there is nothing to indicate that Kaplan acted with the necessary scienter.

Gillespie also argues that Kaplan continued to bury its head in the sand after OCR issued its findings. However, the evidence shows otherwise. Kaplan worked with OCR to resolve the issues. Simply because Kaplan refused to acknowledge that it was not in compliance with the

Rehabilitation Act does not mean that it did not make efforts to resolve the issues with OCR. The evidence shows that Kaplan worked with OCR throughout the investigation and worked with OCR to meet the obligations of the Resolution Agreement. *See U.S. ex rel. Costner v. U.S.*, 317 F.3d 883, 888 (8th Cir. 2003) (stating that a "contractor that is open with the government regarding problems and limitations and engages in a cooperative effort with the government to find a solution lacks the intent required by the Act"). Additionally, testimony indicated that OCR admitted that Kaplan was not actually in violation of the Rehabilitation Act.

Finally, Gillespie argues that there is ample evidence that Kaplan acted with deliberate indifference or reckless disregard. Gillespie asserts that Kaplan certified compliance with Section 504 without even looking at the statute and the regulations and failed to take reasonable steps to ensure compliance. However, Gillespie supports these conclusions with statements taken out of context. While Ross may not have read Section 504 when she drafted the revised policies and procedures, she testified that she had previously read Section 504 and was familiar with it and the implementing regulations. Testimony also indicated that Kaplan had outside counsel review its policies, procedures and training materials. Consequently, not only did Kaplan employees read the statute, Kaplan also took steps to ensure compliance by tasking employees with compliance and by consulting with outside counsel. Thus, Gillespie has failed to establish scienter, a necessary element of his claim. Accordingly, it is

ORDERED that:

1. Defendants Kaplan, Inc., Kaplan University, and Kaplan Higher Education's Motion for Summary Judgment [DE-363] is GRANTED.

2. Relator Jude Gillespie's Motion for Partial Summary Judgment [DE-365] is DENIED as moot.

3. The Court will enter a separate judgment.

4. All pending motions not otherwise ruled upon are DENIED as moot.

5. This case is CLOSED.

DONE and ORDERED in Miami, Florida, this 16th day of July, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: All counsel of record