# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 09-20756-CIV-SEITZ

UNITED STATES OF AMERICA,
*ex rel.* CARLOS URQUILLA-DIAZ,

      Relator,

v.

KAPLAN UNIVERSITY, *et al.*,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING REQUEST FOR ORAL ARGUMENT

THIS MATTER is before the Court on Defendants Kaplan, Inc., Kaplan University, and

Kaplan Higher Education's Motion for Summary Judgment (DE-578), Relator's Amended

Opposition to Motion for Summary Judgment & Request for Oral Argument (DE-641 & 642),

and Defendants' Corrected Amended Reply (DE-647). This *qui tam* action alleges that

Defendants violated the federal False Claims Act (FCA) because they falsely certified that they

were in compliance with the United States Department of Education's (DOE) incentive

compensation ban and thus eligible to receive federal student aid funds. Specifically, the Second

Amended Complaint (DE-170) alleges that facially Defendants' compensation plan for

Admission Advisors facially complied with the applicable statute and regulations but, as applied,

the plan did not.[1]  Defendants (jointly referred to as "Kaplan") move for summary judgment

_____

[1] It appears that Relator's papers may also now be arguing that on its face the
compensation plan at issue did not comply with the applicable law and regulations. However,
that is not what is pled in the Second Amended Complaint. In that Complaint, Relator alleges
that "Although the official compensation plan looked like there were other factors besides the
number of enrollments, it was nothing more than a disguised plan to pay unlawful compensation
to recruiters." (DE-170 at ¶91.) Thus, the only basis for Relator's false claims counts is that the
compensation plan as applied violated the applicable law and regulations. *See Urquilla-Diaz v.*

arguing that Relator cannot establish three of the four elements of a claim under the False Claims Act and that Relator is not an "original source" of his allegations thus barring his claims under the prior disclosure bar of the FCA. Because Relator is not an original source his claims are barred by the public disclosure bar of the FCA. Even if this jurisdictional bar did not exist, Relator has not provided admissible evidence to create a genuine issue of material fact as to the scienter element of his claims. Consequently, Kaplan's motion is granted and the Relator's request for oral argument is denied as moot.

## I. Material Facts[2]

### A. *Requirements for Receiving Title IV Funds*

#### i. *The Incentive Compensation Ban*

In 1992, Congress passed a series of amendments to the Higher Education Act (HEA), including the so-called incentive compensation ban. The purpose of the incentive compensation ban was to prevent admissions employees from being paid on a per student-enrolled basis. In 2002, the DOE passed regulations explaining what was and was not allowed under the incentive compensation ban. Under Title IV of the HEA, an institution eligible to receive federal funds

---

*Kaplan University*, 780 F.3d 1039, 1053-54 (11th Cir. 2015) (noting that the compensation plan's implementation, not its terms, was the issue in Diaz's Second Amended Complaint).

[2]Relator's filing of his exhibits was disorderly, at best. At times finding a referenced exhibit in the docket was like trying to find a needle in a haystack and, at times, as noted below, proved impossible, as the purported exhibits are not in the record. While Defendants exhibits were far more orderly, Defendants' Statement of Undisputed Material Facts contains several partial citations to the record, which also made finding referenced exhibits difficult.

This statement of Material Facts reflects the undisputed facts supported by record evidence viewed in the light most favorable to Relator. The Court notes this because Relator's Amended Statement of Material Facts misrepresents portions of the record evidence by taking statements out of context and making unsupported inferences.

may not:

> provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . to any persons or entities engaged in any student recruiting or admission activities . . .

20 U.S.C. § 1094(a)(20). This section is the so-called "incentive compensation ban." As noted, the incentive compensation ban is further explained in the 2002 regulation, which created a safe harbor:

> (ii) Activities and arrangements that an institution may carry out without violating the [incentive compensation ban] . . .

> (A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid.

34 C.F.R. § 68.14(b)(22)(ii)(A) (2002)[3] (emphasis added). The DOE has explained that "the word 'solely' is being used in its dictionary definition." 67 Fed. Reg. at 67,055.

Relator's Second Amended Complaint alleges that Kaplan violated the incentive compensation ban by paying student Admission Advisors based solely on the number of students that the Advisors enrolled. The Second Amended Complaint also alleges that Kaplan, despite the explicit language of the compensation plans, adjusted Admission Advisors' compensation based solely on the number of enrollments obtained by the Advisors.

*ii. The Program Participation Agreements*

Defendants Kaplan University (KU) and Kaplan Higher Education Corp. (KHEC)[4] are

---

[3]This section was amended in 2010. Relator's allegations pre-date the 2010 amendments so the current section of the regulation does not apply.

[4]KU operates numerous for-profit, online educational enterprises throughout the United States. KU is a wholly owned subsidiary of KHEC. KHEC is a division of Defendant Kaplan, Inc. (Kaplan, Inc.).

accredited by the Higher Learning Commission and are recipients of federal student financial aid funds from the DOE, pursuant to Title IV of the HEA. In order to obtain federal student financial aid through Title IV of the HEA, an educational institution must certify to the United States (Government) that it will comply with statutory and regulatory prerequisites established by the HEA and the DOE, including the incentive compensation ban. Certification is done through the execution of a Program Participation Agreement (PPA).

In May 2004, KU, then called Kaplan College, entered into a PPA with the DOE. (DE-580-4, Ex. 17.) Gary Kerber, as President and CEO of KHEC, signed the May 2004 PPA on behalf of Kaplan College. (*Id.*) When Kerber executed the PPA, he relied on others, including Elaine Neely, Ronald Blumenthal, and Gregory Marino, in developing his belief that Kaplan was in compliance with the incentive compensation rules and regulations. (*Id.* at ¶9.) He also relied on both inside and outside counsel. (*Id.* at ¶10.) While Kerber did not independently verify the accuracy of the representations in the PPA, he relied on people whom he believed to be excellent in their areas of expertise and reflected his sense of integrity. (DE-376-14 at 11:23-12:18.) Additionally, during Kerber's tenure, none of the annual Title IV audits identified any potential violations of the incentive compensation ban. (DE-580-4 at ¶12.) Nor did the DOE raise any issues regarding the incentive compensation ban. (*Id.* at ¶13.) Thus, Kerber believed that at all times during his tenure Kaplan was in compliance with the incentive compensation ban. (*Id.* at ¶14.)

KU entered into another PPA with the DOE in November 2007. (DE-580-5, Ex. 19.) Jeffrey Conlon, as President, executed the November 2007 PPA on behalf of KU. (*Id.*) Both the 2004 and 2007 PPAs contained language that stated that KU agreed to comply with Title IV of

the HEA and all applicable regulatory provisions prescribed by Title IV. Conlon believed that

Kaplan was in compliance with the incentive compensation ban based on his communications

with employees responsible for operations and compliance and with Kaplan's General Counsel's

office. (*Id.* at ¶5.) Conlon also participated in quarterly compliance meetings and regular

executive team meetings and nothing at these meetings made him think that Kaplan was not in

compliance with the incentive compensation ban. (*Id.* at ¶6.) Further, nothing in the annual

independent Title IV compliance audits made him aware that there might be potential violations

of the incentive compensation ban. (*Id.* at ¶7.)

### B. Defendants' Compensation Plan[5]

#### i. The Gem Plan

In late 2005, Kaplan adopted a compensation plan for Admission Advisors, known as the

Gem Plan. (DE-580-1 at ¶10.) Under the Gem Plan, Advisors were evaluated with both a

qualitative and a quantitative score. (*Id.* at ¶13.) The qualitative score included

compliance/quality assurance, presentation mastery, and professionalism. (*Id.* at ¶14 & Exs. 8-

11.) The quantitative score included "start points," which awarded points based on the program

of study or characteristics of the student and the degree or certificate sought by a newly enrolled

student. (*Id.* at ¶17 & Exs. 8-11.) The quantitative score also included points for personally

_____

[5]From 2004 to 2005, a time period covered by the Second Amended Complaint, Kaplan
used a tenure-based compensation plan (the 2004 Plan) for its Admission Advisors. (DE-580-1 at
¶8.) The 2004 Plan is not at issue based on the parties' summary judgment papers and
documents. While Relator mentions the plan, he makes no arguments regarding the 2004 Plan's
compliance or non-compliance with the incentive compensation ban. Thus, the Court concludes
that Relator is not challenging the lawfulness of the 2004 Plan as written or as applied.
Consequently, while the terms of the 2004 Plan are part of the record, the Court will not set them
out because they are irrelevant to the parties' arguments.

developed leads, students who submitted large deposits, and students who were paying in cash, as well as points for perfect attendance, attending training sessions, serving as a mentor, participating in new initiatives, and working the late shift. (*Id.* at ¶18, Exs. 8-11.)

While qualitative and quantitative scores in the Gem Plan appear to have had some overlapping considerations, such as attendance and training, what was measured was different. (DE-592-1 at 174:1-10; 175:16-180:12.) For example, an advisor could receive points for attendance in his qualitative score but, if he had perfect attendance, he would also get quantitative points. (*Id.* at 175:16-177:4.) Similarly, an advisor received qualitative points for attending mandatory training but quantitative points for attending or assisting with non-mandatory training. (*Id.* at 177:15-178:4.) According to Kaplan, it was important in designing the plan that the quantitative score not be based on start points only. (*Id.* at 175:12-15;180:17-21; 182:15-19.)

The scores were converted to gem tiers. (DE-580-2 at ¶19.) To obtain a particular gem salary level an Advisor had to achieve that gem tier in both his qualitative and quantitative score. (*Id.* at ¶19.) In other words, the Advisor received the salary associated with the lower of his two scores. Under the Gem Plan, Admissions Advisors were paid a salary that could not be adjusted more than twice during any 12-month period for merit. (DE-580-2 at ¶5.)

*ii. Development and Implementation of the Gem Plan*

Based on the record evidence, four Kaplan employees were actively involved in the development and implementation of the compensation plans: Ronald Blumenthal, Mike Jones, Elaine Neely, and Gregory Marino. Ronald Blumenthal was Senior Vice President for KHEC from 2004 through 2011. (DE-580-1 at ¶2.) Mike Jones was hired in 2004 as Executive Director

of Admissions for KU, promoted to Assistant Vice President of Admissions for KU in 2007, promoted to Vice President of Admissions for KU in 2009, and became Senior Vice President of Operations of KHEC in 2014. (DE-580-2 at ¶2.) Elaine Neely was Vice President of Financial Aid for KHEC from 1998 until 2005, became Senior Vice President for Regulatory Affairs for KHEC in 2005, then Senior Vice President of Ethics, and in 2011 became Vice President of Regulatory Affairs for Kaplan, Inc. (DE-580-6 at ¶3.) She left Defendants in 2012. (*Id.* at ¶4.) Gregory Marino has worked for Kaplan in various executive positions since 1993, including Senior Vice President of Operations for KU, Chief Operating Officer of KU, and President of Kaplan University Group. (DE-580-7 at ¶2.) He is currently Chief Executive Officer of Kaplan Higher and Professional Education. (*Id.*) Blumenthal, Jones, Neely, and Marino were all familiar with the HEA's incentive compensation provision and the safe harbor regulations (DE-580-1 at ¶5; DE-580-2 at ¶3; DE-580-6 at ¶6; DE-580-7 at ¶5) and all believed that Kaplan was in compliance with the incentive compensation ban at all times during their employment (DE-580-1 at ¶15; DE-580-2 at ¶5; DE-580-6 at ¶11; DE-580-7 at ¶18).

Jones actually drafted the Gem Plan. (DE-580-2 at ¶10.) His priority in developing and implementing the compensation plan was legal compliance. (*Id.* at ¶4.) Before the Gem Plan was adopted, Jones received input and approval from the Compliance Department, Human Resources, and his superiors, including Greg Marino. (*Id.* at ¶11.) Elaine Neely also reviewed the Gem Plan to ensure compliance with the law. (DE-580-6 at ¶8.) Prior to adoption, the Plan was also reviewed by inside and outside counsel. (DE-580-2 at ¶11; DE-580-6 at ¶8.)

Neely participated in quarterly compliance meetings with Kaplan executives and in-house counsel, at which legal and regulatory compliance was discussed, including the incentive

7

compensation rules. (DE-580-6 at ¶9.) Based on these meetings and other information, Neely knew that there were checks and balances in place to insure proper implementation of the compensation plans. (*Id.*) Specifically, Kaplan used several means to try to ensure that the Gem Plan was implemented according to its terms: some calls were monitored by a party outside admissions (originally Compliance Department employees and later a third-party vendor), Kaplan held training sessions for the members of the Compliance Department who monitored the calls, and Kaplan conducted internal reviews of Admissions Advisors' compensation to insure proper implementation. (DE-580-1 at ¶¶12-14; DE-580-2.) Additionally, different departments scored the different parts of the assessment. (DE-580-2 at ¶21.) The quantitative score was compiled by Kaplan's Business Intelligence group at the end of each review period, while the qualitative score was done by Admissions supervisors, the Compliance Department, and a third-party vendor. (*Id.*) Further, Kaplan used third-party/non-Admissions Department contributors to employee evaluations and reviews, Kaplan held calibration sessions to ensure consistent scoring of employees by managers, Kaplan had compliance hotlines for individuals to express any concerns, and Kaplan set up internal review and auditing procedures. (DE-580-6 at ¶9.)

### iii.  *Compliance and the DOE*

In June 2007, Ronald Blumenthal received an email from Tom Beckerle of the DOE asking Blumenthal to "review your November, 2003, response and update any changes regarding your policies and procedures relative to your current, if any, incentive compensation for your admissions representatives[.]" (DE-624-14 at p.1.) Blumenthal responded about a month later by email. (*Id.* at p.2.) In the response, Blumenthal gave a very basic description of Kaplan's compensation of Admission Advisors, explaining that non-commissioned Admission Advisors

were paid on salary alone with the exception of graduation and academic-year-completion bonuses. (*Id.*) He further explained in the response, that salary "is based on a variety of factors and cannot be adjusted more often than twice a year." (*Id.*) Blumenthal testified that based on the DOE's reference to the November 2003 inquiry and response, Blumenthal assumed that the DOE wanted the 2007 response to mirror the nature of the 2003 response, which did not include compensation plan details. (DE-630-1 at 81:14-82:11; DE-624-14 at p.3.) After receiving Blumenthal's response to the 2007 email, the DOE did not ask for any additional information. (DE-630-1 at 84:3-17.)

In September 2009, KU underwent a Program Review by the DOE. (DE-580-7 at ¶17 & Ex. 27.) The subsequent May 22, 2012 Program Review Report did not raise any issues with the Admission Advisors' compensation or the incentive compensation ban. (*Id.* at ¶17 & Ex. 27.) Further, from 2004 through 2009, none of the independent Title IV audits raised any concerns about compliance with the incentive compensation ban. (DE-580-6 at ¶10.)

### iv. *Allegations Regarding the Incentive Compensation Ban in Relator's Complaints*

Relator filed his original complaint on April 18, 2007. (DE-3.) In that complaint he alleged that "Kaplan intentionally violates the incentive compensation ban, by providing trips and club rewards to the highest producing enrollment counselors." (*Id.* at ¶32(b); *see also id.* at ¶40.) The original complaint contains no allegations alleging that Admission Advisors' salaries were based solely on the number of enrollments. Relator filed an Amended Complaint on May 16, 2007. (DE-4.) The Amended Complaint contains the same allegations about violation of the incentive compensation ban. (DE-4 at ¶¶32(b) & 40(a).) Like the original complaint, the

Amended Complaint also does not contain any allegations alleging that Admission Advisors' salaries were based solely on the number of enrollments.

On June 24, 2009, Relator filed his Second Amended Complaint. (DE-170.) For the first time, Relator alleges in the Second Amended Complaint that "[a]lthough the official compensation plan looked like there were other factors besides the number of enrollments, it was nothing more than a disguised plan to pay unlawful compensation to the [Admission Advisors]." (*Id.* at ¶91.)

### C. Public Disclosure

#### i. Media Coverage of Kaplan's Compensation of Admission Advisors[6]

On November 7, 2003, *The Wall Street Journal* published an article entitled *Kaplan Transforms Into Big Operator of Trade Schools*. (DE-580-10 at pp.174-78.) *The Wall Street Journal* article makes the following statements about Kaplan: (1) Admission Advisors' "jobs and raises hinge on meeting quarterly sales goals;" (2) "One-third of [Admission Advisors'] annual pay increase depends on how many prospective students they enroll;" and (3) "If [Admission Advisors] miss goals for more than two quarters, they can lose their jobs." (*Id.*)

Five and a half years later, in March 2009, *Consumers Digest* published an article entitled *Degrees of Difficulty: The Truth About Online Universities*. (DE-580-10 at pp.180-189.) This article made the following statements about Kaplan: (1) "We interviewed former recruiters at . . .

---

[6]Relator objects to the consideration of both the articles mentioned in this section as hearsay. However, neither article is being used to establish the truth of the matters asserted in the articles. Instead, they are being used to establish that the media reported on certain information and when that information was made public by the media reporting. Whether the information in the articles is truthful is irrelevant. Consequently, the articles are not hearsay and may be considered.

Kaplan . . . who say their pay and job status were based on the number of students that they enrolled" and (2) "Two former Kaplan admissions officers whom we interviewed . . . say Kaplan management was careful to say their salaries were being evaluated on qualitative factors, such as professionalism and the quality of phone interviews. But, in reality, they say, pay raises were based on how many students a recruiter could enroll. In short, they say, the more students that a recruiter enrolled, the more pay a recruiter got – regardless of professionalism or telephone skills." (*Id.*)

### ii. Relator's Deposition Testimony[7]

Relator was hired by Kaplan in April 2005 as Director of the School Within a School and stayed in that position until August 2005. (DE-592-9 at 14:5-12; 54:14-17.) From August 2005 until March 2006, Relator was a professor in the School Within a School. (*Id.* at 58:5-14.) In March 2006, Relator became a curriculum developer. (*Id.* at 77:8-13.) Relator was fired in August of 2006. (*Id.* at 14-17.) Relator never worked in the Admissions Department, was never

---

[7]Relator has also submitted a Declaration executed in November 2016 (DE-592-13) and another executed in 2017 (DE-624-15). Both were executed after his 2016 depositions. The Court will not consider the Declarations because "[a]n affidavit may . . . be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (internal quotations omitted and brackets in original). Relator's later Declarations clearly and unequivocally contradict his earlier deposition testimony. As set forth below, Relator repeatedly testified that he never heard anyone say that Admission Advisors were compensated solely or only on the basis of enrollments. In contrast, his Declarations repeatedly state that Greg Marino repeatedly stated that no other factor other than enrollments was considered in Admission Advisor compensation. (DE-592-13 at ¶4.C.; DE-624-15 at ¶¶2.A, 4.C.) Further, despite repeatedly testifying that he was never involved in the compensation process in any way, the Declarations state that Relator has personal knowledge about the application of the compensation plans. (DE-592-13 at ¶5.B.; DE-624-15 at ¶5.B.) Thus, the Declarations amount to sham affidavits and will not be considered.

responsible for enrolling students, and never reviewed the performance of Admission Advisors. (*Id.* at 17:2-4; 19:3-11; 59:21-60:11; 77:23-78:13; 78:25-79:7.) Relator has no personal knowledge about how Kaplan compensated any of its employees in 2007. (*Id.* at 195:8-13.)

Relator learned about how Admissions Advisors were compensated from meetings he attended, and talking to admissions officers, admissions employees, and individual school presidents. (*Id.* at 20:20-22:23.) Relator does not remember anyone at the meetings saying that Admission Advisors were compensated solely on the basis of enrollment numbers. (*Id.* at 27:23-29:19.) In speaking with employees at the various Kaplan schools, Relator was told that Admission Advisors who bring in more students make more money but no one ever told Relator that Admission Advisors' salaries were based solely on student enrollments, except for one professor. (*Id.* at 46:4-10; 44:3-13; 54:20-25: 73:3-11.) Relator would sometimes see documents with Admission Advisors' names, salaries, and the number of enrollments they had. (*Id.* at 51:3-6.)

Relator does not know whether factors other than the number of enrollments were considered in determining salaries. (*Id.* at 57:25-58:4.) Nor does Relator know how any individual Admission Advisor's salary was adjusted. (*Id.* at 87:1-4.) Relator never read Kaplan's official compensation plans and, when asked, was not familiar with the Gem Plan. (*Id.* at 201:17-20; 212:19-213:5.) Relator never reviewed Admission Advisors' compensation files to determine whether they were compensated in accordance with Kaplan's compensation plans, never conducted any audits to determine whether compensation of employees was done in accordance with the plan, and never reviewed any individual performance reviews or compensation adjustments to determine whether they were done in accordance with Kaplan's

compensation plan. (*Id.* at 223:10-24.)

On September 28, 2006, Relator sent a letter to the DOE alleging that Kaplan was committing fraud. (DE-624-1.) The letter asserts that Kaplan "officials committed fraud by falsifying documents to get approval for certain college degree programs." (*Id.*) The letter also states that Ben Wilcox "has all the evidence you will need." (*Id.*) Relator testified that in follow-up conversations with the DOE, he told the DOE that Admission Advisors make more than professors and that they get paid by the number of students they bring in. (DE-592-9 at 178:4-179:9.) After the conversations, Relator sent a follow-up email to the DOE, in which he stated that "Ben Wilcox will . . . bring you all the evidence you need to prosecute this case." (DE-624-4.)

## II. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477

U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III. Discussion

Kaplan seeks summary judgment because Relator's claims are barred by the public disclosure bar of the FCA, as Relator is not an "original source," and because Relator cannot establish all of the elements of his claims. Because there was a public disclosure of the factual basis of Relator's claim prior to Relator making the claims and he is not an original source, Relator's claims are barred. However, even if the claims were not barred by the public disclosure bar, summary judgment would be appropriate because Relator cannot establish all of the necessary elements of his claims.

### A. Relator's Claims Are Barred by the Public Disclosure Bar

In 2007, when Relator first filed this suit, the public disclosure bar created a jurisdictional bar to suit. It stated:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the

information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)-(B) (2006).[8] Kaplan argues that Relator's claims are based on publically disclosed information and that Relator is not an original source, as defined in the FCA. The Eleventh Circuit applies a three part test to determine if a court has jurisdiction when a public disclosure is asserted: "(1) have the allegations made by the plaintiff been publically disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994).

---

[8] In 2010 the language of subsection 3730(e)(4)(A) was amended and the term "jurisdiction" was removed. The current subsection reads:

(4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed–

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). Thus, this subsection is now considered non-jurisdictional and the public disclosure bar may now be raised as a basis for a 12(b)(6) motion to dismiss or as an affirmative defense. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810-11 (11th Cir. 2015). The Eleventh Circuit has held that the amendment is not retroactive. *United States ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 841 F.3d 927, 932 n.1 (11th Cir. 2016).

In the instant matter, the basis of Relator's claims was publically disclosed prior to the filing of Relator's Second Amended Complaint. While *The Wall Street Journal* article only stated that one-third of Admission Advisors' pay was based on enrollment, the *Consumers Digest* article made statements virtually identical to Relator's current allegations – that Admission Advisor pay was based solely on enrollments and that the qualitative factors, such as professionalism and the quality of phone interviews, were ignored, despite representations to the contrary. These statements are the same as Relator's allegations in the 2009 Second Amended Complaint, which allege: "Although the official compensation plan looked like there were other factors besides the number of enrollments, it was nothing more than a disguised plan to pay unlawful compensation to recruiters."

Relator argues that he did not actually base his claims on the information in the *Consumers Digest* article and that the specific Admission Advisors named in the Second Amended Complaint were not named in the article. However, the majority of courts that have considered the issue have concluded that "a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (citing Second, Third, Fifth, Sixth, Eighth, Ninth, Tenth, and D.C. Circuits as in accord); *see also Cooper*, 19 F.3d at 567-568 (stating that "the general definition of 'based on' is 'supported by'" and finding that, although relator did substantial independent research on his own, there had been a public disclosure). Thus, regardless of the specific examples alleged in the Second Amended

Complaint, the allegations in the Second Amended Complaint and the information in the *Consumers Digest* article are substantially similar because they allege the same fraud – that Admission Advisor pay was based solely on enrollments and that the qualitative factors, such as professionalism and the quality of phone interviews, were ignored, despite Kaplan's representations to the contrary.

Relator also maintains that his claim pre-dates the *Consumers Digest* article. However, his claim that Admission Advisors' pay was based solely on enrollments and that the qualitative factors in the Gem Plan were shams do not pre-date the *Consumers Digest* article. These allegations were not raised until Relator filed his Second Amended Complaint on June 24, 2009. The *Consumers Digest* article was published in March 2009. Thus, the basis of Relator's current claims was publically disclosed prior to Relator filing the Second Amended Complaint. *See Rockwell International Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (in *qui tam* action courts must look at complaint that first raises claim to determine jurisdiction under public disclosure bar). Consequently, the Relator can only avoid the public disclosure bar if he is an "original source."

### ii. Relator Is Not an Original Source

As set out above, an original source must have "direct and independent knowledge of the information on which the allegations are based." The Eleventh Circuit has stated:

> The phrase "direct and independent" is most naturally read as creating an extreme limit on secondhand knowledge that is sufficient to qualify as an "original source." Being told what another department is doing is almost necessarily not direct knowledge of that department's behavior.

*United States ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 841 F.3d 927, 936 (11th

Cir. 2016). In *Saldivar*, the Eleventh Circuit held that the relator was not an original source because he learned of the alleged fraud from others, had no direct knowledge of how the allegedly fraudulent billing occurred, and he did not work in the billing department. *Id.* For the same reasons, Relator is not an original source in the instant matter. While Realtor contends that he is an original source, there is no evidence that he was directly involved in the development of the Gem Plan, or any other compensation plan; that he was involved in Admission Advisor reviews; that he was involved in determining Admission Advisors' salaries; or that he ever worked in an admissions department while at Kaplan. In fact, Relator has testified that his knowledge came from what he heard other people say and looking over the shoulder of others to see the documents that others brought to meetings. (DE-592-10 at 278:16-279:11; 326:15-328:15.) Notably, in his contact with the DOE, Relator repeatedly stated that Ben Wilcox had the evidence of Kaplan's fraudulent activities; Relator never stated that he had any evidence of the fraud. Thus, Relator is not an original source.

## B. *Relator Cannot Establish the Elements of His Claims*

Even if Relator's claims were not barred by the public disclosure bar of the FCA, his claims would fail because he cannot establish all of the elements of his claims. In order to prevail on his false certification claims, Relator must establish four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1052 (11th Cir. 2015) (quoting *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)). Under a false certification claim, an educational institution can be found liable under the FCA, by falsely certifying to the DOE in

the institution's PPA that it will comply with federal law and regulations. *Urquilla-Diaz*, 780

F.3d at 1045. In other words, the false statement is the certification of compliance in the PPA.[9]

In this case, the relevant false statement is Kaplan's certification of compliance with the

incentive compensation ban.

Kaplan argues that it is entitled to summary judgment because Relator cannot establish

three of these four elements, namely that: (1) Kaplan actually made a false claim or statement; (2)

Kaplan acted with the requisite scienter; and (3) any false statement was material to the

Government's decision to release Title IV funds to Kaplan students. The record evidence

underscores the fact that Relator cannot establish that Kaplan acted with scienter. Therefore,

Relator cannot establish a necessary element of his false certification claim.[10]

### i. Legal Standard for Scienter

The False Claims Act does not require proof of a specific intent to defraud; instead, it

defines the terms "knowing" and "knowingly" to mean that a person:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

---

[9]While the Second Amended Complaint, paragraph 113, alleges that Kaplan also "certified on an annual basis that it met all the requirements for participation under the Higher Education Act and regulations," neither side has indicated that these alleged annual certifications are part of the voluminous record. Nor has either side raised these certifications in their summary judgment papers. Thus, the only certifications at issue are the PPA.

[10]Because Relator cannot establish scienter, the Court need not address whether the other elements of a false certification claim have been met.

31 U.S.C. § 3729(b) (2006).[11]  Relator argues that Kaplan acted with actual knowledge, as well as with deliberate ignorance or in reckless disregard of the truth.  Kaplan asserts that there is no evidence that it acted with scienter and that the evidence indicates that Kaplan attempted to comply, and did in fact comply, with the incentive compensation ban.

The "knowing" element of the False Claims Act was not meant to punish honest mistakes or incorrect claims submitted through mere negligence; it was meant to reach "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."  *Urquilla-Diaz*, 780 F.3d at 1058[12] (quoting S. Rep. 99-345, at 21, *reprinted in* U.S.C.C.A.N. 5266, 5286).  Reckless disregard has also been described as "an extreme version of ordinary negligence."  *U.S. v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997).  Thus, while a defendant need not have an actual intent to defraud, he must have acted with more than mere negligence in submitting the claim.

### ii.  The Record Evidence Does Not Establish Scienter

#### a.  The Evidence Regarding Scienter at the Signing of the PPAs

Relator has not shown that Kaplan signed either the 2004 or 2007 PPA knowing that it was not in compliance with the incentive compensation ban.  There is no evidence that either Kerber or Conlon knew or should have known that Kaplan was not in compliance with the

---

[11]The False Claims Act was amended in 2009.  While the definition of "knowing" did not change, the numbering of the section changed slightly.  It is now 32 U.S.C. § 3729(b)(1).

[12]Relator argues that the discussion of scienter in *Urquilla-Diaz* is inapplicable because the discussion was in reference to another relator's claims, unrelated to the incentive compensation ban.  However, nothing in the Eleventh Circuit's opinion indicates that the definition of scienter and proof of scienter would differ based on the portion of the PPA at issue or the federal statute allegedly violated.

incentive compensation ban at the time they signed the PPAs.[13]  Both testified that they believed

that Kaplan was in compliance with the incentive compensation ban and, while neither conducted

an independent investigation, both relied on their subordinates to keep them informed about

compliance.

Kerber stated that, in addition to relying on people whom he believed to be excellent in

their areas of expertise and reflected his sense of integrity, he also relied on the opinions of both

inside and outside counsel to ensure compliance.  Moreover, during Kerber's tenure, none of the

annual Title IV audits identified any potential violations of the incentive compensation ban.  Nor

did the DOE raise any issues regarding the incentive compensation ban.

Similarly, Conlon stated that he relied on inside counsel, as well as his subordinates to

ensure that Kaplan was in compliance with the incentive compensation ban.  Nothing in the

quarterly compliance meetings and regular executive team meetings that Conlon attended led him

to think that Kaplan was not in compliance with the incentive compensation ban.  Additionally,

nothing in the annual independent Title IV compliance audits made him aware that there might

be potential violations of the incentive compensation ban.  Consequently, there is no record

evidence that either Kerber or Conlon knew or should have known that Kaplan was not in

---

[13]Relator argues that the Court must look at more than just the knowledge of Kerber and
Conlon, the actual signers of the PPA.  Relator maintains that the corporate knowledge doctrine
extends the examination of scienter to all corporate management.  However, Relator offers no
legal authority applying this doctrine to *qui tam* cases.  The only case Relator cites in support of
applying the corporate knowledge doctrine to this matter is a securities fraud case, that explicitly
limits application of the doctrine to securities fraud cases.  *See In re Worldcom, Inc. Securities
Litigation*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (stating " plaintiffs *in securities fraud
cases* need not prove that any one individual employee of a corporate defendant also acted with
scienter") (emphasis added).  Furthermore, even if the Court were to consider the collective
knowledge of Kaplan's management, Relator has presented no admissible record evidence
indicating that any of the management acted with scienter.

compliance with the incentive compensation ban when they signed the PPAs, or at any other time.

### b. The Evidence Relied Upon By Relator Does Not Establish Scienter

Relator relies on numerous pieces of record evidence to argue that there is a genuine issue of material fact regarding scienter. Specifically, Relator points to testimony from Mike Jones, emails between Kaplan management personnel, the collective knowledge of Kaplan's Directors of Admission, Admission Advisor surveys, and Blumenthal's response to the 2007 DOE inquiry as evidence of scienter. However, some of this evidence is inadmissible and the remainder does not support Relator's position. Thus, there is no admissible record evidence to create a genuine issue of material fact as to scienter.

Relator points to Mike Jones' testimony about the design of the Gem Plan to establish that Kaplan's executives knew prior to the execution of the 2007 PPA that the Gem Plan violated the incentive compensation ban. However, Jones' testimony indicates that the Gem Plan specifically included additional points in the quantitative section, such as attendance and training, so that the quantitative section of the Gem Plan would not be based solely on enrollments. (DE-592-1 at 174: 1-175:15;180:17-21; 182:15-19.) Relator appears to maintain that because these additional points were duplicative of points earned in the qualitative section of the Gem Plan, that the points were just a sham.

However, the uncontested evidence does not support Relator's argument. First, based on Jones' testimony, these points, while similar to points that could be earned in the qualitative section, were not for exactly the same conduct. Second, and most importantly, the fact that these points were added in to the quantitative section completely undermines Relator's arguments that

22

the quantitative section was based solely on enrollments. There is no admissible record evidence that these non-start points in the quantitative section were not calculated and used in determining an Admission Advisor's salary. Even if there were such evidence, Relator has not shown that Jones or any other executive knew that the non-start points were not being calculated and used in determining an Advisor's salary.

Based on emails, Advisor surveys, and the Directors of Admissions's knowledge of Kaplan's compensation practices, Relator also argues that Kaplan knew or should have known that as applied the Gem Plan violated the incentive compensation ban.[14] However, the cited evidence fails to support Relator's position. First, Relator has not pointed to a single email that indicates that the sole basis for Admission Advisor compensation was enrollments. While the emails Relator relies on state that an increase in enrollments could increase an Advisor's salary and that the number of starts are important to Kaplan, nothing in the emails indicates that the number of enrollments, or starts, is the *sole* determining factor in setting an Advisor's salary.

---

[14]In his opposition, Relator also states that he has provided examples of Admission Advisors who were compensated based solely on the basis of enrollments. (DE-641 at 10.) Relator cites to these examples: "Ex. ZZZ - Ex. 2, Advisors 'Darlene L' (bate #54270) - 'Dwight Y' (bate #19753)." The Court has searched the record for these documents but has been unable to find them. Neither of those Bates numbers are part of Ex. ZZZZ (filed at DE-621-17) and there is no Ex. ZZZ to which an Exhibit 2 could be attached. Further, in the index provided as part of the courtesy copy sent to chambers, Relator indicates that the ZZZ exhibits are in Bates number order. Neither of the cited Bates numbers appear in the place they should as the ZZZ exhibits have missing Bates numbers. Thus, the Court, after diligent search, has been unable to find these documents among the thousands of pages of exhibits Relator submitted.

Unfortunately, these are not the only referenced exhibits that do not appear to be part of the record. For example, in his Amended Statement of Material Facts at paragraph 49 and in his Amended Opposition at page 18, Relator references Exhibit WWW but no such exhibit was filed in the docket and in the courtesy copy provided to the Court after the tab labeled "WWW" is a page that states "This page is intentionally left blank."

Relator also points to emails showing that an internal audit determined that a large number of Admission Advisors received the wrong salary after their reviews. (DE-631-14.) However, nothing in these emails indicates knowledge of a violation of the incentive compensation ban. Instead, the emails indicate that Kaplan was performing audits and undertook corrective measures when it found that the Gem Plan was not working properly. Other emails Relator relies upon discuss a change in approach to try to have Admission Advisors focus more on the quality of incoming students by incentivizing retention over starts. (DE-624-2.) However, the fact that starts were incentivized in the Gem Plan does not mean that they were the sole basis for compensation. Thus, nothing in the emails indicates that Kaplan knew or should have known that Kaplan was violating the incentive compensation ban.

Second, the Advisor surveys are inadmissible hearsay, *see* Fed. R. Evid. 801 & 802, and Relator has not shown how the survey contents could be reduced to admissible evidence. *See* Fed. R. Civ. P 56(c)(2). Relator argues that the surveys are admissible under the business record exception of Federal Rule of Evidence 803(6). *See* DE-657 at 6. However, the single case Relator relies on in support of admitting the surveys, *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218 (2d Cir. 1999), permitted the use of surveys under the party admission exception to the hearsay rule. Relator does not argue that the anonymous Advisor surveys constitute party admissions; instead, he argues, without any legal or factual support, that the surveys were business records that Kaplan maintained and kept in the ordinary course of business.

However, the surveys do not qualify for the business records exception of the hearsay rule and Relator has not set forth any other way in which the survey results could be reduced to admissible evidence. Under Federal Rule of Evidence 803(6), to qualify under the business

records exception, a record must be made in the normal course of business, based on personal knowledge of the maker or of a person who had a business duty to transmit the information to the maker, and must not be otherwise untrustworthy. Because the surveys are anonymous, there is no way to establish that each comment-maker had personal knowledge of the compensation plans and their application. In fact, there is no way to know whether the comments constituted knowledge, opinion, or just "sour grapes." Thus, the surveys also lack the necessary indicia of trustworthiness to be admissible into evidence. *See Alkhatib v. Steadman*, 2011 WL 5553775, *8 (S.D. Ala. Nov. 15, 2011) (finding anonymous employee surveys inadmissible). Finally, there is no evidence that the surveys were made in the normal course of business, other than Relator's unsupported assertion. Therefore, Relator cannot establish the essential elements to meet the exception. Consequently, the surveys are inadmissible hearsay and the Court cannot consider them.

Third, Relator has not shown how the alleged knowledge of the Directors of Admission establishes scienter – that Kaplan knew or should have known that it was violating, or planned to violate, the incentive compensation ban when it executed the PPAs. Despite Relator's sweeping statement about the common knowledge of the Directors of Admission, Relator has only submitted evidence of the knowledge of a single Director of Admission, Paris Henderson (DE-592-11), and that evidence is in the form of an inadmissible sham Declaration.[15] Relator has also

---

[15] Henderson's deposition testimony directly contradicts his Declaration regarding the sham nature of the Gem Plan, making the Declaration a sham that should be stricken. In his declaration, Henderson states that "I know personally and personally observed that Kaplan increased or decreased the compensation to Admission Advisors/recruiters *based solely* on the number of students the Admission Advisor enrolled." (DE-592-11 at ¶10 (emphasis added.)) However, at his deposition the following exchange took place:

submitted the declaration of one Associate Director of Admissions, Cornell Adams, Jr. (DE-624-13). However, Adams' declaration is inadmissible because Relator failed to disclose Adams as a witness at any time prior to filing the declaration in response to the motion for summary judgment.[16] Thus, Relator has not offered any admissible evidence regarding the knowledge of the Directors of Admissions that could be attributed to Kaplan.[17]

---

Q.  Now I want to be absolutely clear.  Was there any time that the qualitative score did not get considered in a salary determination under the Gem Plan?

A.  I can't give you one specific time.  I -- I can't give you that.  Because I -- I know that we -- you know, the higher enrolling AAs were favored; meaning, you know, it is not going to go from a 1 to a 5, but could easily go from a 3 to a 4 on their qualitative.  So -- but *the qualitative was still considered*.  But the qualitative could be adjusted to make sure it was still in line with the quantitative.

Q.  *The qualitative was always part of the salary adjustment*, wasn't it?

A.  *Always, yes*.

DE-643-2 at 147:10-23 (emphasis added).   Even if the Declaration were not a sham, there is nothing in the Declaration relevant to the issue of scienter.

[16]Relator maintains that he first contacted Adams on February 14, 2017 but "overlooked" disclosing him because of all the paperwork in this case.  *See* DE-657-1 at ¶¶11, 13.  Under Federal Rule of Civil Procedure 37(c)(1): "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Relator has not shown that the failure was substantially justified given that he alleges that he knew about Adams by February 2017 and simply "overlooked" disclosing him.  Further, this late "disclosure" is clearly prejudicial to Kaplan and, thus, not harmless.  Kaplan had no opportunity to depose or otherwise examine Adams prior to filing summary judgment.  Thus, the Court will not consider Adams' declaration because Relator has not offered a substantially justified reason for Adams' omission from Relator's Rule 26 disclosures and because it would unfairly prejudice Kaplan.

[17]Even if the Court did not strike Henderson's Declaration, it does not provide evidence of scienter.  Contrary to Relator's argument, a single declaration does not provide evidence of widespread knowledge among Directors of Admissions, that could be imputed to Kaplan, regarding the allegedly sham nature of the Gem Plan.  Thus, nothing in Henderson's Declaration

Relator also points to Blumenthal's response to the 2007 DOE request for information as evidence that Kaplan knew or should have known that it was in violation of the incentive compensation ban. However, Relator has offered no evidence to show how the DOE's request for information about Kaplan's compensation practices indicates that Kaplan knew or should have known that it was not in compliance with the incentive compensation ban. Relator maintains that Blumenthal's failure to provide the DOE with a complete explanation of the Gem Plan in response to the 2007 DOE email request for information evinces an intent to hide the sham nature of the Gem Plan. However, the email from the DOE did not request a copy of Kaplan's Admission Advisor compensation plan. The email asked for an update on policies and procedures relevant to any incentive compensation for Admissions Advisors. Blumenthal responded to the email with a very basic explanation of the current compensation system. Relator maintains that Blumenthal's failure to either explain the Gem Plan in detail or provide a copy of it indicates an intent to hide the Gem Plan from the DOE. However, at his deposition, Blumenthal explained that based on the DOE's 2007 email's reference to a 2003 inquiry and response, Blumenthal assumed that the DOE wanted the 2007 response to mirror the nature of the 2003 response, which did not include compensation plan details. Further, after receiving Blumenthal's response to the 2007 email, the DOE did not ask for any additional information. Despite Relator's arguments to the contrary, there is no evidence to indicate that Blumenthal's response to the 2007 email inquiry was an attempt to hide the Gem Plan; nor does Blumenthal's response demonstrate that Kaplan knew that the Gem Plan violated the incentive compensation

---

indicates that the signers of the PPA, Kerber and Conlon, or the people they relied upon, had any knowledge of the allegedly sham nature of the Gem Plan.

ban when the PPAs were signed or at any other time.

Finally, Relator relies on *United States of America ex rel. Washington v. Education Management Corporation*, No. 07-cv-461, DE-390 (W.D. Pa. filed May 6, 2014), to support his argument that a jury could find that Kaplan's qualitative factors were a sham and Kaplan acted with scienter. This reliance is misplaced because the *Washington* case was not about scienter. In *Washington*, the district court denied summary judgment, prior to the close of discovery, based on the defendants' statistical analysis of admission advisor compensation because the relator alleged that the data on which the analysis was based may have been fraudulent. Thus, *Washington* did not address scienter at all, let alone what was necessary to establish scienter. Consequently, Relator has not shown that there is evidence creating a material issue of fact relevant to scienter and, further, Relator has not shown that he can establish scienter, a necessary element of his claim.

## IV. Conclusion

Because Relator has not shown that he is an original source of his allegations, the Court lacks jurisdiction to consider Relator's claims. Even if the Relator's claims were not barred by the prior disclosure bar of the FCA, Relator has failed to show that there is a genuine issue of material fact regarding one of the elements of his claim, scienter. Therefore, Defendants' Motion for Summary Judgment is granted. Accordingly, it is

ORDERED that:

1. Defendants Kaplan, Inc., Kaplan University, and Kaplan Higher Education's Motion for Summary Judgment [DE-578] is GRANTED.

2. Relator's Request for Oral Argument [DE-641 & 642] is DENIED.

3. The Court will enter a separate judgment.

4. All pending motions not otherwise ruled upon are DENIED as moot.

5. This case is CLOSED.

DONE and ORDERED in Miami, Florida, this 13th day of July, 2017.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record